2014-1752

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

JACOBI CARBONS AB, JACOBI CARBONS, INC., NINGXIA GUANGHUA
CHERISHMET ACTIVATED CARBON CO., LTD., CHERISHMET INC.,
BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., DATONG
MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD, SHANXI
INDUSTRY TECHNOLOGY TRADING CO., LTD., CARBON ACTIVATED
CORPORATION, CAR GO WORLDWIDE, INC., TANGSHAN SOLD
CARBON CO., LTD.,
                                              *Plaintiffs-Appellants*,

v.

UNITED STATES,
                                              *Defendant-Appellee*,
and

CALGON CARBON CORP. and NORIT AMERICAS, INC.,
                                              *Defendants-Appellees*.

Appeal From The United States Court Of International Trade
Case No. 12-CV-00365, Judge Richard K. Eaton

**OPENING BRIEF OF PLAINTIFFS-APPELLANTS
CARBON ACTIVATED CORPORATION, CAR GO WORLDWIDE INC.
AND TANGSHAN SOLID CARBON CO., LTD.**

Nancy A. Noonan
Arent Fox LLP
1717 K Street, N.W.
Washington, DC  20006
(202) 857-6000

*Counsel for Plaintiffs-Appellants
Carbon Activated Corporation
& Car Go Worldwide Inc.*

November 24, 2014

Gregory S. Menegaz
DeKieffer & Horgan, PLLC
1455 Pennsylvania Avenue, NW
Suite 900-B
Washington, DC 20005
(202) 783-6900

*Counsel for Plaintiff-Appellant
Tangshan Solid Carbon Co., Ltd.*

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## Jacobi Carbons AB, et al. vs. United States
No. 2014-1752

## CERTIFICATE OF INTEREST

Counsel for **Plaintiff-Appellant** Carbon Activated Corporation certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

**Carbon Activated Corporation**

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   **N/A**

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
**Carbon Activated Corporation is a U.S. company. Lionel Perera and his wife, Mrs. Nirmala P. Perera, are the sole owners of Carbon Activated Corp.**

4. ☒  The names of all law firms and the partners or associates that appeared for the party
or amicus now represented by me in the trial court or agency or are expected to appear in this
court are:

November 24, 2014                              /s/ Nancy A. Noonan_____

Date                                                 Nancy A. Noonan

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## Jacobi Carbons AB, et al. vs. United States
No. <u>2014-1752</u>

## CERTIFICATE OF INTEREST

Counsel for **Plaintiff-Appellant** Car Go Worldwide Inc. certifies the following (use "None" if applicable; use extra sheets if necessary):

2.      The full name of every party or amicus represented by me is:

**Car Go Worldwide Inc.**

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:
   **N/A**

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:
**Car Go Worldwide Inc. is a U.S. company. Lionel Perera and his wife, Mrs. Nirmala P. Perera, are the sole owners of Car Go Worldwide. They are both U.S. citizens. Car Go Worldwide does not have any publicly-owned subsidiaries or affiliates.**

4. ☒   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Arent Fox LLP, Nancy A. Noonan

<u>November 24, 2014</u>                          <u>/s/ Nancy A. Noonan_____</u>

            Date                                      Nancy A. Noonan

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

**Jacobi Carbons AB, et al. vs. United States**
No. <u>2014-1752</u>

**CERTIFICATE OF INTEREST**

Counsel for **Plaintiff-Appellant Tangshan Solid Carbon Co., Ltd.** certifies the following (use "None" if applicable; use extra sheets if necessary):

| | |
|---|---|
| 3. | The full name of every party or amicus represented by me is: |

**Tangshan Solid Carbon Co., Ltd.**

| | |
|---|---|
| 2. | The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: |

The party listed under No. 1 above is the real party in interest.

| | |
|---|---|
| 3. | All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: |

    **None**

4. ☒  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Gregory S. Menegaz, J. Kevin Horgan, John J. Kenkel, deKieffer & Horgan, PLLC, 1455 Pennsylvania Avenue NW, Suite 900B, Washington, D.C. 20004

<u>November 24, 2014</u>        <u>/s/ Gregory S. Menegaz</u>

      Date                    Gregory S. Menegaz

# TABLE OF CONTENTS

I.    STATEMENT OF RELATED CASES............................................................1

II.   JURISDICTIONAL STATEMENT ...............................................................1

III.  STATEMENT OF THE ISSUES ..................................................................2

IV.   STATEMENT OF THE CASE .....................................................................4

V.    STATEMENT OF FACTS ............................................................................7

VI.   SUMMARY OF ARGUMENT.....................................................................8

VII.  ARGUMENT...............................................................................................10

      A.   Legal Framework ................................................................................10

      B.   The Surrogate Value Used By Commerce For Carbonized
           Material Was Unsupported By Substantial Evidence And Not
           In Accordance With Law ................................................................11

      C.   The Surrogate Value Used By Commerce For Truck Freight
           Was Unsupported By Substantial Evidence And Not In
           Accordance With Law........................................................................14

VIII. CONCLUSION AND RECOMMENDED APPELLATE REMEDY.........18

# TABLE OF AUTHORITIES

**Page(s)**

C<span>ASES</span>

*Jacobi Carbons AB v. United States*,
  992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014) ....................................................1, 3

*Peer Bearing Co.-Changshan v. United States*,
  752 F. Supp. 2d 1353 (Ct. Int'l Trade 2011) ......................................................13

*Shakeproof Assembly Components v. United States,*
  268 F.3d 1376 (Fed. Cir. 2001) ..........................................................................10

*Shantou Red Garden Foodstuff Co. v. United States,*
  880 F. Supp. 2d 1332 (Ct. Int'l Trade 2012) ........................................................4

*Union Camp Corp. v. United States*,
  53 F. Supp. 2d 1310 (Ct. Int'l Trade 1999) ........................................................13

*Xinjiamei Furniture (Zhangzhou) Co. v. United States*,
  No. 11-00456, 2013 WL 920276 (Ct. Int'l Trade Mar. 11, 2013) .........10, 12, 13

S<span>TATUTES</span>

19 U.S.C. § 1516a .........................................................................................................1

19 U.S.C. § 1677b(c) ...................................................................................4, 8, 18

19 U.S.C. § 1677b(c)(1)..............................................................................................2, 10

19 U.S.C. § 1677b(c)(1)(B) .........................................................................................10

28 U.S.C. § 1295(a)(5).................................................................................................1

28 U.S.C. § 1581(c) .......................................................................................................1

Section 773(c) of the Tariff Act of 1930, 19 U.S.C. § 1677b(c)(1) ...................2, 10

**ADMINISTRATIVE DETERMINATIONS**

*Certain Activated Carbon from the People's Republic of China Final Results of Antidumping Duty Administrative Review; 2010-2011*, 77 Fed. Reg. 67337 (Dep't Commerce Nov. 9, 2012), and accompanying Issues & Decision Memorandum..........................................................3, 7, 8, 14

*Multilayered Wood Flooring From the People's Republic of China; Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 26712 (Dep't Commerce May 9, 2014), and accompanying Issues & Decision Memorandum......................................................................15

## I.   STATEMENT OF RELATED CASES

In response to Federal Circuit Rule 47.5(a), Plaintiffs-Appellants are not aware of any other appeal in or from the same civil action or proceeding in the lower court that was previously before this Court or any other appellate court.

## II.   JURISDICTIONAL STATEMENT

This Court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 1295(a)(5), as an appeal from the U.S. Court of International Trade ("Trade Court" or "lower court").  The Trade Court had jurisdiction under 28 U.S.C. § 1581(c), which gives the Trade Court jurisdiction over any action commenced with respect to final Commerce Department determinations under 19 U.S.C. § 1516a.

This appeal is timely.  Plaintiffs-Appellants Carbon Activated Corporation, Car Go Worldwide Inc. and Tangshan Solid Carbon Co., Ltd.   (collectively, "Plaintiffs-Appellants") filed their notices of appeal on August 22, 2014 and August 26, 2014, respectively, within 60 days of the Trade Court's final judgment issued on June 24, 2014, in *Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014) (attached to this brief and at JA-1).

## III.   STATEMENT OF THE ISSUES

This case presents the following issues:

Whether Commerce adopted a reasonable interpretation of the statutory term "best available information" in Section 773(c) of the Tariff Act of 1930, 19 U.S.C. § 1677b(c)(1), when it chose a surrogate value for carbonized material that did not meet its criteria of specificity.

Whether Commerce's decision to disregard domestic price data as the appropriate surrogate value for carbonized material is supported by substantial evidence on the record where the domestic price data best satisfies Commerce's surrogate value criteria.

Whether Commerce adopted a reasonable interpretation of the statutory term "best available information" when it chose a surrogate value for inland truck freight that was inferior to the source the Department used in the preliminary results based on a number of the Department's established criteria.

## IV.    STATEMENT OF THE CASE

This appeal involves the surrogate values used by the U.S. Department of Commerce ("Commerce") to value carbonized material and freight in the fourth administrative review of the antidumping duty order on activated carbon from the People's Republic of China.  Plaintiffs-Appellants Carbon Activated Corporation and Car Go Worldwide, Inc. are importers of record and must pay the final assessment (liquidation) rates assigned to its exporters who qualified for a separate rate in the final results of the U.S. Department of Commerce ("Commerce") in *Certain Activated Carbon from the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67337 (Dep't Commerce Nov. 9, 2012), JA-432.  Tangshan Solid Carbon Co., Ltd. is an exporter of activated carbon from China and was found by Commerce to qualify for a separate rate.  *See id*. at 67388, JA-433.  Commerce's calculation of the separate rate was a weighted-average margin based on the ranged, publicly available U.S. sales quantities for Jacobi Carbons AB ("Jacobi"), and Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("Cherishmet").

Plaintiffs-Appellants appeal from the final judgment of the Court of International Trade in *Jacobi Carbons AB, et al. v. United States*, 992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014), JA-1.  Copies of the Trade Court's opinion and order are attached to this brief.  Plaintiffs-Appellants wholly endorse and adopt by

3

reference the arguments set forth by Plaintiff-Appellants Jacobi Carbons AB and Jacobi Carbons, Inc. (collectively "Jacobi") and by Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Cherishmet Inc., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd. ("collectively Cherishmet") in their November 24, 2014 Briefs in this proceeding.  Plaintiffs-Appellants are filing this short brief in order to preserve their rights in this appeal, as Plaintiffs-Appellants will be assessed or assigned the new separate rate calculated as a result of any changes to the final antidumping duty margins calculated for Jacobi and Cherishmet.

Commerce is required to "determine the normal value of the subject merchandise . . . the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries . . . ." 19 U.S.C. § 1677b(c).  In determining what constitutes the best available information for valuing a factor of production, this Court has upheld Commerce's longstanding policy to apply surrogate value information that represents a broad market average covering a range of prices. Moreover, judicial review has favored use of broad market average data from outside of primary surrogate country over narrower and less representative data from the primary surrogate country. *See, e.g.,  Shantou Red Garden Foodstuff Co.*

4

*v. United States,* 880 F. Supp. 2d 1332, 1335 (Ct. Int'l Trade 2012).  This Court

applies a *de novo* review to Commerce's interpretation of what is the "best

available information" in choosing amongst different surrogate value information

and its final determination.  Commerce's choices must be reasonable, and its final

determination in an antidumping administrative review must be based on

substantial evidence.

Commerce's interpretation of "best available information" was not

reasonable under the statute because the surrogate value information that it chose

for carbonized material, a very significant factor of production in producing

activated carbon, and for truck freight was not the "best" under the applicable

criteria.  The best available information on the record for carbonized material was

the national domestic price data for coconut-shell charcoal from a publicly

available newsletter in the Philippines called *Cocommunity*.  Instead of using the

*Cocommunity* data, Commerce used Philippine import statistics from Harmonized

Tariff Schedule ("HTS") category 4402("Wood Charcoal (Including Shell or Nut

Charcoal), Whether or Not Agglomerated") which is a "basket category" for wood

charcoal.  Commerce's final determination is based on surrogate value information

for carbonized material that was second-best to the domestic selling data (the

*Cocommunity* data) on the record, and therefore Commerce's final determination is

not supported by substantial evidence.

The Philippine truck freight data is based on a single transaction between two cities and, therefore, fails to provide a broad-based and representative truck freight value.  On the other hand, the Thai truck freight data provides a broad market average since it is based on an average of ten different transactions encompassing transportation of goods between five different city points for two classes of goods.  Moreover, the Thai truck freight data is based on "full truck load," rather than transportation of "loose goods" as reflected by the Philippine data.  Unsurprisingly, Commerce having selected a less specific less representative source, the surrogate value used in the final results was aberrantly high and not in line with economic reality.  Consequently, Commerce's decision to utilize the very limited Philippine truck freight data is not supported by substantial evidence.

Because Commerce's statutory interpretation was unreasonable and its final determination in the fourth antidumping administrative review of certain activated carbon from China was not supported by substantial evidence, this Court should vacate the lower court's judgment and remand to Commerce with instructions to recalculate Jacobi's and Cherishmet's antidumping margins using the *Cocommunity* data, and to use Thai truck data as the surrogate value for truck freight.  Recalculation of the margins of the mandatory respondents would also require recalculation of the separate rates.

## V.    STATEMENT OF FACTS

Plaintiffs-Appellants endorse the statements of facts provided in the briefs of Jacobi and Cherishmet.  The companies from which Carbon Activated Corporation and Car Go Worldwide Inc. imported subject merchandise are separate rate companies which were assigned separate rates and Tangshan Solid Carbon Co., Ltd. is an exporter that was assigned a separate rate in Commerce's November 9, 2012, final results in the administrative review, accompanied by an Issues and Decision Memorandum ("I&D Memo"), JA-371.  *Certain Activated Carbon from the People's Republic of China Final Results of Antidumping Duty Administrative Review; 2010-2011*, 77 Fed. Reg. 67337 (Dep't Commerce Nov. 9, 2012) (collectively, "*Final Results*"), JA-432.  Commerce's calculation of the separate rate was a weighted-average margin based on the ranged, publicly available U.S. sales quantities for Jacobi and Cherishmet.  *See id*. at 67388, JA-433.

In its *Final Results*, Commerce selected the Philippines as the surrogate country and valued the carbonized material input from average import values from the Philippines import data for HTS category 4402, a category comprised primarily of wood charcoal even though Jacobi's suppliers and Cherishmet did not use wood charcoal to produce activated carbon during the relevant period of review. Commerce rejected the more specific coconut shell charcoal price information from *Cocommunity*, a monthly publication of the Asian and Pacific Coconut

7

Community ("APCC") that contains news and statistical data, including

contemporaneous domestic prices in the Philippines of coconut shell charcoal

(hereafter, "*Cocommunity* data"). *See* I&D Memo at 18, JA-388; Jacobi's

Surrogate Value Comments at 4-5 and Exh. SV-04 (Nov. 16, 2011), JA-177 – 78,

184 ("Jacobi Surrogate Value Comments").

For the surrogate value of freight, Commerce used Philippine truck freight

data that was based on a single transaction between two cities, and rejected the

Thai truck freight data used in the preliminary results even though that Thai data

provides a broad market average since it is based on an average of ten different

transactions encompassing transportation of goods between five different city

points for two classes of goods. Moreover, the Thai truck freight data is based on

"full truck load," rather than transportation of "loose goods" as reflected by the

Philippine data. *Compare* Memo from K. Marksberry to the File, re: Surrogate

Values for the Preliminary Results at 9 and Attach. 8 (April 30, 2012) ("Prelim.

Surrogate Value Memo"), JA-310, 315 *with* Memo from E. Chukwudebe to the

File, re Surrogate Values for the Final Results at 6 and Attach. 5a (Nov. 2, 2012)

("Final Surrogate Value Memo"), JA-406, 426.

## VI.    SUMMARY OF ARGUMENT

Commerce's statutory interpretation of "best available information" under

19 U.S.C. § 1677b(c) as to carbonized material and inland truck freight was

unreasonable because the surrogate values chosen by Commerce were not the "best" available on the administrative record. For the carbonized material, the record contained values for the national domestic price data for coconut-shell charcoal from a publicly available newsletter in the Philippines called *Cocommunity*. That information was more specific to the actual input used by Jacobi's suppliers and Cherishmet to produce activated carbon and represented preferred domestic prices in the Philippines than the Philippine import statistics from the non-specific HTS category 4402 that Commerce used as the surrogate value. Further, the value derived from the HTS category 4402 import data was aberrational compared to the surrogate values previously used by Commerce for carbonized material. Similarly, Commerce's use of the Philippine truck freight data instead of the Thai truck freight data to value truck freight did not comply with its statutory mandate to use the best information available, as a matter of law and evidence. The Thai truck freight data was more specific and more representative than the Philippine data. In addition, the Philippine truck freight data is aberrational. Due to these legal and evidentiary errors, we ask that this Court vacate the lower court's judgment and remand to Commerce with instructions to recalculate Jacobi's and Cherishmet's antidumping margins using the *Cocommunity* data and to also recalculate Cherishmet's antidumping margin

using the Thai freight value. If the margins are recalculated, we ask that Commerce be ordered to recalculate the separate rates.

## VII. ARGUMENT

### A. Legal Framework

In nonmarket economy ("NME") cases such as the underlying proceeding, "Commerce's task . . . is to determine, using surrogate costs, what a producer's **costs would be** if the inputs were valued at market prices." *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, No. 11-00456, 2013 WL 920276, *3 (Ct. Int'l Trade Mar. 11, 2013) (emphasis added). Above all, the statute requires Commerce to "establish[ ] antidumping margins as accurately as possible." *Shakeproof Assembly Components v. United States,* 268 F.3d 1376, 1382 (Fed. Cir. 2001). For both surrogate values at issue, carbonized material and truck freight, Commerce was instructed by the statute that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries . . . ." 19 U.S.C. § 1677b(c)(1). As discussed in the briefs of other Plaintiffs-Appellants, hereby adopted by reference, the law imposes a special burden of care on the Department in selecting such values. Congress used the extreme superlative "best" uniquely in the section of the statute dealing with constructed normal value in NME cases like this one. *See id.* § 1677b(c)(1)(B). In other words, the Department does not have discretion to use

10

any merely "usable" record data for a particular surrogate value.  Rather, the

Department must establish, supported by substantial evidence on the record, that its

choice is the "best" information on the record for the valuation of that factor. This

Court reviews Commerce's interpretation and application of this statute *de novo*,

both as to the reasonableness of Commerce's interpretation of the law and of the

substantiality of the evidence underlying Commerce's decision.

> **B.    The Surrogate Value Used By Commerce For Carbonized Material Was Unsupported By Substantial Evidence And Not In Accordance With Law**

For the reasons stated in Jacobi's and Cherishmet's briefs, Commerce's

selection of Philippine import data from HTS category 4402 ("Wood Charcoal

(Including Shell or Nut Charcoal), Whether or Not Agglomerated"), to value the

carbonized material consumed in producing activated carbon rather than Philippine

domestic price data from *Cocommunity* that contained actual prices in the

Philippines of the type of carbonized material (coconut-shell charcoal), that

Commerce had found in all prior administrative reviews to be the best alternative

for calculating the surrogate value for the coal-based charcoal that Jacobi's

suppliers consume to produce activated carbon, was unreasonable.  HTS category

4402, a broad import tariff schedule category for wood charcoal, did not include

any value for coconut shell charcoal, in contrast to the *Cocommunity* data which

was only contained domestic prices in the Philippines for coconut shell charcoal.

11

The *Cocommunity* data was more specific (comparable) to the actual inputs used by Jacobi's suppliers and Cherishmet, and the *Cocommunity* data satisfies Commerce's preference for using the price of domestically produced inputs in the surrogate country.  Commerce's decision to use Philippine import data from HTS category 4402 ("Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated"), and thereby reject the Philippine domestic price data, the *Cocommunity* data, was not supported by substantial evidence, and we respectfully ask the Court to remand to Commerce with instructions to recalculate Jacobi's and Cherishmet's antidumping margins using the *Cocommunity* data, and to recalculate the separate rate margins based on the new margins for Jacobi and Cherishmet.

The value used by Commerce for carbonized material was aberrational when compared to the values used for this input in the past three administrative proceedings and the value of coconut charcoal provided in the *Cocommunity* data. *See* Direct Brief of Plaintiffs-Appellants Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Cherishmet Inc., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd., Section II.B (Nov. 24, 2014) ("Cherishmet's Direct Brief").  Commerce has told the Court of International Trade that it will consider whether "*other market data indicates that the value falls within a reasonable range of market-driven prices.*" *Xinjiamei Furniture*, 2013

12

WL 920276, at *6 (referencing range of market-driven prices in the context of a small import volume that was being used as a surrogate value).  In *Xinjiamei Furniture*, the issue of the surrogate value used for a steel coil input was remanded because the data on the record:

> reflected values ranging from $524.12/MT to $743/MT.  When compared with the $1,943.80/MT value derived from the GTA data {the data used by Commerce in that proceeding for the margin calculation}, the difference in price, between two hundred and nearly four hundred percent, is clearly substantial.  *See, e.g., Peer Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353,1372–4 (Ct. Int'l Trade 2011) (remarking that a sixty percent price differential was substantial).

*Id*.

Cherishmet provided a chart showing the surrogate values for coconut charcoal from prior review periods.  *See* Cherishmet's Direct Brief at Section II.B.  Those values ranged from $32.99 to $435.62.[1]  *Id.*  Yet the surrogate value used for this proceeding is $1,203.80.  *Id.*  The *Cocommunity* average price of $255 is

---

[1]  The Court may take judicial notice of these publicly available surrogate values from the prior segments of the proceeding.  *See e.g., Union Camp Corp. v. United States*, 53 F. Supp. 2d 1310, 1313 (Ct. Int'l Trade 1999) (taking "judicial notice of the fact that in its third administrative review of antidumping duties on sebacic acid from the PRC, Commerce, on the basis of a letter from the editor of the *Chemical Weekly* (India), reversed its previous position and found that the "octanol" quote from this publication did not refer to octanol–1. . . . Having taken judicial notice of this fact, the Court directs Commerce to consider the letter from the editor of the *Chemical Weekly* (India) in choosing an appropriate surrogate value on remand.").

13

consistent with the range of market-driven prices from the prior proceedings.  *See id.*

### C.    The Surrogate Value Used By Commerce For Truck Freight Was Unsupported By Substantial Evidence And Not In Accordance With Law

Likewise, the Department's selection for the surrogate inland freight (factory to Chinese port) was not based upon the "best available information" in light of established Department criteria for the selection of surrogate values.

As a general matter of practice, the Department evaluates four criteria as a way of assessing which surrogate information is "best": (1) specificity; (2) public availability; (3) country wide representativeness; and (4) tax exclusivity.  I&D Memo at 8, JA-378.  No party to this litigation disputes that the competing Thai and Philippine sources are not publicly available or tax exclusive.  Accordingly, this dispute centers on whether the freight source selected by the Department is more specific and more representative than the Thai source.  Plaintiff-Appellants submit it is neither.

As discussed at length before the court below and in Cherishmet's brief before this Court, the Philippine source is not specific because the price is for trucking "loose cargo".  As the name implies, this is non-packaged cargo shipped in bulk in unknown quantities.  In contrast, the Thai data is for full truck loads comparable to respondents' method of shipping finished subject merchandise.  A

14

simple review of the surrogate value summary sheets for the final results demonstrates that both Jacobi and Cherismet were charged for packing materials in their normal value build up.  Final Surrogate Value Memo at 4-5, JA-404 - 05 (packaging and packing materials include buckle, fiberboard, paint, thinner, drums, plastic strap, plastic (PE) stretch film, wooden pallet, PE bags, and super sacks).  That is, they shipped packed goods; not loose goods, in containerized shipments.  The inquiry should have ended there:  The Philippine source is non-specific and the Thai source is specific.  The Department, as the supposed expert in administering the trade laws, certainly knows this.

Turning to the representativeness of the source, the Department's choice is likewise far inferior to the Thai source.  As Cherishmet points out in its briefs, the Department relied upon a single short trip between Manila and Legazpi in the Philippines whereas the Thai source had a total of ten prices for five routes.  As there were nine more datapoints in the Thai data, it was nine times more representative than the Philippine data.  Quite logically, the Department otherwise has a stated preference for sources with more data points which naturally are more representative.

Indeed, the Department has rejected Philippine freight sources such as the one it used in this review in favor of other Philippine freight sources with more data points.  *See Multilayered Wood Flooring From the People's Republic of*

15

*China; Final Results of Antidumping Duty Administrative Review; 2011-2012*, 79 Fed. Reg. 26712 (Dep't Commerce May 9, 2014) and accompanying Issues & Decision Memorandum at 70 (Cmt. 23) (wherein the Department selected a source with multiple truck routes and fares over a "Doing Business" source with a limited number of truck routes because "data representing a broad market average is superior to sources representing single or fewer distances.").

Moreover, the source selected by the Department does not even purport to be country-wide, broadly representative, or commercial. Rather, it is issued by the locality so that businesses that may be attracted there can get a glimpse of sample costs of doing business across a spectrum of activity. *See* Jacobi Surrogate Value Comments at Exh. SV-8, JA-217. Nothing in the source infers that the route from Manila to Legazpi is a major or even normal commercial route and it is evidently not country-wide. In contrast, the Thai source is a first-hand set routes and fares provided directly by a commercial trucking/expediting company as representative costs of transportation in Thailand. Memo from K. Marksberry to the File, re: Surrogate Values for the Preliminary Results at Attach. 8 (April 30, 2012) ("Prelim S-V Memo"), JA-315.

Finally, apart from the standard four criteria, the Department will evaluate other factors when necessary to determine if a source is reliable and representative. In this review, Cherismet raised the issue that the source newly selected by the

16

Department in the *Final Results* was aberrantly expensive on a per unit basis. Cherismet included a table demonstrating that this cost for what should be a routine movement expense was nearly 8.5 times higher than the uncontested value for such movement expense in the Thai source (no party briefed an alternative Thai truck freight surrogate value before the agency). *See* Cherishmet Direct Brief Section III.A, Philippine Data Are Abberrational. It is precisely in cases where the Department selects non-specific sources that are not broadly representative that such aberrations occur. To be sure, if the value was only slightly aberrant it would not be worth briefing. In this case, a value nearly 8.5 times than in Thailand and much higher than the historic expected cost distorts not only the movement expense but the entire normal value calculation.

For all the above reasons, the Department has not established, based upon substantial evidence, that the surrogate source it selected for inland freight was the "best available information" on the record. This Court should remand this issue with instructions for the Department to utilize the Thai source for inland truck freight.

## VIII. CONCLUSION AND RECOMMENDED APPELLATE REMEDY

For these reasons, and the reasons provided in the briefs of Jacobi and Cherishmet, as supplemented by this brief, we respectfully request that this Court hold that based on the record before it, Commerce's statutory interpretation of "best available information" under 19 U.S.C. § 1677b(c) as to carbonized material and inland truck freight was unreasonable; and further, that Commerce's decision to disregard the domestic price data from the source *Cocommunity* as the surrogate value for carbonized material and instead use Philippine import data from HTS category 4402 was not based on substantial evidence, and that Commerce's use of the Philippine truck freight data instead of the Thai truck freight data was not based on substantial evidence.  Accordingly, we ask that this Court vacate the lower court's judgment and remand to Commerce with instructions to recalculate Jacobi's and Cherishmet's antidumping margins using the *Cocommunity* data and to also recalculate Cherishmet's antidumping margin using the Thai freight value. If the margins are recalculated, we ask that Commerce be ordered to recalculate the separate rates applicable to the companies from which Carbon Activated Corporation and Car Go Worldwide Inc. imported subject merchandise, and the

separate rate applicable to Tangshan Solid Carbon Co., Ltd.

Respectfully submitted,


**/s/ Nancy A. Noonan**

Nancy A. Noonan
Arent Fox LLP
1717 K Street, N.W.
Washington, DC  20006
(202) 857-6000

*Counsel for Plaintiffs-Appellants*
*Carbon Activated Corporation*
*& Car Go Worldwide Inc.*


**/s/ Gregory S. Menegaz**

Gregory S. Menegaz
DeKieffer & Horgan, PLLC
1455 Pennsylvania Avenue, NW
Suite 900-B
Washington, DC 20005
(202) 783-6900

*Counsel for Plaintiff-Appellant*
*Tangshan Solid Carbon Co., Ltd.*

19

**Certificate of Compliance Pursuant to Rule 32(a)(7)(C)**

This brief has been prepared utilizing Microsoft Word 2010 using a proportionally spaced typeface (14 point Times New Roman font).

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the requirement of Fed. R. App. P. 32(a)(7)(B)(i). Specifically, excluding those exempted portions of the brief, as set forth in Fed. R. App. P. 32(a)(7)(B)(iii), this brief contains 3,912 words.  In accordance with Fed. R. App. P. 32(a)(7)(C), this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/  Nancy A Noonan
Nancy A. Noonan

Arent Fox LLP
1717 K Street, N.W.
Washington, DC  20006
(202) 857-6000

Form 30

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

# CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on
by:

| Nov 24, 2014 |

☐ US mail
☐ Fax
☐ Hand
☒ Electronic Means
   (by email or CM/ECF)

| Nancy A. Noonan | | /s/ Nancy A. Noonan |

Name of Counsel             Signature of Counsel

Law Firm    Arent Fox LLP

Address    1717 K Street, NW

City, State, ZIP    Washington, DC 20036

Telephone Number    202.857.6479

FAX Number    202.857.6395

E-mail Address    nancy.noonan@arentfox.co

NOTE: For attorneys filing documents electronically, the name of the filer
under whose log-in and password a document is submitted must be preceded
by an "/s/" and typed in the space where the signature would otherwise appear.
Graphic and other electronic signatures are discouraged.

*Jacobi Carbons AB v. United States*,
992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014)

**JACOBI CARBONS AB, Jacobi Carbons, Inc., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Cherishmet Inc., Beijing Pacific Activated Carbon Products Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., Shanxi Industry Technology Trading Co., Ltd., Carbon Activated Corp., Car Go Worldwide, Inc., and Tangshan Solid Carbon Co., Ltd., Plaintiffs,**

v.

**UNITED STATES, Defendant,**

and

**Calgon Carbon Corp. and Norit Americas, Inc., Defendant–Intervenors.**

Slip Op. 14–70.

Court No. 12–00365.

United States Court of International Trade.

June 24, 2014.

**Background:** Importers filed suit challenging Department of Commerce's final results in fourth administrative review of antidumping duty order on activated carbon from People's Republic of China. Importers moved for judgment on agency record.

**Holdings:** The Court of International Trade, Eaton, J., held that:

(1) importers were not required to exhaust arguments regarding surrogate values;

(2) importer's submitted price data did not constitute best available information to value carbonized material input;

(3) surrogate value for carbonized material was based on best available information; and

(4) surrogate value for truck freight was based on best available information.

Motions denied.

**1. Customs Duties ⟺21.5(1)**

 The United States imposes antidumping duties on foreign-produced goods that are sold in the United States at less-than-fair value. Tariff Act of 1930, § 773(a), 19 U.S.C.A. § 1677b(a).

**2. Customs Duties ⟺84(1)**

 A party may seek judicial review of an unexhausted antidumping issue that it did not raise in a case brief if Department of Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level. 28 U.S.C.A. § 2637(d); 19 C.F.R. § 351.309(c)(2).

**3. Customs Duties ⟺84(1)**

 Importers' arguments challenging Philippine surrogate value for truck freight selected by Department of Commerce and Philippine data used by Commerce to value factors of production (FOP) for activated carbon from nonmarket economy China did not require exhaustion before Commerce prior to presenting arguments for judicial review, where Commerce's final results changed primary surrogate country from Thailand to Philippines after importers had already submitted their case briefs based on Commerce's preliminary results that used Thai data, so importers had no realistic opportunity to present their arguments before Commerce.

**4. Customs Duties ⟺21.5(3)**

 Importer's price data submitted in administrative review of antidumping duty order on activated carbon from China was not best available information to value carbonized material input; submitted data

had limited geographical scope for Philippine prices with respect to carbonized material derived from coconut shell charcoal, as data were not countrywide but rather were based on only one geographical area that did not represent substantial portion of market for activated carbon in Philippines, so prices were less representative of broad market averages than other data providing nationwide prices and were not exclusive of taxes and duties. Tariff Act of 1930, § 773(c)(1)(B), 19 U.S.C.A. § 1677b(c)(1)(B).

**5. Customs Duties ⟐21.5(5)**

The burden of building the administrative record for review of an antidumping duty order lies with the interested parties.

**6. Customs Duties ⟐21.5(3)**

Department of Commerce's choice of surrogate value for carbonized material input relied on best available information from Philippine Harmonized Tariff Schedule (HTS) to value factors of production for activated carbon from nonmarket economy China, in calculating antidumping duties, although surrogate value was partially derived from feedstock other than that used by importers' suppliers so that HTS data were less specific than other data regarding carbonized material inputs, since other data's slight superiority in specificity failed to compensate for its deficiencies regarding limited breath of market prices and lack of record evidence demonstrating that its prices were tax and duty free. Tariff Act of 1930, § 773(c)(1)(B), 19 U.S.C.A. § 1677b(c)(1)(B).

**7. Customs Duties ⟐21.5(3)**

In calculating antidumping duties, the factors of production actually used by a respondent to an administrative review of an antidumping duty order are important, if not controlling, when determining nor-mal value. Tariff Act of 1930, § 773(c)(1)(B), 19 U.S.C.A. § 1677b(c)(1)(B).

**8. Customs Duties ⟐21.5(3)**

Department of Commerce's selected surrogate value for truck freight was based on best available information consisting of Philippine data rather than data from Thailand, in administrative review of antidumping duty order on activated carbon from China, since Philippine data was more specific than Thai data, was not aberrational compared to truck freight rates used in prior reviews, was more contemporaneous to period of review (POR) than Thai data, and was supported by information from two routes, and Commerce preferred to rely on single surrogate country to value all factors of production in order to limit amount of distortion in antidumping duty calculations. Tariff Act of 1930, § 773(c)(1)(B), 19 U.S.C.A. § 1677b(c)(1)(B); 19 C.F.R. § 351.408(c)(2).

————

Daniel L. Porter, Curtis, Mallet–Prevost, Colt & Mosle LLP, of Washington, D.C., argued for plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. With him on the brief was Ross Bidlingmaier.

Francis J. Sailer, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP, of Washington, D.C., argued for consolidated plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Cherishmet Inc., Beijing Pacific Activated Carbon Products Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd. With him on the briefs were Mark E. Pardo, Dharmendra N. Choudhary, Andrew T. Schutz, and Kavita Mohan.

Nancy A. Noonan and Matthew L. Kanna, Arent Fox LLP, of Washington, D.C., for consolidated plaintiffs Carbon Activated Corp. and Car Go Worldwide, Inc.

Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, D.C., for consolidated plaintiff Tangshan Solid Carbon Co., Ltd.

Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. On the brief were Melissa M. Devine, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Devin S. Sikes, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

John M. Herrmann, Kelley Drye & Warren, LLP, of Washington, D.C., argued for defendant-intervenors Calgon Carbon Corp. and Norit Americas, Inc. With him on the brief were David A. Hartquist and R. Alan Luberda.

## OPINION

EATON, Judge:

This matter is before the court on the USCIT Rule 56.2 motions for judgment on the agency record of plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. (collectively, "Jacobi"),[1] and consolidated plaintiffs[2] Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC"), Cherishmet Inc. ("Cherishmet"), Beijing Pacific Activated Carbon Products Co., Ltd. ("BPACP"), Datong Municipal Yunguang Activated Carbon Co., Ltd. ("Datong Municipal"), Shanxi Industry Technology Trading Co., Ltd. ("Shanxi Industry"), Carbon Activated Corp. and Car Go Worldwide, Inc. (collectively, "CAC"), and Tangshan Solid Carbon Co., Ltd. ("Tangshan") (collectively, "plaintiffs"). By their motions, plaintiffs, all of which are producers, exporters, or importers of subject merchandise,[3] challenge the U.S. Department of Commerce's ("Commerce" or

---

**1.** Jacobi Carbons AB is a foreign producer and exporter of subject merchandise, while Jacobi Carbons, Inc. is the importer of record for Jacobi Carbons AB's merchandise. Compl. ¶ 3 (ECF Dkt. No. 7).

**2.** This action includes court numbers 12–00372, 12–00377, 12–00396, and 12–00401. *See* Scheduling Order (ECF Dkt. No. 42).

**3.** The subject merchandise is activated carbon, a substance "capable of collecting gases, liquids, or dissolved substances on the surface of its pores." MᴄGʀᴀᴡ-Hɪʟʟ Cᴏɴᴄɪsᴇ Eɴᴄʏ-ᴄʟᴏᴘᴇᴅɪᴀ ᴏꜰ Sᴄɪᴇɴᴄᴇ & Tᴇᴄʜɴᴏʟᴏɢʏ 21 (Sybil P. Parker ed., 2d ed. 1987). Activated carbon is described in the antidumping duty order as follows:

[A] powdered, granular, or pelletized carbon product obtained by "activating" with heat and steam various materials contain-

ing carbon, including but not limited to coal (including bituminous, lignite, and anthracite), wood, coconut shells, olive stones, and peat.

. . .

The scope of this order covers all forms of activated carbon that are activated by steam or $CO_2$ [ (carbon dioxide) ].... Unless specifically excluded, the scope of this investigation covers all physical forms of certain activated carbon....

. . .

Excluded from the scope of the order are chemically-activated carbons.... Chemically activated carbons are typically used to activate raw materials with a lignocellulosic component such as cellulose, including wood, sawdust, paper mill waste and peat. Certain Activated Carbon From the PRC, 72 Fed.Reg. 20,988, 20,988 (Dep't of Commerce Apr. 27, 2007) (notice of antidumping duty order).

the "Department") Final Results in the fourth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC"). Certain Activated Carbon From the PRC, 77 Fed.Reg. 67,337 (Dep't of Commerce Nov. 9, 2012) (final results of antidumping duty admin. review), and accompanying Issues and Decision Memorandum ("Issues & Dec. Mem.") (collectively, "Final Results").

Jacobi, GHC, Cherishmet, BPACP, Datong Municipal, CAC, and Tangshan contest two aspects of the Department's Final Results: (1) the selection of the surrogate value for carbonized material, which is one of the primary inputs used in the production of subject merchandise;[4] and (2) the selection of the surrogate value for truck freight. *See* Resp't Pls.' Rule 56.2 Mot. for J. on the Agency R. 1–2 (ECF Dkt. No. 47) ("Jacobi's Br."); Mem. in Supp. of Pls.' Rule 56.2 Mot. for J. upon the Agency R. 1 (ECF Dkt. No. 46) ("GHC's Br.")[5]; Rule 56.2 Mot. for J. upon the Agency R. of Pls. Carbon Activated Corporation and Car Go Worldwide, Inc. 2 ("CAC's Mot."); Consol. Pl. Tangshan Solid Carbon Co., Ltd.'s Rule 56.2 Mot. for J. on the Agency R. 1–2 ("Tangshan's Mot.").

Shanxi Industry and Tangshan (collectively, "separate rate companies" or "separate rate respondents") are plaintiffs that established their independence from Chinese government control, and as a result, were assigned a separate antidumping duty rate in the Final Results. *See* Final Results, 77 Fed.Reg. at 67,338. The separate rate respondents and CAC[6] claim that, should Commerce recalculate the final dumping margin for the mandatory respondents pursuant to any remand ordered by the court, the Department must also recalculate the rate assigned to the separate rate companies. *See* Mem. of Law in Supp. of Pl. Shanxi Industry Technology Trading Co., Ltd.'s Rule 56.2 Mot. for J. upon the Agency R. 2 (ECF Dkt. No. 44) ("Shanxi Industry's Br."); Tangshan's Mot. 2; CAC's Mot. 2.

Defendant United States opposes plaintiffs' motions and asks that Commerce's Final Results be sustained. Def.'s Resp. to Pls.' and Consol. Pls.' Mots. for J. upon the Agency R. 2 (ECF Dkt. No. 56) ("Def.'s Br."). Defendant-intervenors, Calgon Carbon Corp. and Norit Americas, Inc. (collectively, "defendant intervenors"), each domestic manufacturers of activated carbon, join in opposition to plaintiffs' motions. Def.-Ints.' Resp. in Opp'n to Consol. Pls.' Mots. for J. on the Agency R. 1 (ECF Dkt. No. 58) ("Def.-Ints.' Br."). Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2006) and 19 U.S.C.

---

**4.** In order to produce steam-activated carbon, the carbonized materials are placed in a furnace and activated through steam at temperatures between 800 and 1,000 degrees Centigrade. Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable Rebecca M. Blank, Acting Secretary of Commerce, U.S. Department of Commerce at 99, PD 29, at bar code 3027303–01 (Sept. 1, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's Questionnaire Response"). "This process produces a carbonaceous substance (i.e., activated carbons) with many small pores." Jacobi's Questionnaire Response at 99.

**5.** The Department treated GHC and BPACP as a single entity, based on a determination in the first administrative review of the Order. Final Results, 77 Fed.Reg. at 67,338 n. 23. Accordingly, Commerce assigned the entity a single rate. Final Results, 77 Fed.Reg. at 67,338 n. 23. Thus, although this brief was jointly submitted by GHC, Cherishmet, BPACP, and Datong Municipal, the arguments made in this brief will be represented by reference only to GHC.

**6.** The companies from which CAC imported subject merchandise are separate rate companies. CAC's Mot. 2.

§§ 1516a(a)(2)(A)(i)(I), (B)(iii) (2006). For the reasons set out below, Commerce's Final Results are sustained.

## BACKGROUND

On April 27, 2007, the Department issued the antidumping duty order on certain activated carbon from the PRC. Certain Activated Carbon From the PRC, 72 Fed.Reg. 20,988, 20,988 (Dep't of Commerce Apr. 27, 2007) (notice of antidumping duty order) (the "Order"). Following timely requests from defendant-intervenors and other companies, the Department conducted its fourth administrative review of the Order for the period of review ("POR"), April 1, 2010, through March 31, 2011. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 76 Fed.Reg. 30,912, 30,913 (Dep't of Commerce May 27, 2011).

On May 4, 2012, the Department published its Preliminary Results for the review, selecting Datong Juqiang Activated Carbon Co., Ltd.,[7] Jacobi, and GHC as mandatory respondents. Certain Activated Carbon from the PRC, 77 Fed.Reg. 26,496, 26,497 (Dep't of Commerce May 4, 2012) (preliminary results of the fourth antidumping duty admin. review, and intent to rescind in part) ("Preliminary Results"). BPACP, Datong Municipal, Shanxi Industry, and Tangshan each filed separate rate certifications, and Cherishmet and CAC joined as interested U.S. importers. *See* Preliminary Results, 77 Fed.Reg. at 26,501. In the Preliminary Results, Commerce "selected Thailand as the primary surrogate country for the valuation of the [factors of production] and surrogate financial ratios." Mem. from Katie Marksberry, International Trade

Specialist, to the File at 1, PD 193, at bar code 3072722–01 (Apr. 30, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Preliminary Results Surrogate Values Mem.").

Following publication of the Preliminary Results, Jacobi, GHC, Cherishmet, and BPACP submitted comments that placed on the record additional data from the Philippines, and urged the Department to use it to value all of the major material inputs. Issues & Dec. Mem. at cmt. 1. In the Final Results, Commerce found that "both the Philippines and Thailand [were] significant producers [of activated carbon] because, in quantity terms, they [were] exporters of goods identical to the subject merchandise, [and] ha[d] production of comparable merchandise as evidenced by the financial statements on the record." Issues & Dec. Mem. at cmt. 1. The Department determined, however, that although otherwise "relatively equal in terms of quality and satisf[action] of all of the surrogate value criteria," the Philippine data (particularly the financial statements) was "clearly superior" to the Thai data because it was "industry-specific, whereas the Thai data [was] for the manufacturing sector in general." Issues & Dec. Mem. at cmt. 1. The Philippine data was also found to be more contemporaneous to the POR than the Thai data. Issues & Dec. Mem. at cmt. 1.

As a result, Commerce departed from its determination in the Preliminary Results, and selected the Philippines as the primary surrogate country to value most of the major material inputs used in the production of subject merchandise, including the carbonized material and truck freight.[8] Final Results, 77 Fed.Reg. at

---

7. Datong Juqiang Activated Carbon Co., Ltd. is not a party to this action.

8. Global Trade Atlas import data from Thailand, however, was found by the Department

to be superior for two inputs: bituminous coal and pitch. Issues & Dec. Mem. at cmt. 1; Mem. from Emeka Chukwudebe, Case Analyst, to the File at 2, 3, PD 283, at bar code

67,338. Specifically, the Department used Harmonized Tariff Schedule ("HTS") [9] import data, derived from the Global Trade Atlas ("GTA"), from the Philippines under heading HTS 4402 ("Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated") to value carbonized material, and used publicly available data reported in the Cost of Doing Business in Legazpi City, Philippines ("Cost of Doing Business") to value truck freight. Mem. from Emeka Chukwudebe, Case Analyst, to the File at 3, 6, PD 283, at bar code 3104537–01 (Nov. 2, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Final Results Surrogate Values Mem.").

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (2006).

## DISCUSSION

### I. LEGAL FRAMEWORK

[1] "The United States imposes duties on foreign-produced goods that are sold in the United States at less-than-fair value." *Clearon Corp. v. United States*, 37 CIT ——, ——, Slip Op. 13–22, at 4, 2013 WL 646390 (2013). The Department is responsible for making the fair value determination, and is directed by statute to make a "comparison . . . between the export price or constructed export price [10] and normal value." 19 U.S.C. § 1677b(a) (2006). Where, as here, the merchandise in question is exported from a nonmarket economy country,[11] "the normal value of the

---

3104537–01 (Nov. 2, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Final Results Surrogate Values Mem."). Accordingly, the Department used the Thai data to value bituminous coal and pitch, despite using Philippine data to value all other major factors of production. Issues & Dec. Mem. at cmt. 1; Final Results Surrogate Values Mem. at 2, 3. These findings are uncontested.

9. The purpose of the HTS is to provide a certain level of organization to the classification of imported goods. "The tariff schedules of signatories to the Harmonized System Convention are required to have tariff categories 'harmonized with the internationally-developed HS nomenclature up to the six-digit level, *i.e.*, to the two-digit chapter, the four-digit heading, and the six-digit subheading levels.'" *Xinjiamei Furniture (Zhangzhou) Co. v. United States*, 38 CIT ——, —— n. 2, 968 F.Supp.2d 1255, 1261 n. 2 (2014) (internal quotation marks omitted) (quoting *Victoria's Secret Direct, LLC v. United States*, 37 CIT ——, ——, 908 F.Supp.2d 1332, 1345 (2013)).

10. Under the statute, the terms "export price" and "constructed export price" are defined as follows:

The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States. . . .
. . .
The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter. . . .
19 U.S.C. § 1677a(a)-(b) (2006).

11. A nonmarket economy country is a "foreign country that the [Department] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A). Because the Department deems the PRC "to be a nonmarket economy country, Commerce generally considers information on sales in [the PRC] and financial information obtained from Chinese producers

subject merchandise [is based on] the value of the factors of production utilized in producing the merchandise and [an] added . . . amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* § 1677b(c)(1)(B).

To determine the normal value of the subject merchandise, Commerce is directed to use "the best available information regarding the values of such factors in a [comparable] market economy country or countries considered to be appropriate by the [Department]." *Id.* Commerce's practice, in selecting the best available information for valuing factors of production, is to "choose surrogate values that represent broad market-average prices, prices specific to the input, prices that are net of taxes and import duties, prices that are contemporaneous with the POR, and publicly available non-aberrational data from a single surrogate market-economy." *Clearon,* 37 CIT at ——, Slip Op. 13–22, at 7 (citation omitted) (internal quotation marks omitted); *see also* 19 C.F.R. § 351.408(c)(2) (2012) ("[T]he Secretary [of Commerce] normally will value all factors [of production] in a single surrogate country."). The Department's task is to "attempt to construct a hypothetical market value" of the subject merchandise in the nonmarket economy. *Nation Ford Chem. Co. v. United States,* 166 F.3d 1373, 1375 (Fed.Cir.1999).

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

As an initial matter, defendant and defendant-intervenors claim that plaintiffs

failed to exhaust their administrative remedies with respect to certain arguments. They contend that plaintiffs failed to present these arguments during the underlying administrative proceeding, and are thus, prohibited from making them now before the court. Specifically, defendant and defendant-intervenors allege that plaintiffs failed to present their arguments before Commerce with respect to (1) the Philippine surrogate value for truck freight selected by the Department, and (2) claims that the import data under Philippine HTS 4402 is not the best available information when compared to the domestic Cocommunity data [12] and the price data used by Commerce to value carbonized material in prior reviews. Def.'s Br. 27–37; Def.-Ints.' Br. 10–13.

[2] The court finds defendant and defendant-intervenors' exhaustion claims to be unpersuasive. A court "shall, where appropriate, require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d) (2006); *Yangzhou Bestpak Gifts & Crafts Co. v. United States,* 716 F.3d 1370, 1381 (Fed.Cir.2013). "To exhaust its administrative remedies, a party usually must submit a case brief 'present[ing] all arguments that continue in [its] view to be relevant to [Commerce's] final determination or final results.'" *Qingdao Taifa Grp. Co. v. United States,* 33 CIT 1090, 1092–93, 637 F.Supp.2d 1231, 1236 (2009) (alterations in original) (quoting 19 C.F.R. § 351.309(c)(2) (2012)). This Court has held, however, that requiring exhaustion may be inappropriate under certain cir-

---

to be unreliable for determining, under 19 U.S.C. § 1677b(a), the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States,* 28 CIT 480, 481, 318 F.Supp.2d 1339, 1341 (2004).

**12.** As shall be seen, the term "Cocommunity data" means data derived from a monthly publication of the Asian and Pacific Coconut

Community. Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S. Department of Commerce at 47, PD 101, at bar code 3041311–01 (Nov. 16, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's Surrogate Value Comments").

cumstances. For instance, "[a] party . . . may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level." *Id.* at 1093, 637 F.Supp.2d at 1236 (citing *LTV Steel Co. v. United States,* 21 CIT 838, 868–69, 985 F.Supp. 95, 120 (1997)).

[3] Here, in the Final Results, Commerce changed the primary surrogate country from Thailand to the Philippines to value most of the major factors of production used in the production of subject merchandise. Issues & Dec. Mem. at cmt. 1. In its Preliminary Results, where it used Thailand as the primary surrogate country, Commerce valued carbonized material using GTA import data derived from Thai HTS 440290, and used publicly available Thai data from a Thai consulting company to value truck freight transportation costs. Preliminary Results Surrogate Values Mem. at 9, 13. Following publication of the Preliminary Results, the parties submitted case and rebuttal briefs to the Department regarding its determinations, and while plaintiffs argued for the use of the Philippine data, they could hardly foresee what use the Department would make of that data.

In the Final Results, Commerce departed from its prior determinations by selecting the Philippines as the primary surrogate country to value most of the factors of production. Issues & Dec. Mem. at cmt. 1. Thus, Commerce valued the carbonized material input using Philippine HTS 4402,

and valued truck freight using publicly available data reported in the Cost of Doing Business in Legazpi City, Philippines. Final Results Surrogate Values Mem. at 3, 6. As a result, it was not until after the submission of the parties' case briefs that Commerce made its determination to select the Philippines as the primary surrogate country, and articulated its basis for its selection of sources to value carbonized material and truck freight (i.e., Philippine HTS 4402 and Cost of Doing Business). It is simply too much to ask of the parties to anticipate (1) that Commerce would change the surrogate country between the preliminary and Final Results, (2) the reasons that the Department would state for deciding to change surrogate countries, and (3) precisely how Commerce would value the various inputs. Under similar circumstances, it has been held that a party "is not required to predict that Commerce would accept other parties' arguments and change its decision." *Qingdao,* 33 CIT at 1093, 637 F.Supp.2d at 1237. Accordingly, because plaintiffs had no realistic opportunity to present their arguments before the Department, the court finds that plaintiffs did not fail to exhaust their administrative remedies.

### III. COMMERCE'S CHOICE OF A SURROGATE VALUE FOR CARBONIZED MATERIAL IS IN ACCORDANCE WITH LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE

#### A. The Cocommunity Data Is Deficient

In the Final Results, the Department found that the Cocommunity [13] price data placed on the record by Jacobi was not the

---

**13.** Cocommunity is a monthly publication of the Asian and Pacific Coconut Community that contains news, statistical data, and domestic prices for coconut shell charcoal in the Philippines. Jacobi's Surrogate Value Comments at 47. "[T]he [Asian and Pacific Coco-

nut Community] is an independent regional intergovernmental organization which consists of sixteen member countries and accounts for 85–90% of the world production of coconut." Jacobi's Surrogate Value Comments at 47.

best available information to value the carbonized material input. *See* 19 U.S.C. § 1677b(c)(1)(B). Plaintiffs object to this finding.

When making a "best available information" finding, this Court, among other things, has repeatedly confirmed the importance that the information used to value the factors of production (1) represents a broad market average of prices for the input in question, and (2) be exclusive of taxes and duties. *See, e.g., Jining Yongjia Trade Co. v. United States*, 34 CIT ——, ——, Slip Op. 10–134, at 23, 2010 WL 5121964 (2010) ("Commerce's practice, in selecting the best available information for valuing [factors of production], is to select surrogate values which are . . . representative of a broad market average . . . and exclusive of taxes and duties." (citation omitted) (internal quotation marks omitted)).

As noted, in the Final Results, Commerce selected the Philippines as the primary surrogate country to value most of the major factors of production used in the manufacture of activated carbon. Final Results, 77 Fed.Reg. at 67,338. Specifically, the Department used HTS import data derived from the GTA from the Philippines under heading HTS 4402 [11] ("Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated") to value carbonized material, one of the important material inputs used in the production of

activated carbon. Final Results Surrogate Values Mem. at 3.

**[4]** Although plaintiffs argue for the use of the Cocommunity data that they placed on the record to value the carbonized material input, it is clear that the data is deficient in at least two important respects. The Cocommunity data's deficiencies begin with its limited geographical scope for the prices, in the Philippines, of carbonized material derived from coconut shell charcoal. The Cocommunity publication unmistakably indicates that its Philippine prices for coconut shell charcoal are based only on one geographical area. That is, the data came only from the Visayas region.[15] *See* Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S. Department of Commerce at 51, PD 101, at bar code 3041311–01 (Nov. 16, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's Surrogate Value Comments") ("**Coconut Shell Charcoal**: Philippines (Domestic), *Visayas*, Buyer" (emphasis added)). A review of the "Prices of Coconut Products and Selected Oils (US$/MT)" ledger makes that much clear. *See* Jacobi's Surrogate Value Comments at 51.

GHC, in its case brief, acknowledges that the Cocommunity publication lacked countrywide data. GHC's Br. 27 ("[T]he product specific Cocommunity data, even though lacking country wide coverage, represent a far more suitable surrogate value

---

**14.** In its Issues and Decision Memorandum, Commerce misidentified the tariff heading that it was using as Philippine HTS 4402.90.00. *See* Issues & Dec. Mem. at cmt. 1 ("First, the publicly available import data from the Philippines under HTS 4402.90.00 comes from an approved surrogate country."). Having reviewed the record, however, it is clear that Commerce analyzed the Philippine import data under the four-digit heading, HTS 4402, and not under 4402.90.00. *See, e.g.,* Issues & Dec. Mem. at cmt. 1 (properly

naming the section heading two lines above its inadvertent error, as "Philippine GTA Import Data 4402.00.00"); Final Results Surrogate Values Mem. at 3 ("For the final results, we valued carbonized material using GTA data from the Philippines, specifically HTS 4402.00, for a value of 53.73 Ps/Kg.").

**15.** The Visayas is one of three geographical regions, consisting of several islands that make up the Philippines.

data source."). Thus, the Cocommunity prices are less representative of broad market averages than the GTA data for HTS 4402, which provides nationwide data for imports of carbonized materials that enter the Philippines from its global trading partners. Moreover, despite GHC's assertions, plaintiffs identify no record evidence demonstrating that the Cocommunity data is, in fact, representative of a broad market average. That is, plaintiffs point to no record evidence suggesting that the Visayas region represents a substantial portion of the market for activated carbon in the Philippines, or that these prices are reflective of the national Philippine market for the subject merchandise. It is therefore apparent that the import data represents a broader market average than the Cocommunity data, and that the Cocommunity data fails to provide the "broad market average" of prices reasonably preferred by Commerce when making a best available information finding.

Next, aside from Jacobi's own statements in its surrogate value comments submitted to Commerce, plaintiffs cite no record evidence demonstrating that the Cocommunity prices are tax and duty exclusive. *See* Jacobi's Surrogate Value Comments at 5 ("[T]he data in *Cocommunity* meet the Department's criteria of being specific to the input in question and the data tax exclusive."). As has been noted, that a price be "exclusive of tax and duties" is another important preference for Commerce when considering the "best available information," so that an "apples to apples" calculation can be made when constructing normal value. The Department has found that import data is "reported on a duty-exclusive, tax-exclusive basis." *Shandong Huarong Gen. Corp. v. United States*, 25 CIT 834, 845, 159 F.Supp.2d 714, 725 (2001); *see also* Issues & Dec. Mem. at cmt. 1 ("Finally, the Department previously has found that data

from the [GTA], such as that on the record, is publicly-available, represents a broad market average, and is *tax and duty exclusive*." (emphasis added) (citation omitted)).

**[5]** The burden of building the administrative record lies with the interested parties. *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed.Cir.2011) (citations omitted). Thus, the burden, here, rested with plaintiffs to supply Commerce with a probative source showing that the Cocommunity prices were free of tax and duty. Because plaintiffs put no evidence on the record showing that the Cocommunity data was tax and duty free, the data lacks an important criterion looked at in a best available information determination.

Based on the foregoing, the Department's finding that the Cocommunity data lacked two important preferences looked to by Commerce when making a best available information determination was reasonable.

**B.  Commerce's Past Practice**

GHC also contends that Commerce's failure to use the Cocommunity data as the surrogate value for carbonized material marked a departure from an established agency preference and policy to rely on domestic data for the valuation of material inputs, rather than import statistics. GHC's Br. 14 (citing *Tianjin Magnesium Int'l Co. v. United States*, 34 CIT ——, ——, 722 F.Supp.2d 1322, 1333 (2010) ("[W]hen the Department has a choice between domestic data and import statistics, Commerce's preference is to use domestic data." (citations omitted)); *Dorbest Ltd. v. United States*, 30 CIT 1671, 1688–89, 462 F.Supp.2d 1262, 1278–79 (2006), *rev'd on other grounds*, 604 F.3d 1363 (Fed.Cir. 2010); *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 29 CIT 288,

294–303, 366 F.Supp.2d 1264, 1269–77 (2005)).

While it may be the case that Commerce has a preference for domestic data, the Department, as has been noted, also prefers, whenever possible, to use data that (1) represents a broad market average of prices for the input, and (2) is exclusive of taxes and duties. *Jining*, 34 CIT at ——, Slip Op. 10–134, at 23. Had the record contained domestic countrywide data, that was tax and duty free, GHC's claim might have had merit. Here, although the Cocommunity data represented domestic price information, the data (1) was regional and not countrywide, and (2) was not shown to be tax and duty exclusive. None of the cases relied upon by GHC involved domestic price data that suffered from similar deficiencies as those in the data published in Cocommunity. Thus, these cases do not aid plaintiffs.

## C. Specificity of HTS 4402

[6]    Plaintiffs also argue that, when valuing the carbonized material input, the Department was required to employ a surrogate price for the type of carbonized material that they actually used in their production processes.[16]  Jacobi's Br. 1–2; GHC's Br. 8–9. Thus, they insist that, even though the Philippine HTS 4402 heading covers the carbonized material derived from shell that Jacobi and GHC used in their processes, the heading cannot be used because it also covers carbonized material made from wood, which, they claim, neither company used in their production of activated carbon.

For plaintiffs, because Commerce used a surrogate value for the carbonized material input that was derived, in part, from a feedstock (i.e., wood) other than those used by Jacobi's and GHC's suppliers (anthracite coal and coconut shell charcoal for Jacobi, and bituminous coal, coconut shell charcoal, "and other carbonized materials" for GHC), HTS 4402 was not the best available information on the record. Jacobi's Br. 2 ("Very simply, the import data for HTS category 4402 cannot possibly be considered the 'best information available' for carbonized material because such import data for HTS category 4402 concerned primarily raw material inputs [ (i.e., wood) ] that were not used by Jacobi to make the steam activated carbon produced by Jacobi and exported to the United States."); *see* Letter from Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, to Secretary of Commerce, U.S. Department of Commerce at 17, 22, CD 106, at bar code 3046449–01 (Dec. 14, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("GHC's Supplemental Section D Response"); Letter from Daniel L. Porter, Counsel for Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S. Department of Commerce at 10–11, PD 109, at bar code 3041511–01 (Nov. 17, 2011), ECF Dkt. No. 43 (Apr. 5, 2013); Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable Rebecca M. Blank, Acting Secretary of Commerce, U.S. Department of Commerce at 99, 146, PD 29, at bar code 3027307–01 (Sept. 1, 2011), ECF Dkt. No. 43 (Apr. 5, 2013).

[7]    With respect to plaintiffs' legal argument, the court finds that plaintiffs are correct, that the factors of production actu-

---

16. Plaintiffs initially contended that carbonized material derived from wood could not be used to make products covered by the Order, but have since seemingly abandoned this argument when it was pointed out by the other parties that plaintiffs had inaccurately represented to the court the Order's contents. *See* Jacobi's Br. 16–18; Resp't Pls.' Reply Br. in Supp. of their Mot. for J. on the Agency R. 14–15 (ECF Dkt. No. 68); GHC's Br. 13, 18–19; Def.'s Br. 16–17; Def.-ints.' Br. 20–22.

ally used by a respondent are important, if not controlling, when determining normal value. This is because the purpose of a review is to determine a margin for a respondent's product based on the valuation of the product's factors of production. Were the factors of production of another company used, even to make an identical product, the margin would not be as accurate of a reflection of that respondent's cost of production. *See Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1341 (Fed.Cir.2011) ("In determining the valuation of the factors of production, 'the critical question is whether the methodology used by Commerce is based on the best available information and establishes the antidumping margins as accurately as possible.'" (quoting *Shakeproof Assembly Components v. United States*, 268 F.3d 1376, 1382 (Fed.Cir. 2001))). Thus, although the Order covers activated carbon products manufactured using other inputs, here, the inputs actually used by plaintiffs must be taken into account.

Although plaintiffs are correct in their assessment of the importance of the inputs actually used in the production of their activated carbon, their claims with respect to the HTS 4402 data fail on substantial evidence grounds. As has been noted, both GHC and Jacobi use carbonized material produced from shell and coal in their manufacturing processes. As part of their argument favoring the use of the Cocommunity data over the data obtained from imports under HTS 4402, plaintiffs insist that carbonized material derived from shell, and carbonized material derived from coal, are comparably priced.

Specifically, the Cocommunity data reflects the price for carbonized material derived from shell, while the data for Philippine HTS 4402 includes import data for carbonized material derived from shell, as well as other sources, such as wood. GHC argues that price data for coconut shell charcoal (i.e., the Cocommunity price data) is the best available information, because the Department found, in the initial less-than-fair value investigation and in its final results of remand redetermination in the first administrative review of the Order, that coconut shell charcoal and coal-based carbonized materials are comparably priced. GHC's Br. 15–16 (citing Certain Activated Carbon from the PRC, 72 Fed. Reg. 9,508 (Dep't of Commerce Mar. 2, 2007) (final determination of sales at less than fair value), and accompanying Issues and Decision Memorandum at comment 16 ("In the instant case, as discussed in the *Preliminary Determination*, the Department found that the coconut shell charcoal value, although not identical to the coal-based carbonized material used by respondents, is comparable in that both products are a type of charcoal." (citation omitted) (internal quotation marks omitted)); Final Results of Redetermination Pursuant to Ct. Remand at 10–11, *Calgon Carbon Corp. v. United States*, No. 09–00524 (2011), ECF Dkt. No. 36 ("*Calgon Carbon Remand Results*") ("[O]ur re-examination of the record indicates that coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the production of activated carbon. The expert's report found that coal-based carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in the production of activated carbon. Thus, in this instance, between the two alternative Indian HTS categories, 'Other Cokes of Coal' and 'Coconut Shell Charcoal,' the Department determines that Indian HTS number 4402.00.10 'Coconut Shell Charcoal' results in a better, input-specific price for coal-based carbonized materials." (footnotes omitted)). Thus, for

plaintiffs, because both inputs (shell-derived carbonized material and coal-based carbonized material) that they employed in their production processes are comparably priced, they are both covered by the Cocommunity data relating to the price of shell.

Despite the Department's finding as to price comparability between shell charcoal and coal, this finding is not determinative here. First, it is worth noting that the discussion leading up to the comparability finding is less than clear as to whether the price of shell-derived charcoal is comparable to that of coal-based carbonized material, or if the materials themselves are comparable for the use in the manufacture of activated carbon. Although, in the Final Results of Redetermination Pursuant to Court Remand in the first administrative review of the antidumping duty order, the Department concluded "that Indian HTS number 4402.00.10 'Coconut Shell Charcoal' results in a better, input-specific *price* for coal-based carbonized materials," the discussion leading up to this finding does not support the conclusion as to price. *Calgon Carbon* Remand Results at 11 (emphasis added).

Moreover, even if shell-based charcoal and coal-based carbonized materials have comparable prices, the Cocommunity data is only marginally more useful on the basis of specificity than the import data. This is because HTS heading 4402 also encompasses shell-derived carbonized material. Thus, if coconut shell charcoal is "comparable" to coal-derived carbonized material, the import heading covers entries comparably priced with coal-derived carbonized material too. The Cocommunity publication that covers price data for coconut shell charcoal is only more specific to value coal-based carbonized material than HTS 4402 because the import data also covers imports of wood-based carbonized materi-

al. Thus, it is only the possibility that the HTS 4402 data could contain some entries of carbonized material derived from wood that arguably makes this data less comparable to the carbonized materials used by GHC and Jacobi than the Cocommunity data.

This observation leads to plaintiffs' next argument. Plaintiffs contend that the Philippine HTS 4402 import data is less specific than the Cocommunity data because the heading covers carbonized material derived from wood, which they insist, is a material that they did not use in the production of their activated carbon. As noted, plaintiffs argue, and the court has found, that the factors of production actually used by a respondent in an administrative review are important, if not controlling, in determining normal value. Nonetheless, the record here does not support plaintiffs' claim.

Despite arguments to the contrary, the record demonstrates that GHC has used wood as a material in the production of its activated carbon. *See* Letter from Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, to Secretary of Commerce, U.S. Department of Commerce at 44, PD 17, at bar code 3025194–05 (Aug. 19, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("We also produce variety high-grade pellet products with the materials of coconut shell, nutshell and *wood.*" (emphasis added)). Moreover, Jacobi itself asserted in this review that the carbonized material used to produce the subject merchandise can be derived from coconut shell and coal, as was used by Jacobi and GHC, but also from wood, lignite, and other materials. *See* Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S. Department of Commerce at 13, PD 159, at bar code 3056304–01 (Feb. 10, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's

Additional Surrogate Value Information") (listing the "[f]ixed carbon content of raw materials used for the production of activated carbon" to include soft wood, hard wood, coconut shells, lignite, bituminous coal, and anthracite). Thus, contrary to plaintiffs' assertions, the record does not indicate unambiguously that neither Jacobi nor GHC used carbonized material derived from wood in the production of their activated carbon products during the POR.

Based on the foregoing, it appears that the Cocommunity data is only modestly more specific to the carbonized material inputs used in the production of plaintiffs' activated carbon than the import data found under HTS 4402. The court's best available information inquiry, however, does not end here. Despite the specificity conclusion (which remains somewhat uncertain based on the lack of clarity as to price comparability in the discussion in the *Calgon Carbon* Remand Results), the Cocommunity data is unable to overcome the earlier discussed deficiencies from which it suffers, i.e., that the publication's price data for coconut shell charcoal did not represent a broad market average, and was not shown to be tax and duty exclusive. Put another way, Commerce was not unreasonable in finding that a slight superiority in specificity failed to compensate for the Cocommunity data's deficiencies with respect to the limited breadth of market prices it supplied and the lack of record evidence demonstrating that the publication's prices were tax and duty free.

#### D. Imports Under HTS 4402

Finally, plaintiffs argue that imports made under HTS 4402 during the POR did not contain any entries of coconut shell charcoal. Jacobi's Br. 19. For plaintiffs, if there were no imports of the input used to produce the carbonized material that they employed in the manufacture of their merchandise, then the surrogate value for that input is not the best available information. GHC's Br. 17–18 ("[D]uring [the] POR . . . there were no imports of coconut shell charcoal under HTS 4402000001. As such, the Department succumbed to a clear error of fact in its belief that the broad basket sub-heading HTS 4402.00 captured imports of coconut shell charcoal. The issue should be remanded to the Department to correct this erroneous finding of fact because it renders the Department's choice as arbitrary and wholly unsupported by substantial evidence.").

Plaintiffs' only support on the record for this assertion, however, appears to be Jacobi's own statement in its surrogate value comments submitted before the Department. *See* Jacobi's Surrogate Value Comments at 4 ("First, there are no data available for coconut shell charcoal from the Philippines imported under [HTS 4402.00.00.01]"); Jacobi's Br. 20; GHC's Br. 17. Beyond this assertion, plaintiffs do not point to any evidence that there were no inputs of shell-derived carbonized material entered during the POR. Thus, plaintiffs have failed to establish their conclusion with probative record evidence.

#### E. Commerce Reasonably Determined the Surrogate Value for Carbonized Material

Based on the foregoing, the Department's selection of data from Philippine HTS 4402 as the surrogate value for carbonized material in the present review is in accordance with law and supported by substantial evidence. By their arguments, plaintiffs have demonstrated that the Cocommunity data is marginally more specific than the HTS 4402 data. Because of the infirmities in the Cocommunity data, however, it is apparent that Commerce did not err in its selection of GTA import data from HTS 4402 ("Wood Charcoal (Includ-

ing Shell or Nut Charcoal), Whether or Not Agglomerated") to provide the surrogate value for carbonized material.

Accordingly, the court finds that the Cocommunity data was not the best available information on the record with which to calculate the surrogate value for carbonized material. In addition, Commerce reasonably determined that the Philippine GTA import data under HTS 4402 represents the best available information with which to value the carbonized material input used in the production of subject merchandise.

## IV. COMMERCE'S CHOICE FOR A SURROGATE VALUE FOR TRUCK FREIGHT IS SUPPORTED BY SUBSTANTIAL EVIDENCE

In the Preliminary Results, the primary surrogate country selected by the Department was Thailand. Preliminary Results Surrogate Values Mem. at 1. Specifically, "[t]o value the cost of transportation [ (truck freight) ] from the suppliers to the factory, the Department calculated a contemporaneous per-unit average rate based on publicly available data from Siam Partners Group Company Limited" ("Siam"), a Thai consulting company, for the year 2005, for the transportation of goods by truck from Bangkok to five other provinces in Thailand. Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem. at 9, Attach. 8 at 55. Commerce computed the per-unit average rate by dividing the cost per metric ton rates by the distance from each province to Bangkok. Preliminary Results Surrogate Values Mem. at 9. The Department then averaged the rates for each province to obtain a cost per metric ton per kilometer rate of 0.903 baht. Preliminary Results Surrogate Values Mem. at 9. Because the Siam data was from 2005, the Department then inflated the rate using the Thai Producer Price Index. Preliminary Results Surrogate Values Mem. at 9. As noted, the POR was April 1, 2010, through March 31, 2011.

For the reasons previously stated, the primary surrogate country selection was changed from Thailand in the Preliminary Results, to the Philippines in the Final Results. Thus, the Department used Philippine data to revalue most of the major factors of production for the subject merchandise, including the cost of truck freight from the suppliers to the factory. *See* Final Results Surrogate Values Mem. at 6. In the Final Results, Commerce "calculated a contemporaneous per-unit average rate based on publicly available data [as reported in] the Cost of Doing Business in Legazpi City, Philippines" from the year 2010. Final Results Surrogate Values Mem. at 6, 53. Commerce computed the per-unit average rate by "taking the average of the high and low [p]eso per [kilogram] rate, and then dividing that amount by the distance from Legazpi City to Manila" to obtain a rate of 0.01 pesos per kilogram per kilometer. Final Results Surrogate Values Mem. at 6. This rate was substantially higher than that found in the Preliminary Results.

GHC objects to the Department's use of the Philippine data to value truck freight. It argues that, despite the agency's preference to use a single surrogate country, and despite having put the Philippine data on the record itself and urging its use to value all of the factors of production, Commerce should have continued to use the Thai truck freight data used in the Preliminary Results as the surrogate value. *See* GHC's Br. 35–36 (citing *Shantou Red Garden Foodstuff Co. v. United States,* 36 CIT ——, ——, 880 F.Supp.2d 1332, 1334–35 (2012)); *see generally* Case Br. of Cherishmet Group and Datong Juqiang Activated Carbon Co., Ltd., PD 243 at 3081186–01

(June 13, 2009), ECF Dkt. No. 43 (Apr. 5, 2013). GHC claims that the Thai data was superior because, (1) unlike the Philippine data, the Thai data "represent[ed] a broad market average covering a range of prices" compared to the Philippine truck freight data which was based on a single route, (2) "[t]he Philippine data fail[ed] to satisfy the 'specificity' criteria," because the reported data was based on the transportation of "loose cargo," while the Thai data provided a truck freight cost for fully loaded trucks, and (3) the Philippine data is aberrational as compared to the data used in prior reviews of the Order (approximately eight times higher than the value used in any of the three prior reviews). GHC's Br. 31–34.

As noted, Commerce's preference for surrogate information is to use data that is "product-specific, representative of a broad market average, . . . contemporaneous with the POR[,] and exclusive of taxes and duties." *Jining*, 34 CIT at ——, Slip Op. 10–134, at 23 (citation omitted) (internal quotation marks omitted). In addition, Commerce's regulations direct that "the Secretary [of Commerce] normally will value all factors [of production] in a single surrogate country." 19 C.F.R. § 351.408(c)(2).

[8] Having taken GHC's arguments into consideration, the court holds that the Department reasonably found that Philippine data was the best available information with which to value truck freight. While the Thai data contains ten different price points, valuing the cost of transportation from Bangkok to five other provinces, and may appear to be more probative in this regard, the Thai data suffers from defects that diminish its worth. *See* Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55.

Although GHC contends that the Philippine data lacked specificity because it was based on the transportation of "loose cargo" rather than that of a "full truckload," the court is unpersuaded. The Thai source is based on the rental cost of a truck carrying ten to twelve tons of cargo. *See* Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55. The source further states that a full cargo load for one of these trucks is thirteen tons. *See* Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55. The Philippine data, on the other hand, reported transportation costs for a truck carrying "loose cargo." *See* Final Results Surrogate Values Mem. at 51. Nowhere in the Philippine data source does it define or explain the relevance or meaning of "loose cargo," nor has GHC offered anything to support its contention that the Philippine data based on the transportation of "loose cargo" is not representative of the transportation costs incurred for a fully loaded truck. Thus, the Thai data appears to represent shipping costs for less than a full truckload of shipments, while there is no record evidence that the Philippine data is not representative of the shipping costs for a full truckload, albeit of loose cargo. Without more, GHC's speculation that the Philippine data lacks specificity cannot be credited.

Additionally, GHC claims that the Philippine data is aberrational when compared to truck freight rates used by Commerce in prior reviews. Its argument is premised on the observation that the surrogate value for truck freight selected in the Final Results is several times higher than the values applied in prior reviews when Indian data was employed. Specifically, the Philippine data is eight times higher

than the surrogate value selected in the Preliminary Results, based on the Thai data that GHC contends should be used, and eight times higher than the surrogate values selected in the three prior reviews, from Indian sources. In other words, plaintiffs' objection, unsupported by further record evidence, is that the Philippine prices must not be the best available information because they are too high. Thus, while plaintiffs' observation as to the cost ratios is, no doubt, factually correct, without more it cannot be given much weight.

Despite plaintiffs' arguments, the Philippine source appears to be the best on the record. First, the data is from 2010, and is thus, far more contemporaneous to the POR (April 1, 2010, through March 31, 2011) than the Thai source which supplied its data from August 8, 2005, over four years prior to the POR. *Compare* Final Results Surrogate Values Mem. at 53, *with* Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55. Indeed, the Philippine data's contemporaneity was expressly identified by Commerce as one of its principal reasons for abandoning the use of Thailand as the primary surrogate country in favor of the Philippines. *See* Issues & Dec. Mem. at cmt. 1; *see, e.g., Jining*, 34 CIT at ——, Slip Op. 10–134, at 23 ("Commerce's practice, in selecting the best available information for valuing [factors of production], is to select surrogate values which are . . . contemporaneous with the POR. . . . This practice has found approval in this Court." (citations omitted) (internal quotation marks omitted)).

Next, although the Philippine truck freight data relied upon by Commerce was based on the price range of a single route, from Legazpi to Manila, there is evidence on the record for a second route, from Legazpi to Naga/Tabaco, with the exact same price range. *See* Final Results Surrogate Values Mem. at 51 (listing price ranges from Legazpi to Manila of 5.00/kg to 8.00/kg, and from Legazpi to Naga/Tabaco of 5.00/kg to 8.00/kg). This suggests that the Legazpi to Manila rate is, in fact, more representative than plaintiffs claim.

Finally, although not absolute, the Department is directed by its regulations to endeavor to value all factors of production with a single surrogate country. *See* 19 C.F.R. § 351.408(c)(2) ("[T]he Secretary [of Commerce] normally will value all factors [of production] in a single surrogate country."). Courts have found that Commerce's single surrogate country preference is strong and must be given significant weight. *See, e.g., Clearon*, 37 CIT at ——, Slip Op. 13–22, at 12. This Court and the U.S. Court of Appeals for the Federal Circuit have repeatedly confirmed the reasonableness of the preference to restrict selections for surrogate values to a single surrogate country. *See, e.g., Dorbest Ltd. v. United States*, 604 F.3d 1363, 1367–68 (Fed.Cir.2010) ("For most of the factors of production, Commerce uses the values that prevail in a single market economy country (called a 'surrogate country') that Commerce finds is both (a) economically comparable to the non-market economy country in question and (b) a significant producer of the merchandise in question." (citing 19 C.F.R. § 351.408(c)(2))); *Clearon*, 37 CIT at ——, Slip Op. 13–22, at 12 ("[T]he court must treat seriously the Department's preference for the use of a single surrogate country." (citations omitted)); *Bristol Metals L.P. v. United States*, 34 CIT ——, ——, 703 F.Supp.2d 1370, 1375–76 (2010).

This preference stems from the sensible conclusion that "deriving the surrogate data from one surrogate country limits the amount of distortion introduced into [the Department's] calculations because a do-

**JACOBI CARBONS AB v. U.S.**                **1377**
Cite as 992 F.Supp.2d 1360 (CIT 2014)

mestic producer would be more likely to purchase a product available" domestically. *Clearon,* 37 CIT at ——, Slip Op. 13–22, at 12, 13 ("[T]he use of a 'single surrogate country' is justified when . . . all other factors are 'fairly equal' because minimizing distortion supports a finding that Commerce relied upon the best available information on the record."). Moreover, the process of determining normal value by using data from a market economy country to value factors of production used in manufacturing a product in a nonmarket economy country is inexact enough without adding greater ambiguity, such as the inclusion of a third market and yet another currency. Here, the Department valued most of the major inputs by using Philippine prices, and its preference for valuing factors of production from a single country weighs heavily in favor of valuing truck freight using the Philippine data derived from the Cost of Doing Business.

Accordingly, because (1) the Philippine data is more specific than the Thai dataset on the record, (2) the Philippine data is more contemporaneous to the POR than the competing Thai dataset, (3) the Philippine data, while having fewer data points than the Thai data, is supported by information from two routes, and (4) the court is mindful of Commerce's goal to minimize distortion by means of its strong preference to value factors of production within a single surrogate country, Commerce was reasonable in its choice of the Philippine data as the best available information to value truck freight. Thus, the Department's finding is supported by substantial evidence.

### V. COMMERCE'S CALCULATION OF THE SEPARATE RATE IS SUSTAINED

CAC and the separate rate respondents, Shanxi Industry and Tangshan, urge the court, should it remand the Final Results to Commerce, to instruct the Department to recalculate the dumping margin assigned to the separate rate respondents based on any recalculation of the rate assigned to the mandatory respondents. CAC's Mot. 2; Shanxi Industry's Br. 2; Tangshan's Mot. 2. These companies raise no challenge with respect to the manner in which their rate was calculated. *See* Shanxi Industry's Br. 2 ("[I]n accordance with the law, Shanxi's margin was calculated in a manner consistent with the Department's customary practice of assigning dumping margins to non-individually investigated companies based on the margins calculated for the exporters and producers that are individually investigated as mandatory respondents."). Rather, the success of their motions hinges solely on the merits of Jacobi and GHC's underlying motions, challenging the surrogate values selected for carbonized material and truck freight, which the court has found wanting. Because the court sustains the Department's Final Results, the separate rate respondents' motions for judgment on the agency record are thereby rendered moot. Accordingly, the separate rate calculated by the Department in the Final Results is sustained, and the motions of CAC, Shanxi Industry, and Tangshan are denied.

### CONCLUSION

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Results are sustained. Judgment will be entered accordingly.

