# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## Appeal No. 2014-1752

JACOBI CARBONS AB, JACOBI CARBONS, INC., NINGXIA GUANGHUA
CHERISHMET ACTIVATED CARBON CO., LTD., CHERISHMET INC., BEIJING
PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., DATONG MUNICIPAL
YUNGUANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY
TECHNOLOGY TRADING CO., LTD., CARBON ACTIVATED CORPORATION,
CAR GO WORLDWIDE, INC., TANGSHAN SOLID CARBON CO., LTD.,

<div align="right">Plaintiffs-Appellants,</div>

<div align="center">v.</div>

<div align="center">UNITED STATES,</div>

<div align="right">Defendant-Appellee,</div>

<div align="center">and</div>

CALGON CARBON CORPORATION and NORIT AMERICAS, INC.,

<div align="right">Defendants-Appellees.</div>

---

Appeal from the United States Court of International Trade in
Case Nos. 12-cv-00365, 12-cv-00372, 12-cv-00377, 12-cv-00396, 12-cv-00401,
Judge Richard K. Eaton

---

## CORRECTED
## DIRECT BRIEF OF PLAINTIFFS-APPELLANTS NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., CHERISHMET INC., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., AND SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD.

Francis J. Sailer
Kavita Mohan

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Ste. 650
Washington, DC 20005
Phone: (202) 783-6881
Fax : (202) 783-0405
*Attorneys for Plaintiffs - Appellants*

Dated: November 24, 2014

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## JACOBI CARBONS AB V. U.S., 2014-1752, -1754

## CERTIFICATE OF INTEREST

Pursuant to Rule 47.4 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiffs-Appellants, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Cherishmet Inc., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd., certify the following:

1.     The full name of every party or *amicus* represented by me is:

Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Cherishmet Inc., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest)

Not applicable.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

Not applicable.

4.     The names of all law firms and the partners or associates that have appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Francis J. Sailer, Mark E. Pardo, Andrew T. Schutz, Dharmendra N. Choudhary, and Kavita Mohan of the law firm Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (GDLSK) appeared in the trial court below and Francis J. Sailer, Mark E. Pardo, Andrew T. Schutz, and Kavita Mohan of GDLSK are expected to appear in this court.

Date: November 24, 2014                    /s/Francis J. Sailer_____
                                           Francis J. Sailer
                                           *Counsel for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**STATEMENT OF RELATED CASES** ............................................................1

**JURSIDICTIONAL STATEMENT** ..............................................................1

**STATEMENT OF THE ISSUES** ................................................................2

**STATEMENT OF THE CASE** ...................................................................2

**STATEMENT OF FACTS** ........................................................................4

**SUMMARY OF ARGUMENT** ..................................................................16

**ARGUMENT** ..........................................................................................18

**I.     STANDARD OF REVIEW** ...............................................................18

**II.    THE TRIAL COURT ERRED IN ITS FINDING THAT THE
        DEPARTMENT'S CHOICE OF IMPORT DATA UNDER GTA
        PHILIPPINES HTS 4402.00 AS A SURROGATE VALUE SOURCE FOR
        CARBONIZED MATERIALS IS SUPPORTED BY SUBSTANTIAL
        EVIDENCE AND IN ACCORDANCE WITH THE LAW** ........................20

     A.    LEGAL FRAMEWORK ................................................... 21

     B.    COMMERCE'S SELECTION OF IMPORT DATA UNDER GTA
         PHILIPPINES HTS 4402 TO VALUE CARBONIZED MATERIALS IS
         NOT SUPPORTED BY SUBSTANTIAL EVIDENCE ................... 27

     C.    COMMERCE'S OBJECTIONS TO COCOMMUNITY DATA ARE
         UNSUPPORTED BY RECORD EVIDENCE ................................. 36

          1.    COCOMMUNITY DATA ARE THE MOST SPECIFIC TO THE
              CARBONIZED MATERIAL CONSUMED BY CHERISHMET
              ......................................................... 37

          2.    THERE IS NO RECORD EVIDENCE THAT COCOMMUNITY
              DATA ARE NOT TAX- AND DUTY-EXCLUSIVE OR
              REPRESENTATIVE OF A BROAD MARKET AVERAGE 41

**III.   THE TRIAL COURT ERRED IN FINDING THAT THE
        DEPARTMENT'S CHOICE OF SURROGATE VALUE DATA FOR
        TRUCK FREIGHT IS SUPPORTED BY SUBSTANTIAL EVIDENCE
        AND CONTRARY TO LAW** ..............................................................45

A.       PHILIPPINE DATA ARE ABERRATIONAL ................................. 46

B.       PHILIPPINE DATA DO NOT REPRESENT A BROAD MARKET AVERAGE ........................................................................ 50

C.       PHILIPPINE DATA FAIL TO SATISFY THE SPECIFICITY CRITERIA........................................................................ 52

D.       THE DEPARTMENT MAY RELY UPON A SECONDARY SURROGATE COUNTRY TO CALCULATE AN ACCURATE RATE ................................................................................... 54

**IV.    THE DEPARTMENT SHOULD RECALCULATE THE RATE ASSIGNED TO APPELLANT SEPARATE RATE COMPANIES ........56**

**CONCLUSION AND REQUEST FOR RELIEF ......................................................60**

# TABLE OF AUTHORITIES

## Cases

*Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368 (Ct. Int'l Trade 2009)..................................................................................22

*Amanda Foods (Vietnam) Ltd. v. United States*, 714 F. Supp. 2d 1282 (Ct. Int'l Trade 2010)......................................................................... 58, 59

*Amanda Foods (Vietnam) Ltd. v. United States*, 774 F. Supp. 2d 1286 (Ct. Int'l Trade 2011)..................................................................................57

*Blue Field (Sichuan) Food Indus. Co. v. United States*, 949 F. Supp. 2d 1311 (Ct. Int'l Trade 2013)...............................................................47

*Calgon Carbon Corp. v. United States*, 33 Int'l Trade Rep. (BNA) 1232 (Ct. Int'l Trade 2011)..................................................................39

*Clearon Corp. v. United States*, 2013 Ct. Intl. Trade LEXIS 27 (Ct. Int'l Trade Feb. 20, 2013)........................................................................49

*CS Wind Vietnam Co. v. United States*, 2014 Ct. Intl. Trade LEXIS 129 (Ct. Int'l Trade Nov. 3, 2014)...........................................................24

*Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262 (Ct. Int'l Trade 2006)...........22

*F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ..................................................19

*Fuwei Films Shandong Co. v. United States*, 837 F. Supp. 2d 1347 (Ct. Int'l Trade 2012)......................................................................49

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997)......................19

*Guangdong Chems. Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365 (Ct. Int'l Trade 2006).......................................................46

*Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 366 F. Supp. 2d 1264 (Ct. Int'l Trade 2005) ................................ 25, 26, 35, 42

*Jinan Yipin Corp. v. United States*, 800 F. Supp. 2d 1226 (Ct. Int'l Trade 2011) ..26

*Jining Yongjia Trade Co. v. United States*, 2010 Ct. Intl. Trade LEXIS 140 (Ct. Int'l Trade 2010)..................................................................43

*Longkou Haimeng Machinery Co. v. United States*, 581 F. Supp. 2d 1344 (Ct. Int'l Trade 2008)..................................................................24

*Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295 (Ct. Int'l Trade 2007)......................................................................46

*Ningbo Dafa Chem. Fiber Co., Ltd. Consol. Fibers, Inc. v. United States*, 580 F.3d 1247 (Fed. Cir. 2009) ............................................................22

*Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378 (Fed. Cir. 2014) .37

*Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376 (Fed. Cir. 2001) ..................................................... 20, 22, 46

*Shanghai Foreign Trade Enters. Co., Ltd. v. United States*, 318 F. Supp. 2d 1339 (Ct. Int'l Trade 2004) ......................................................46

*Shantou Red Garden Foodstuff Co. v. United States*, 880 F. Supp. 2d 1332 (Ct. Int'l Trade 2012).............................................................54

*Sichuan Changhong Elec. Co. v. United States*, 460 F. Supp. 2d 1338 (Ct. Int'l Trade 2006)......................................................... 37, 42

*SNR Roulements v. United States*, 402 F.3d 1358 (Fed. Cir. 2005) ......................20

*Taian Ziyang Food Co., Ltd. v. United States*, 637 F. Supp. 2d 1093 (Ct. Int'l Trade 2009).............................................................23

*Taian Ziyang Food Co., Ltd. v. United States*, 783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011)......................................................... 23, 37

*Thai Pineapple Canning Indus. Corp. v. United States*, 273 F.3d 1077 (Fed. Cir. 2001) ................................................................ 19, 20

*Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322 (Ct. Int'l Trade 2010)............................................................27

*Timken Co. v. United States*, 166 F. Supp. 2d 608 (Ct. Int'l Trade 2001) ....... 54, 55

*United States v. Eurodif S.A.*, 555 U.S. 305 (2009)........................................ 20, 35

*US Magnesium LLC v. United States*, 895 F. Supp. 2d 1319 (Ct. Int'l Trade 2013) .............................................................................51

*Writing Instrument Mfrs. Ass'n, Pencil Section v. United States*, 984 F. Supp. 629 (Ct. Int'l Trade 1997) ....................................................23

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 783 F. Supp. 2d 1343 (Ct. Int'l Trade 2011)............................................................58

*Zhengzhou Harmoni Spice Co. v. United States,* 617 F. Supp. 2d 1281 (Ct. Int'l Trade 2009)......................................................... 22, 26

## Administrative Decisions

*Final Determination in the Antidumping Duty Investigation of Certain Activated Carbon from the People's Republic of China*, 72 Fed. Reg. 9,508 (Mar. 2, 2007) ...............................................................................................................38

*Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Second Antidumping Duty Administrative Review,* 75 Fed. Reg. 70,208 (Nov. 17, 2010) ...............................................................39

*Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review*, 76 Fed. Reg. 67,134 (Oct. 31, 2011) .................................................................40

*Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 70,533 (Nov. 26, 2013)......................................................................................43

*Certain Activated Carbon from the People's Republic of China: Issues and Decision Memorandum for the Final Results of the Sixth Antidumping Duty Administrative Review and I&D Memo* (Nov. 18, 2014)....................................44

*High Pressure Steel Cylinders from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 26,739 (May 7, 2012).......................................................................................................51

*Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of the 2007-2008 Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 844 (Jan. 6, 2010) ..........55

*Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 70 Fed Reg. 12,651 (Mar. 15, 2005) ........................................................55

*Multilayered Wood Flooring From the People's Republic of China:  Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 64,318 (Oct. 18, 2011)........................................................................................................58

*Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China:  Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 76 Fed. Reg. 51,940 (Aug. 19, 2011)............................58

## Statutes/ Regulations

19 U.S.C. § 1673d(c)(5)....................................................................... 58,59

19 U.S.C. § 1677b(c) ............................................................... 21, 22, 50, 54

19 U.S.C. § 1677f-1(c)(2)(B)..................................................................57

28 U.S.C. § 1295(a)(5)...........................................................................1

28 U.S.C. § 1581(c) ...............................................................................1

28 U.S.C. § 2107(b) ..............................................................................2

**Other**

*Webster's Third New International Dictionary* 2280 (1993) ..................................20

## STATEMENT OF RELATED CASES

In accordance with Rule 47.5 of the Rules of this Court, counsel for Plaintiffs-Appellants, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC"), Beijing Pacific Activated Carbon Products Co., Ltd. ("BPACP"), Cherishmet Inc., and Datong Municipal Yunguang Activated Carbon Co., Ltd. ("Datong Municipal") (collectively, "Cherishmet"),  and Shanxi Industry Technology Trading Co., Ltd. ("Shanxi"), state:

1. This appeal consolidates the following member cases: CAFC Nos. 14-1752, 14-1753, 14-1754, and 14-1756.  All of these cases appeal the Court of International Trade's ("CIT" or "trial court") decision in *Jacobi Carbons AB, et al. v. United* States, Consol. Court No. 12-365.  *See Jacobi Carbons Ab v. United States*, 992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014).

2. Counsel for Cherishmet and Shanxi are not aware of any other appeal in or from the same civil action or proceeding in the lower court or body that was previously before this Court or any other appellate court.

## JURSIDICTIONAL STATEMENT

The trial court had exclusive subject matter jurisdiction over this action under 28 U.S.C. § 1581(c).  This Court has exclusive jurisdiction over this appeal under 28 U.S.C. § 1295(a)(5).  This appeal was timely filed on August 22, 2014,

*i.e.*, within 60 days of the trial court's final opinion and judgment of June 24, 2014. 28 U.S.C. § 2107(b); Fed. R. App. P. 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1. Whether the trial court erred in finding that the U.S Department of Commerce's ("Commerce" or "the Department") choice of a surrogate value for carbonized material was in accordance with law and supported by substantial evidence.

2. Whether the trial court erred in finding that the Department choice of a surrogate value for truck freight was supported by substantial evidence and in accordance with the law.

3. Whether the Department's calculation of the separate rate is supported by substantial evidence and in accordance with the law.

## STATEMENT OF THE CASE

This case concerns the Department's Final Results in the fourth administrative review of the antidumping duty ("AD") Order on certain activated carbon from the People's Republic of China ("PRC"). *See Certain Activated Carbon from the People's Republic of China; 2010-2011; Final Results of Antidumping Duty Administrative Review*, 77 Fed. Reg. 67,337 (Nov. 9, 2012), and accompanying Issues and Decision Memorandum ("I&D Mem.") (collectively, "Final Results"). JA432, JA371. In its Final Results, the Department departed from its determination in the Preliminary Results to use Thailand as a primary

2

surrogate country, and instead selected the Philippines as the primary surrogate country to value most of the major material inputs used in the production of subject merchandise, including carbonized materials and truck freight. *See Final Results*, 77 Fed. Reg. at 67,338. Specifically, the Department used Harmonized Tariff Schedule ("HTS") import data, derived from the Global Trade Atlas ("GTA"), from the Philippines under heading HTS 4402 ("Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated") to value carbonized materials, and used publicly available data reported in the Cost of Doing Business in Legazpi City, Philippines ("Cost of Doing Business") to value truck freight. Mem. from Emeka Chukwudebe, Case Analyst, to the File at 3, 6 (Nov. 2, 2012) ("Final Results Surrogate Values Mem."). JA403, JA406. For those companies that were not selected to receive an individual review, but that had established their independence from the Chinese government ("separate rate companies"), the Department assigned a rate calculated using the ranged total sales quantities of the individually-reviewed respondents with margins above de minimis from the public versions of their submissions. *Final Results,* 77 Fed. Reg. 67,338.

On November 20, 2012, Cherishmet filed an appeal challenging the Department's selection of surrogate values for carbonized materials and truck freight. *See Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd. et al. v. United States*, Court No. 12-00372, ECF Dkt. No. 1 (Nov. 20, 2012). On

3

November 23, 2012, Shanxi filed an appeal urging the court to instruct the Department to recalculate the rate for separate rate companies if the rate for mandatory respondents was to be changed.  The trial court issued its final decision on June 24, 2014, sustaining the Department's selection of surrogate values for carbonized materials and truck freight and also finding that arguments to revise the separate rate calculation were moot since there were no changes to the calculation of the rate for individually-reviewed respondents.  *Jacobi Carbons*, 992 F. Supp. 2d at 1360. JA1.

On August 22, 2014, Cherishmet and Shanxi filed this appeal with this Court, appealing the trial court's decisions upholding the Department's selection of surrogate values for carbonized materials and truck freight, and also the separate rate assigned to separate rate companies. *Jacobi Carbons AB, et al. v. United States*, Court No. 12-00365, ECF Dkt No. 85 (Aug. 22, 2014).

## STATEMENT OF FACTS

On April 27, 2007, the Department issued the antidumping duty order on certain activated carbon from the PRC.  *See Notice of Antidumping Duty Order: Certain Activated Carbon from the People's Republic of China*, 72 Fed. Reg. 20,988, 20,988 (Apr. 27, 2007) (the "Order"). Following timely requests, the Department conducted its fourth administrative review of the Order for the period of review ("POR"), April 1, 2010, through March 31, 2011. *See Initiation of*

4

*Antidumping and Countervailing Duty Administrative Reviews*, 76 Fed. Reg. 30,912, 30,913 (May 27, 2011).

On July 11, 2011 Commerce issued its antidumping (AD) questionnaire to Jacobi and Cherishmet. *Fourth Antidumping Administrative Review of Certain Activated Carbon from the People's Republic of China: Non-market Economy Questionnaire*, A-570-904 (July 11, 2011) ("POR 4 Questionnaire"). JA65-JA93. Under Section C of the AD questionnaire, Cherishmet was required to provide detailed physical characteristics for all subject merchandise that Cherishmet sold to the United States during the review period.  POR 4 Questionnaire at C-6, C-8 – C-12.  Specifically, Commerce's AD questionnaire set forth the following instructions with respect to reporting in the U.S. sales database the physical material used in the product that was the subject of the sale:

**FIELD NUMBER 3.1:**    **Physical Material**

FIELD NAME:    CARBONU

DESCRIPTION:    Specify the type of source material used to produce the activated carbon.  If you report using char/charcoal, describe in your accompanying narrative the source material(s) from which the char/charcoal was produced, such as metallurgical grade bituminous coal.

01 =    Bituminous coal, metallurgical grade
02 =    Bituminous coal, not metallurgical grade
03 =    Sub-bituminous coal
04 =    Lignite coal
05 =    Anthracite coal

5

|        |                                    |
|--------|------------------------------------|
| 06 =   | Wood                               |
| 07 =   | Peat                               |
| 08 =   | Coconut shell                      |
| 09 =   | Char/Charcoal                      |
| 10 =   | Other (please specify each unique code) |

*Id.* at C-8. JA77.

On September 12, 2011, Cherishmet filed its U.S. sales database with the Department, along with its Section C (U.S. Sales) and Section D (Cost) narrative responses to the Department's Questionnaire. GHC Final Section C and Section D Response (Sept. 12, 2011) at 9 and Exhibit C-1.  JA149-JA156.  Specifically, Cherishmet identified the "source material used to produce the activated carbon" for each of Cherishmet's U.S. sales transactions.  And the database demonstrates that there was not a single U.S. sales transaction in which the activated carbon sold was produced from "wood" as a source material.  *Id*.  Neither petitioner nor Commerce ever disputed the accuracy of the physical characteristic information provided in Cherishmet's U.S. sales database.  On November 16, 2011, Cherishmet filed pre-preliminary surrogate values, proposing an average unit value of 10.65 Peso/MT (*i.e.*, $238.64/MT) based on import data from GTA Philippines HTS 27040090 ("Coke and semicoke of coal") to value carbonized materials.  *See* First Surrogate Value Submission of Cherishmet Group and DJAC (Nov. 16, 2011), Exhibits 1 and 2.  JA228, JA237.

6

On November 16, 2011, Jacobi Carbons Inc. and Jacobi Carbons AB ("Jacobi"), another Chinese respondent, submitted a pre-preliminary surrogate value submission, including a domestic price data source from the Philippines to value carbonized materials. Specifically, Jacobi proposed that the Department should value carbonized materials at $255/MT based on the average domestic prices of coconut charcoal in the Philippines during the period of review, as reported in Cocommunity, a monthly publication of the Asian and Pacific Coconut Community ("APCC"). *See* Letter from Winston & Strawn LLP pertaining to Jacobi Carbons Inc. and Jacobi Carbons AB Surrogate Value Comments, at pages 4-5 and Exhibit SV-4. JA177-JA178, JA184. Jacobi supported its proposal by citing to the Department's Draft Remand Determination in connection with *Calgon Carbon Corp. v. United States*, 33 Int'l Trade Rep. (BNA) 1232 (Ct. Int'l Trade 2011) (Feb. 11, 2011), in which the Department concluded that "coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the production of activated carbon." JA177. Further, Jacobi argued that since the domestic prices of coconut charcoal in Cocommunity were for a material that is equivalent to the coconut shell charcoal imported under Indian HTS 4402.90.10 , which was used in the third administrative review and in the amended final results of the POR 1 administrative review to value carbonized materials, it satisfied the Department's specificity criteria. Jacobi also noted in its

7

submission that the Cocommunity data met the Department's requirement of being tax and duty exclusive.   JA178.

Jacobi also opposed the choice of the GTA Philippines import data under HTS 4402.00 on two grounds. First, and significantly, there were no imports reported for the period covered by POR 4 under the GTA Philippine HTS subheading 4402.00.10, the specific sub-heading that captures imports of coconut shell charcoal.[1] *Id*.  Second, as importantly, the remaining imports under HTS 4402.00 were comprised of various types of charcoal (*i.e.*, wood charcoal, including shell and nut charcoal) that were not specific to the activated carbon industry. JA177-JA178.

Cherishmet submitted its final U.S. sales database on March 22, 2012, confirming that none of the subject merchandise was produced using "Wood" (code "06").  JA290-301.

On May 4, 2012, the Department published its Preliminary Results for the review, identifying Datong Juqiang Activated Carbon Co., Ltd.,[2] Jacobi Carbons AB ("Jacobi"), and GHC as mandatory respondents. *See Certain Activated Carbon*

---

[1] Jacobi inadvertently referred to the Philippine HTS sub-heading as 4402.00.10 instead of the correct 10-digit sub-heading (4402000001), which covers imports of coconut shell charcoal. GTA Philippines import data during POR 4 show no imports under HTS 4402000001. This minor error does not affect the substantive argument, *i.e.*, that during POR 4, there were no imports of coconut shell charcoal into the Philippines.

[2] This company is not a party to this action.

*from the People's Republic of China: Preliminary Results of the Fourth Antidumping Duty Administrative Review, and Intent To Rescind in Part*, 77 Fed. Reg. 26,496, 26,497 (May 4, 2012) ("Preliminary Results"). JA321.  BPACP, Datong Municipal, Shanxi, and Tangshan Solid Carbon Co., Ltd. ("Tangshan") each filed separate rate certifications.  *See Preliminary Results*, 77 Fed. Reg. at 26,501.  In the Preliminary Results, Commerce "selected Thailand as the primary surrogate country for the valuation of the [factors of production] and surrogate financial ratios." Mem. from Katie Marksberry, International Trade Specialist, to the File at 1 (Apr. 30, 2012) ("Preliminary Results Surrogate Values Mem."). JA302.  Pursuant to its selection of Thailand as the primary surrogate country, the Department used GTA Thailand import data from HTS 4402.90.00 to value carbonized materials. *See* Preliminary Results Surrogate Values Mem. at  4 and Attachment 1. JA305, JA314.

Following publication of the Preliminary Results, Jacobi, GHC, Cherishmet, and BPACP submitted comments that placed on the record additional data from the Philippines, and urged the Department to use it to value all of the major material inputs. I&D Mem. at Cmt. 1. JA374-JA397.   On June 13, 2012, Jacobi filed its Administrative Case Brief arguing that the Thai HTS 4402.90.00 was inappropriate for valuing carbonized materials because it included imports of wood charcoal, which was not being used as a raw material by either Jacobi or any other

9

respondent (including Plaintiffs) in producing steam activated carbon, *i.e.*, the subject merchandise. *See* Case Brief of Jacobi Carbons (June 13, 2012), at pages 10-14, 38-39. JA339. In order to impeach the choice of Thai HTS 4402.90.00, Jacobi drew support from the scope of the order, demonstrating that the scope excluded chemically activated carbon, and also citing independent technical literature demonstrating that chemically activated carbon was produced from wood. Subject merchandise, steam activated carbon, on the other hand, is generally produced using carbonized coal. JA344-JA347. As such, the manufacturing process for chemically activated carbon was shown to be distinctly different from that used in producing subject merchandise. *Id.* Jacobi noted that in prior segments of this proceeding, the Department had valued carbonized materials consumed by respondents using coconut shell charcoal price data. *Id.* Jacobi reiterated its proposal that domestic Philippine price data for coconut charcoal, as reported in Cocommunity publication, be applied as the best surrogate value for carbonized materials used in the production of subject merchandise, stating that "Cocommunity meets all of Commerce's needs when valuing FOPs as it is complete, contemporaneous, publicly available, represents a broad market average, and is tax-exclusive." *Id.*

In the *Final Results*, Commerce found that "both the Philippines and Thailand are significant producers [of activated carbon] because, in quantity terms,

they are  exporters of goods identical to the subject merchandise, [and] have

production of comparable merchandise as evidenced by the financial statements on

the record." I&D Mem. at Cmt. 1. JA377.   The Department determined, however,

that although otherwise "relatively equal in terms of quality and satisf[action] of all

of the surrogate value criteria," the Philippine data (particularly the financial

statements) were "clearly superior" to the Thai data because they were "industry-

specific, whereas the Thai data [were] for the manufacturing sector in general."

I&D Mem. at Cmt. 1. JA396.  The Philippine data were also found to be more

contemporaneous to the POR than the Thai data.  I&D Mem. at Cmt. 1. *Id.*

   As a result, Commerce departed from its determination in the Preliminary

Results, and selected the Philippines as the primary surrogate country to value

most of the major material inputs used in the production of subject merchandise,

including carbonized materials and truck freight.  *Final Results*, 77 Fed. Reg. at

67,338.  Specifically, the Department used Harmonized Tariff Schedule ("HTS")

import data, derived from the GTA from the Philippines under heading HTS 4402

("Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not

Agglomerated") to value carbonized materials.  The Department provided the

following rationale for its selection of Philippines HTS 4402:

> The Philippine data satisfies all of the surrogate value
> criteria to value carbonized material. First, the publicly
> available import data from the Philippines under HTS
> 4402.90.00 comes from an approved surrogate country.

11

Second, the data comes from the HTS described as "Wood Charcoal (including shell, nut charcoal, and bamboo)", which is specific to the input in question because Jacobi and the other mandatory respondents use this type of carbonized material in the production of subject merchandise. Third, the data is contemporaneous with the POR. Finally, the data represents a broad market average and is tax and duty exclusive. . . . As stated above, this category would include materials that fall within the scope of this order for feedstock of carbonized material. Furthermore, while this HTS category is a basket, we note that, like the Thai import data above, any imports of coconut shell carbonized material would be included herein.

I&D Memo at Cmt. 1.  JA387-JA388.

Conversely, the Department rejected the alternative choice of Cocommunity data, reasoning that:

The price listed in the publicly available Cocommunity data is from an approved surrogate country and is contemporaneous with the POR.  While Jacobi states that the document contains data on coconut charcoal and that this type of carbonized material is the most specific to what they use, we note that Cherishmet uses both coconut charcoal and other carbonized materials as an input, as does Jacobi. Furthermore, the record lacks any information about whether or not the price listed in Cocommunity is in fact tax and duty exclusive. Finally, the value for coconut charcoal from Cocommunity is region-specific and, thus, is not as representative of broad market averages as GTA data because the latter provides country-wide data on imports into the particular country from all global trading partners. Thus, the Cocommunity document does not provide the best information available on the record.

I&D Memo at Cmt. 1. JA388.

12

The Department also used publicly available data reported in the Cost of Doing Business in Legazpi City, Philippines to value truck freight. Final Results Surrogate Values Mem. at 3, 6. JA406.  For those companies that were not selected to receive an individual review, but that had established their independence from the Chinese government ("separate rate companies"), the Department assigned a rate calculated using the ranged total sales quantities of the individually-reviewed respondents with margins above de minimis from the public versions of their submissions. JA433.

On November 20, 2012, Cherishmet filed an appeal challenging the Department's selection of surrogate values for carbonized materials and truck freight.  *See Ningxia Guanghua Cherishmet Activated Carbon Company, Ltd., et al. v. United States*, Court No. 12-00372, ECF Dkt. No. 1 (Nov. 20, 2012).  On November 23, 2012, Shanxi filed an appeal urging the Court to instruct the Department to recalculate the rate for separate rate companies if the rate for mandatory respondents changed.  *See Shanxi Industry Technology Trading Co., Ltd. v. United States*, Court No. 12-00377, Ecf. Dkt. No. 1 (Nov. 23, 2014).  These cases were consolidated at the CIT with cases filed by Jacobi, Carbon Activated Corp. ("CAC"), Car Go Worldwide, Inc. ("Car Go"), and Tangshan Solid Carbon Co., Ltd. ("Tangshan") under Consol. Court No. 12-00365.

At the trial court, Cherishmet argued that the choice of GTA Philippines HTS 4402.00 to value carbonized materials was clearly contradicted by substantial record evidence and was also inconsistent with the Department's longstanding precedent to value carbonized materials based on the surrogate value of coconut shell charcoal. Cherishmet further argued that the domestic Philippine data source, Cocommunity, reports price data for coconut shell charcoal, which is a comparable grade of carbonized material to that used by Cherishmet to produce the subject merchandise. Thus, Cocommunity data satisfy the most important criterion -- "product specificity," and constituted the best available, in fact, the only appropriate, price data on the record which could be applied to accurately value carbonized materials utilized by Cherishmet in the production of subject merchandise. Regarding truck freight, Cherishmet argued that the Department's selection of the Philippines data source to value truck freight failed to comport with the statute, was unsupported by substantial evidence and was also inconsistent with established precedent. In contrast, Cherishmet demonstrated that the Thai truck freight data applied in the Preliminary Results met all of the criteria established for the selection of the best surrogate value. Accordingly, Cherishmet urged the Court to reject the Department's choice of the Philippine data and remand the issue to Commerce to apply the Thai data to value truck freight.

14

On June 24, 2014, the trial court issued its final decision in consolidated Court No. 12-365, sustaining the Department's final results.  The trial court sustained the Department's surrogate value for carbonized materials on the following bases:

1. Cocommunity data are only "modestly more specific" to the carbonized material inputs than import data found under HTS 4402 and "Commerce was not unreasonable in finding that a slight superiority in specificity failed to compensate for the Cocommunity data's deficiencies with respect to the limited breadth of market prices it supplied and the lack of record evidence demonstrating that the publication's prices were tax- and duty-free." *Jacobi Carbons Ab*, 992 F. Supp. 2d at 1373.

2. None of the cases relied upon by GHC to demonstrate that Commerce prefers using domestic data were cases in which the data were regional and not country-wide or not shown to be tax- and duty-free. *Id.* at 1369-1370.

3. Plaintiffs do not point to any evidence that there were no imports of shell-derived carbonized material entered during the POR under HTS 4402. *Id.* at 1373.

Regarding truck freight, the trial court sustained Commerce's determination on the basis that Philippine data were more specific, contemporaneous, and were from Commerce's primary surrogate country. *Id*. at 1377.  Finally, the trial court

rejected Shanxi's arguments to revise the separate rate, since the rate for the mandatory respondents was not being revised and the separate rate respondents did not have separately challenge how the rate was calculated. *Id.*

## SUMMARY OF ARGUMENT

The trial court erred in affirming the Department's selection of GTA Philippines HTS 4402.00 data covering "Wood charcoal (including shell, nut charcoal, and bamboo)" to use as a surrogate value for carbonized materials in this review. The trial court also erred in affirming the Department's selection of Philippine data to value truck freight. The Court should issue a remand ordering the Department to reconsider these two issues, and also order the Department to recalculate the rate for separate rate companies.

Record evidence establishes that the Department's reasons for selecting GTA Philippines HTS 4402.00 data to value carbonized materials is not supported by substantial evidence. Specifically, contrary to the Department and the trial court's assertions, GHC did not use any wood in the production of its subject merchandise and the Department's selection of wood charcoal to value carbonized material is not specific to the input in question. In addition, during POR 4, Philippine imports under this heading did not include *any* coconut shell charcoal. The Department's selection is also inconsistent with the Department's longstanding precedent to value carbonized materials based on the surrogate value

16

of coconut shell charcoal.  Finally, HTS 4402 import data are demonstrably

aberrational as compared to the domestic Cocommunity data as well as the historic

surrogate value data used to value coconut shell charcoal in prior proceedings, and

thus does not represent the economic reality.   Consequently, HTS 4402.00 cannot

represent the "best available information" under any definition of the term.

In contrast, the domestic Philippine data source, Cocommunity, reports price

data for coconut shell charcoal, which is more specific to the type of carbonized

material used to produce the subject merchandise. As such, Cocommunity data

satisfy the most important criterion of "product specificity," and constitute the best

available data on the record that can properly be used to value carbonized materials

like that used in Cherishmet's Chinese production of subject merchandise.

Furthermore, the Department's reasons for not selecting Cocommunity data are

unsupported by substantial evidence.

The trial court also erred in affirming the Department's selection of

Philippine data to value truck freight.  Thai truck freight data applied in the

Preliminary Results meet all of the criteria established for the selection of the best

surrogate value.  They are based on a broad market average, an important factor in

the context of freight, and are more specific than the Philippine Cost of Doing

Business data.  In contrast, the Department's selection in the Final Results of the

Philippine data source fails to comport with the statute, is unsupported by

17

substantial evidence, is inconsistent with established precedent and yields an aberrationally high and commercially unrealistic value. Therefore, the Court should reject the Department's choice of the Philippine data and remand the issue for the Department to apply the Thai data to value truck freight.

Finally, in its Final Results, the Department assigned to Shanxi a separate rate of $1.04 per kilogram of subject merchandise, which was based on the ranged, publicly available U.S. sales quantities from the two mandatory respondents: Jacobi and GHC. Shanxi's margin was calculated in a manner consistent with the Department's customary practice of assigning dumping margins to non-individually investigated companies based on the margins calculated for the exporters and producers that are individually investigated as mandatory respondents. Accordingly, in revising the final dumping margin for Jacobi and/or GHC based on any remands ordered by this Court, the Court should also order the Department to recalculate the final weighted average dumping margin for Shanxi using the revised margins calculated for Jacobi and/or GHC.

## ARGUMENT

## I.    STANDARD OF REVIEW

When reviewing the Department's antidumping duty determinations, "{the Federal Circuit} applies anew the standard of review applied by the Court of International Trade in its review of the administrative record. . . .  In doing so, {the

18

Court will} uphold Commerce's determination unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with law.' 19 U.S.C. § 1516a (b)(1)(B)(i) (1994)." *F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1031 (Fed. Cir. 2000) (internal citations omitted).

"{S}tatutory interpretations articulated by Commerce in antidumping determinations qualify for Chevron deference;" however, "if the Government's position is unreasonable, deference does the agency no good." *Thai Pineapple Canning Industry Corp. v. United States*, 273 F.3d 1077, 1083 (Fed. Cir. 2001). "While various methodologies are permitted by the statute, it is possible for the application of a particular methodology to be unreasonable in a given case when a more accurate methodology is available and has been used in similar cases." *Id.*

"{T}he substantial evidence standard requires more than mere assertion of evidence which in and of itself justified the . . . determination, without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn. . . .  Rather {t}he substantiality of evidence must take into account whatever in the record fairly detracts from its weight. . . .  In sum, the question before this court on review is whether "the administrative record contains substantial evidence to support the determination and was it a rational decision?" *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (internal

19

citations deleted). The word "substantial" generally means "considerable in amount, value or worth." *Webster's Third New International Dictionary* 2280 (1993).

"Antidumping laws intend to calculate antidumping duties on a fair and equitable basis." *SNR Roulements v. United States*, 402 F.3d 1358, 1363 (Fed. Cir. 2005). "The purpose of the statutory provisions is to determine antidumping margins as accurately as possible." *Shakeproof Assembly Components Div. of Ill. Tool Works v. United States*, 268 F.3d 1376, 1382 (Fed. Cir. 2001) (citations omitted). "[F]orm should be disregarded for substance and the emphasis should be on economic reality." *United States v. Eurodif S.A.*, 555 U.S. 305, 317-18 (2009). To avoid distortions, the Department must consider all relevant factors, including those "not present in most antidumping determinations." *Thai Pineapple Canning Indus. Corp.*, 273 F.3d at 1085.

## II.   THE TRIAL COURT ERRED IN ITS FINDING THAT THE DEPARTMENT'S CHOICE OF IMPORT DATA UNDER GTA PHILIPPINES HTS 4402.00 AS A SURROGATE VALUE SOURCE FOR CARBONIZED MATERIALS IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND IN ACCORDANCE WITH THE LAW

The Department's selection of GTA Philippines HTS 4402.00 data covering "Wood charcoal (including shell, nut charcoal, and bamboo)" was improper for the valuation of carbonized materials in this review. Record evidence establishes that

20

the Department's reasons for selecting GTA Philippines HTS 4402.00 data are not

supported by substantial evidence and HTS 4402.00 cannot represent the "best

available information" under any definition of the term.  In contrast, the domestic

Philippine data source, Cocommunity, reports price data for coconut shell charcoal

that satisfy the most important criterion of "product specificity," and constitute the

best available data on the record to value carbonized materials.   The Department's

reasons for rejecting Cocommunity data are unsupported by substantial evidence.

## A.   <u>LEGAL FRAMEWORK</u>

When subject merchandise is exported from a non-market economy country

("NME") in an antidumping duty investigation, Commerce must "determine the

normal value of the subject merchandise on the basis of the value of the factors of

production utilized in producing the merchandise and to which shall be added an

amount for general expenses and profit plus the cost of containers, coverings, and

other expense."  19 U.S.C.  § 1677b(c)(1).  In valuing the factors of production

under this section, Commerce "shall utilize, to the extent possible, the prices or

costs of factors of production in one or more market economy countries that are -

(A) at a level of economic development comparable to that of the nonmarket

economy country, and (B) significant producers of comparable merchandise."  *Id.*

§ 1677b(c) (4).  The antidumping statute requires that "the valuation of the factors

of production shall be based on the *best available information* regarding the values

of such factors in a market economy country or countries considered to be appropriate by the administering authority." *Id.* § 1677b(c)(1)(emphasis added).

This Court and the CIT have interpreted this statutory provision as requiring Commerce to compare the different sources of data in the evidentiary record and select the best source among the options, looking at the quality, specificity and contemporaneity of the data. *See Ningbo Dafa Chemical Fiber Co., Ltd. Consolidated Fibers, Inc., et al. v. United States*, 580 F.3d 1247, 1257 (Fed. Cir. 2009 )("In determining the valuation of . . . factors of production, the critical question is whether the methodology used by Commerce is based on the best available information and establishes antidumping margins as accurately as possible") )(internal quotation marks omitted), quoting *Shakeproof Assembly Components Div. of Ill. Tool Works,* 268 F.3d at 1382; *see also Amanda Foods (Vietnam) Ltd. v. United States*, 647 F. Supp. 2d 1368, 1378 (Ct. Int'l Trade 2009) ("In considering the validity of proposed surrogate values, Commerce seeks to weigh the specificity, the accuracy, and the contemporaneity of the proposed data"); *Dorbest Ltd. v. United States*, 462 F. Supp. 2d 1262, 1268 (Ct. Int'l Trade 2006)( "[the] term 'best available' is one of comparison, *i.e.*, the statute requires Commerce to select, from the information before it, the best data for calculating an accurate dumping margin"); *Zhengzhou Harmoni Spice Co. v. United States,* 617 F. Supp. 2d 1281, 1296 (Ct. Int'l Trade 2009)(Commerce's discretion to select

22

surrogate values is "curtailed by the purpose of the statute, *i.e.*, to construct the product's normal value as it would have been if the NME country were a market economy country"); *Writing Instrument Mfrs. Ass'n, Pencil Section v. United States*, 984 F. Supp. 629, 637 (Ct. Int'l Trade 1997)( calculating the most accurate dumping margins possible remains "the paramount objective of the statute" even under the factors of production methodology).  The courts have further explained that Commerce's goal should be to attempt to create a "hypothetical market value" for the subject merchandise.  *See Taian Ziyang Food Co. v. United States*, 637 F. Supp. 2d 1093, 1105 (Ct. Int'l Trade 2009)("In essence, Commerce creates a 'hypothetical' market value to approximate the production experience in the NME country").

Among the criteria that the Department must consider, the specificity of the product is typically afforded the greatest consideration.  In *Taian Ziyang Food Company, Ltd. v. United States*, 783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) ("*Taian*"), the CIT rejected Commerce's use of a surrogate value derived from a broad "basket" provision of the Indian Tariff Schedules ("HTS") when there was more specific (or better) information available.  *Id.* at 1334-1340.  The *Taian* court explained that:

> {a}ll of the criteria outlined in Policy Bulletin 04.1 may
> be important. But they are not equally important. As a
> matter of pure logic, first among them must be 'product

23

specificity' (or in the parlance of the Policy Bulletin, 'prices specific to the input in question')."

*Id.* at 1300 (holding that product specificity must be the primary consideration by Commerce in determining the "best available information"). *See also CS Wind Vietnam Co. v. United States*, 2014 Ct. Intl. Trade LEXIS 129 (Ct. Int'l Trade Nov. 3, 2014)(finding that Commerce acted reasonably in" giving greater weight to the specificity of the product over the lack of contemporaneity and the concerns regarding whether the SICGIL data are based on broad market averages").

In *Longkou Haimeng Machinery Co. v. United States*, Commerce selected an HTS heading which contained several different types of pig iron, all of which had less than or equal to 0.5% phosphorous. 581 F. Supp. 2d 1344, 1361-62 (Ct. Int'l Trade 2008). The manufacturer cited InfoDrive data indicating that as much as 70% of the material imported into India under the relevant HTS heading was Sorelmetal. *Id.* at 1363. Sorelmetal was not suitable for use in manufacturing the subject merchandise because it has very different properties than the pig iron that the manufacturer had utilized. *Id.* In response to this argument, Commerce stated that it had chosen this heading because it was contemporaneous with the period of review and it was specific to the raw material used by the manufacturer because the manufacturer had indicated that it used pig iron with less than or equal to 0.5% phosphorous. *Id.* at 1362. The Court of International Trade found Commerce's argument insufficient to explain why the HTS heading was the best available

24

information for valuing the pig iron utilized by the manufacturer.  *Id.* at 1363.  The

court concluded that Commerce's argument:

> [d]id not address the question of whether or not the pig
> iron imports into India, under HTS 7201.1000, are
> consistent with the pig iron consumed by Plaintiffs.
> Therefore, the Court finds that Commerce failed to
> adequately explain whether the Indian imports under
> HTS 7201.1000 are the best available information for
> valuing pig iron consumed by the Plaintiffs in the
> production of subject merchandise.

*Id.*  Similarly, in *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States*, 366

F. Supp. 2d 1264 (Ct. Int'l Trade 2005)("Hebei II"), the Department reviewed

whether Commerce's selection of HTS code 2701.19.09 (referring to an "other"

basket category of coal) was the proper surrogate for the coal that respondents used

in the production of subject merchandise.  The Court found that it was not,

concluding that:

> A broad and unsupported coal value falls short of a
> substantial evidentiary basis just as a narrow and
> unsupported coal value does. During its investigation or
> upon remand, Commerce should have established the
> category of coal used by Hebei *or at least established the
> category or categories of coal normally used to produce
> the subject merchandise. Commerce's failure to do so
> leaves no basis for favoring import data.* Because
> Commerce drew no rational connection between its
> surrogate value and the coal used in production of the
> subject merchandise, its broad versus narrow distinction
> is arbitrary.

*Id.* at 1272-1273 (emphasis added).

In *Zhengzhou Harmoni*, *supra*, the CIT remanded Commerce's surrogate value finding that "higher-price-equals-bigger-bulb" for the garlic bulb raw material input.  Finding that the Department's finding was not based on substantial evidence, the Court stated explicitly that:

> The statutory objective of calculating dumping margins as accurately as possible can be achieved only when Commerce's choice as to what constitutes the best available *information evidences a rational and reasonable relationship to the factor of production that it represents.*

617 F. Supp. 2d at 1297 (emphasis added).  Specifically, the CIT found unsustainable the selection of purported market price data without specific information regarding the "nature and characteristics" of the product for which it had market price data.  *Id.*

Finally, there is a well-established Department preference for selecting domestic data rather than import statistics.  In selecting a surrogate value for various material inputs, a "domestic price is preferred . . . by prior practice, policy, and logic. . . . [T]he preference for domestic data is most appropriate where the circumstances indicate that a producer in a hypothetical market would be unlikely to use an imported factor in its production process." *Hebei Metals II.*, 366 F. Supp. 2d at 1273-1274; *Jinan Yipin Corp. v. United States*, 800 F. Supp. 2d 1226, 1286 (Ct. Int'l Trade 2011) ("Like the Final Results, the Remand Determination fails to adequately address Commerce's general preference for the use of domestic data,

26

rather than import statistics"); *Tianjin Magnesium Int'l Co. v. United States*, 722 F. Supp. 2d 1322, 1333 (Ct. Int'l Trade 2010) ("when the Department has a choice between domestic data and import statistics, Commerce's preference is to use domestic data").

Commerce did not use the best information available to value carbonized materials when it used Philippines HTS data over Cocommunity data. As discussed above, specificity is the most important criterion in selecting an appropriate surrogate value and the Philippines HTS data are not specific. Moreover, as discussed below, the reasons cited by the Department for selecting the Philippines HTS data over Cocommunity data are unsupported by substantial evidence.

### B. COMMERCE'S SELECTION OF IMPORT DATA UNDER GTA PHILIPPINES HTS 4402 TO VALUE CARBONIZED MATERIALS IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE

The Department's selection of Philippine import data to value carbonized materials, and the trial court's support of that determination, are not supported by substantial evidence. In its Final Results, the Department supported its selection of Philippines HTS 4402.00 to value carbonized material for the following reasons:

1. "{T}he data comes from the HTS described as "Wood Charcoal (including shell, nut charcoal, and bamboo)" and is "specific to the input in question because Jacobi and the other mandatory respondents use this type of

carbonized material in the production of subject merchandise." *Final Results*, I&D Memo at Cmt. 1.

2. "Furthermore, while this HTS category is a basket, we note that, like the Thai import data above, any imports of coconut shell carbonized material would be included herein." *Id.*

The trial court supported the Department's selection. Although it agreed with Cherishmet and Jacobi's legal arguments pertaining to the "the importance of the inputs actually used in the production of their activated carbon" it held that Cherishmet's and Jacobi's arguments failed the substantial evidence standard because Cocommunity data were only "marginally" more specific than HTS heading 4402. It supported this on its faulty presumption that "HTS heading 4402 also encompasses shell-derived carbonized material" and that "the record demonstrates that GHC has used wood as a material in the production of its activated carbon." *Jacobi AB*, 992 F. Supp. 2d at 1372. Both of these threshold findings that Commerce cited in support of its choice are directly contradicted by substantial record evidence.

First, contrary to the Court's assertion, GHC *did not use any wood* in the production of subject merchandise. The trial court supported its assertion that GHC had used wood by noting that Cherishmet had submitted an excerpt from its website stating that GHC produces a "variety high-grade pellet products with the

28

materials of coconut shell, nutshell and wood." 992 F. Supp. 2d at 1372, *citing*

Letter from Francis J. Sailer, Grunfeld, *et al*., to Secretary of Commerce, U.S.

Department of Commerce at 44 (Aug. 19, 2011). JA102.  However, this statement

was interpreted entirely out of context, since it merely showcased the company's

production capabilities generally.  There is nothing on the record that even

suggests that Cherishmet actually used wood to produce the subject merchandise.

In fact, to the contrary, the record demonstrates conclusively that Cherishmet did

*not* use wood to produce the subject merchandise.  As explained in the Statement

of Facts, *supra*, Cherishmet filed its U.S. sales database on September 12, 2011

and a final version of its U.S. sales database on March 22, 2012.  JA149-156 and

JA290-301.  A review of these databases demonstrates that *none* of Cherishmet's

subject merchandise was produced using "Wood" (code "06").  *Id.*  Thus, the trial

court's assertion that "GHC has used wood as a material in the production of its

activated carbon" is inaccurate and misstates the critical fact, demonstrated by

record evidence that GHC did not use wood in its production of subject

merchandise (*i.e.*, activated carbon sold to the U.S.).

    Second, Commerce's and the trial court's assertion that "HTS heading 4402

also encompasses shell-derived carbonized material" is similarly not supported by

substantial evidence.  The HTS import category that Commerce used as its

surrogate value for carbonized materials was entitled "Commodity 4402, Wood

Charcoal (Including Shell or Nut Charcoal) Whether or Not Agglomerated." *See*

Final Results Surrogate Values Mem at Attachment 2.  JA411-JA424.  Referring to

the fact that this basket category (4402) also included "shell charcoal,"

Commerce's final I&D Memo concludes that: "the [import] data comes from the

HTS . . . which is specific to the input in question because Jacobi and the other

mandatory respondents use this type of carbonized material in the production of

subject merchandise."  I&D Memo, *supra*.  JA387.  However, this conclusion is

contradicted by the evidentiary record.  While in the abstract the broad category

covered by HTS 4402 includes "shell-based charcoal" and therefore would include

coconut shell carbonized material, the actual import data for the POR that

Commerce used to derive the surrogate value for the carbonized materials clearly

demonstrated that it did not include any imports of coconut shell charcoal.

   This is clearly evident from the composition of the actual import data

 under HTS 4402 for the period of review (April 1, 2010 – March 31, 2011).  As

detailed below, under the four digit HTS 4402 in the Philippine HTS system, there

are four sub-categories at the 10-digit level.

| HTS | Description |
|---|---|
| Commodity 4402 | Wood Charcoal (Including Shell or Nut Charcoal) Whether or Not Agglomerated. |
| Commodity 4402.00.00.01 | Of Coconut Shell, Not Agglomerated |

| Commodity 4402.00.00.02 | Of Wood, Not Agglomerated |
|---|---|
| Commodity 4402.00.00.03 | Of Wood (Including of Shell or Not Agglomerated) |
| Commodity 4402.00.00.09 | Other |

That is, the Philippine tariff has a specific 10 digit HTS subheading for coconut shell charcoal. However, the evidentiary record confirms that during the period of review, there were no import data recorded under "Commodity 4402.00.00.01, Of Coconut Shell, Not Agglomerated." *See* Jacobi's Comments on Surrogate Values, dated November 16, 2011 at 4 ("there are no data available for coconut shell charcoal from the Philippines imported under HTS 4402.00.10"). JA177. No party has ever challenged this assertion, and neither the Department nor the petitioners ever took issue with this fact or placed any contradictory information on the record. The fact that no document on the record shows a non-existent fact is hardly surprising, but had the fact been controvertible, surely such a document would have been placed on the record.

Indeed, it was precisely because there were no usable import data (during the review period) under HTS 4402.00.00.01 that Jacobi submitted an alternative data source; namely, average Philippine selling prices for coconut shell charcoal published in Cocommunity. *Id.* Thus, contrary to Commerce's conclusion, the surrogate value data source that Commerce utilized for valuing carbonized

31

materials did not include any data for the type of carbonized materials that is comparable to those consumed by Cherishmet in producing the activated carbon subject merchandise. The surrogate value that Commerce applied was based on the average value of wood charcoal and undefined miscellaneous products, which, as noted above, were simply *not* utilized in the production of subject merchandise.

There is substantial precedent establishing that Commerce must consider the specific type of product at issue and articulate a rational and reasonable relationship between the surrogate value it selects and the actual factor of production used to produce the subject merchandise, as discussed above.  *See* Section II.A. on the Legal Framework, *supra*.   Contrary to the trial court's assessment, the use of Philippine import data for carbonized materials has no rational connection to the subject merchandise, and the reasons cited by the Department for using Philippine import data over Cocommunity data are entirely unsupported by the record.

Finally, and importantly, the average unit value ("AUV") from the HTS 4402 import data is demonstrably aberrational as compared to the domestic Cocommunity data as well as the historic surrogate value data used to value coconut shell charcoal in prior proceedings.  The following chart summarizes the surrogate values the Department has consistently used:

| Period of Review | SV (USD/MT) |
| --- | --- |

32

| | |
|---|---|
| POR 1 | 32.99[3] |
| POR 2 | 66.256/435.62[4] |
| POR 3 | 83.45[5] |
| POR 4 | 1,203.80 |
| Cocommunity Avg Price | 255 |

Even though the average domestic price ($255/MT) of coconut charcoal is significantly higher than the surrogate value data for coconut shell charcoal applied in prior review proceedings (*i.e.*, $33-84/MT), it is far more reasonable and probative, as compared to the aberrationally higher average import price of

---

[3] *See* Memo To: The File, Through: Catherine Bertrand, Program Manager, Office 9, IA, From: Bob Palmer, Case Analyst, Office 9, IA, Re: Draft Remand Redetermination Analysis Memorandum for Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. in the Antidumping Duty Review of Certain Activated Carbon from the People's Republic of China (Apr. 20, 2011) (Based on the POR 1 exchange rate conversion of 1 Rs = 0.024164 USD).

[4] In POR 2, the Department valued coconut shell charcoal at $66.256/MT and valued coal based carbonized materials under HTS 27940090 at $435.62/MT. *See* Memo To: The File, Through: Catherine Bertrand, Program Manager, Office 9, IA, From: Bob Palmer, Case Analyst, Office 9, IA, Re: Second Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Value for the Final Results (November 9, 2010), at Attachment 1.

[5] *See* Memo To: The File, Through: Catherine Bertrand, Program Manager, Office 9, IA, From: Bob Palmer, Case Analyst, Office 9, IA, Re: Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Value for the Final Results (Oct. 25, 2011), at Attachment 1 & 3 (Based on POR 3 exchange rate conversion of 1 Rs = 0.021982 USD).

$1,203.80/MT applied in the POR 4 Final Results.  Thus, even if the domestic

price data *may* provide a conservative *overestimate* of the actual price of

carbonized materials, they satisfy other critical criteria, particularly product-

specificity, used to evaluate an acceptable surrogate value data source.

    In sum, the surrogate value of coconut shell charcoal during the previous

three administrative reviews varied in a close range of from $33 to $84 per MT.  In

contrast, the surrogate value applied in the challenged Final Results was 53.73

Pesos/kg (*i.e.*, about $1,203.80/MT) based on the Philippines import data under

HTS 4402.[6]  Thus, the Department valued carbonized materials at more than ***15***

***times*** the highest surrogate value ($83.45/MT) used in any prior review.  On the

other hand, as noted earlier, the average domestic price of coconut charcoal in the

Philippines during POR 4 was a more reasonable $255/MT.

    Under its normal commercial operations, Cherishmet would prefer to source

more reasonably priced coconut charcoal from the Philippine domestic market

rather than pay aberrationally high prices for imported wood charcoal that the

record confirms was never utilized by Cherishmet for the production of activated

carbon subject merchandise.  As the CIT has noted, a "preference for domestic data

is most appropriate where the circumstances indicate that a producer in a

---

[6] *See* Final Results Surrogate Values Mem. at Attachment 1 and 2a & 2b
(reflecting that the AUV for carbonized materials was based on an exceedingly
small quantity of imports, *i.*e., only 13.785 MT). JA409-JA424.

hypothetical market would be unlikely to use an imported factor in its production process. The most obvious circumstance occurs where the import price is significantly greater than the domestic price." *See Hebei Metals II*, 366 F. Supp. 2d at 1274. The *Hebei* Court continued:

> In addition to being a Commerce policy in accordance with precedent, the conditional preference for domestic data is a logical starting point for achieving the objective set by Congress. In a hypothetical world of a NME country as a market economy country from which taxes, duties, and other governmental interference have been excluded, it is reasonable to assume that a domestic price reflects the value of a factor of production more accurately than an import price. This assumption may be undermined by record evidence showing how an import price more accurately reflects the actual costs incurred by a producer of the relevant product, but this must be explained reasonably by Commerce.

*Id*.

Thus, the choice of the aberrationally higher GTA Philippine data is contrary to law and inconsistent with the price data used to value carbonized materials in prior reviews. *See also Eurodif S.A.*, 555 U.S. at 317-18 ("the emphasis should be on economic reality."). Moreover, Commerce's choice of surrogate value represents the average value of a basket category of materials that are neither comparable to the actual raw material nor actually utilized in the production of subject merchandise. In contrast, the domestic Cocommunity price data for coconut charcoal are not only supported by substantial record evidence but also

35

comport best with the criteria established by the courts and long-standing agency

practice.  Notably, on a practical level, a hypothetical Chinese producer in the

Philippines market would clearly prefer the more reasonable domestic coconut

charcoal (and, indeed, the *only*) alternative as compared to the aberrationally high

priced imported goods that does not include the specific type of carbonized

material (i.e. Coconut charcoal) that is comparable to the carbonized materials

actually utilized in the production of subject merchandise.

### C.    COMMERCE'S OBJECTIONS TO COCOMMUNITY DATA ARE UNSUPPORTED BY RECORD EVIDENCE

Commerce's rejection of Cocommunity data – and the trial court's

affirmance of this decision - was not supported by substantial record evidence.

Commerce acknowledged in the Final Results that Cocommunity data are publicly

available and contemporaneous with the POR.  However, it rejected Cocommunity

data because (1) the record lacks information about whether or not the prices listed

in Cocommunity are tax and duty exclusive; and (2) the value for coconut charcoal

is region specific and not as representative of broad market averages as GTA data.

The trial court affirmed the Department's finding, explaining that "Cocommunity

data is unable to overcome. . . deficiencies with respect to the limited breadth of

market prices it supplied and the lack of record evidence demonstrating that the

36

publication's prices were tax and duty free."  Contrary to the trial court's finding, the Department's reasons for rejecting the Cocommunity data are unsupported by substantial evidence.

### 1.    COCOMMUNITY DATA ARE THE MOST SPECIFIC TO THE CARBONIZED MATERIAL CONSUMED BY CHERISHMET

As established above, product specificity is the most important of the criteria to be considered by the Department.  *See, e.g., Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ("The record further supports Commerce's conclusion that garlic bulb size is a more important factor than contemporaneity. Consumers often pay a premium for large-bulb garlic, and the information submitted by Sea-line shows that its own customers rely primarily on size when purchasing garlic. Commerce thus reasonably concluded that the best available information consisted of non-contemporaneous grade Super A prices"). In *Taian*, the CIT explained that "product specificity" should be afforded the greatest weight, and it is appropriate to select a more product specific surrogate value even when that data did not satisfy other criteria.  *See Taian Ziyang Food Co.*, 783 F. Supp. 2d at 1330; *see also, Sichuan Changhong Elec. Co. v. United States*, 460 F. Supp. 2d 1338, 1358-59 (Ct. Int'l Trade 2006) (sustaining the Department's selection of more specific data despite arguments that the data were not contemporaneous and not tax exclusive).

37

The import data for HTS category 4402 fails as the "best information available" for valuing carbonized materials because during the review period, the actual imports under HTS 4402 pertained to such goods (wood charcoal and other miscellaneous products) that are neither comparable to the carbonized materials nor were used to make the subject merchandise - steam activated carbon. In contrast, the average selling prices published by Cocommunity reference a type of carbonized materials that are closely comparable to the materials actually consumed by Cherishmet and Jacobi in the production of steam activated carbon.

In this proceeding, beginning from the LTFV Investigation leading up to the final results in the third administrative review, the Department has consistently followed a policy of valuing carbonized materials based on the surrogate value data for coconut shell charcoal. In the LTFV Investigation, the Department applied import data from an HTS heading for coconut shell charcoal to value carbonized materials, explaining that "coconut shell charcoal value, although not identical to the coal-based carbonized material used by respondents, is comparable in that both products are a type of charcoal." *See Final Determination in the Antidumping Duty Investigation of Certain Activated Carbon from the People's Republic of China*, 72 Fed. Reg. 9,508 (Mar. 2, 2007). In the POR 1 administrative review proceeding, in its Remand Redetermination pursuant to a

remand in *Calgon Carbon Corp. v. United States*, 33 Int'l Trade Rep. (BNA) 1232

(Ct. Int'l Trade 2011) the Department explained that:

> coconut shell charcoal shares similar properties with
> carbonized material and . . . those similar properties are
> essential in the production of activated carbon. The
> expert's report found that coal-based carbonized
> materials used by Cherishmet and coconut shell charcoal
> are similar in porosity and adsorption, which are both
> properties essential in the production of activated carbon.

*See* Remand Redetermination in the Antidumping Duty Administrative Review of

Certain Activated Carbon from the People's Republic of China, Court No. 09-

00524, ECF Dkt. No. 36 (July 26, 2011), at 10.  Thus, similarities in the key

characteristics of the adsorption and porosity of coconut shell charcoal and coal

based carbonized materials were key to finding the two materials comparable,

particularly in the context of the production of subject merchandise.

In the final results of the administrative review of POR 2, consistent with its

earlier approach, the Department continued to apply HTS 4402.90.10, covering

imports of coconut shell charcoal, to value coconut charcoal; it did make a

distinction in that review between coconut charcoal and coal-based carbonized

materials.  *See Certain Activated Carbon from the People's Republic of China:*

*Final Results and Partial Rescission of Second Antidumping Duty*

*Administrative Review*, 75 Fed. Reg. 70,208, 70,211 (Nov. 17, 2010).  For coal

based carbonized materials, the Department used HTS 2704.00.90 (Other Cokes of

Coal) because of the availability of more specific value data for each of the different respondents involved in that review.[7]

Finally, in the final results of the administrative review of POR 3, the Department reaffirmed its choice of coconut shell charcoal as the surrogate value for carbonized materials yet again. The Department explained:

> In the Department's recent Carbon Remand, the Department stated that *coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential in the production of activated carbon.* As we previously stated, it is the Department's practice to select SVs which are product specific. Therefore, because Indian HTS number 4402.90.10 "*Coconut Shell Charcoal" results in a better, input-specific price for coal-based carbonized materials,* is contemporaneous and tax/duty exclusive, the Department will use Indian HTS number 4402.90.10 "Coconut Shell Charcoal" to calculate the SV for CCT and Jacobi's carbonized material input.

See *Certain Activated Carbon from the People's Republic of China: Final Results and Partial Rescission of Third Antidumping Duty Administrative Review*, 76 Fed. Reg. 67,134, 67,146 (Oct. 31, 2011). Thus, the Department has followed a consistent policy of valuing carbonized materials based on the surrogate value of coconut shell charcoal. Given this fact, and absent any explanation derogating from such precedent, the Department's choice of an average unit value (AUV) from

---

[7] Cherishmet initially proposed that the GTA Philippines import data under HTS 2704.00.90 be used to value carbonized materials in its pre-preliminary surrogate value submission. *See* First Surrogate Value Submission of Cherishmet Group and DJAC (Nov. 16, 2011), at Exhibits 1 and 2. JA227-243.

GTA Philippines import data under HTS 4402.00 (which demonstrably did not include imports of coconut shell charcoal, and where the imported articles covered by it could not be used in the production of subject merchandise) in the POR 4 Final Results is unsupported by substantial record evidence and is contrary to settled agency precedent, as also affirmed by the Court.

> ### 2.  THERE IS NO RECORD EVIDENCE THAT COCOMMUNITY DATA ARE NOT TAX- AND DUTY-EXCLUSIVE OR REPRESENTATIVE OF A BROAD MARKET AVERAGE

Commerce justified its decision not to use Cocommunity data to value carbonized material on the basis that the record lacked any information about whether or not the price listed in Cocommunity is in fact tax and duty exclusive and because the data was not representative of a broad market average.  However its justification is not in accordance with the law.

 First, as discussed above, the specificity of a product is the most important criterion, and even if the data were tax-inclusive or not representative of a broad market average, these alleged infirmities would be superseded by the Department's obligation to use the most specific (*i.*e., the best) information available.

Second, there is no record evidence supporting Commerce's claim that the prices are not tax- and duty-exclusive. The Department and the trial court improperly shifted the burden to Cherishmet and Jacobi to demonstrate that Cocommunity data are tax-exclusive.  However, the absence of evidence

41

suggesting otherwise affords a sufficient basis to conclude that there were no

domestic tax distortions.  The CIT's analysis in *Sichuan Changhong Elec. Co.,* 460

F. Supp. 2d at 1358-59 is particularly instructive here.  In that case, the Court

sustained the Department's selection of data that were specific, despite arguments

that the data were not contemporaneous and not tax exclusive.  The Court

sustained the Department's decision to use more specific data noting that

"{b}ecause the selected information appears to be more accurate, it cannot be said

that Commerce was unreasonable in choosing it over a more contemporaneous, but

less accurate alternative." The Court also did not find that the data being tax

inclusive was a persuasive reason to reject the data because "The Court . . .

recognized Commerce's practice to remove sales and excise taxes from its

calculation of normal value only "*when there is an affirmative indication of their*

*presence*." *Id.* (citations omitted)(emphasis added).  In *Hebei Metals*, *supra*, the

CIT noted that "federal courts have recognized Commerce's prerogative to select

import data over domestic data on the grounds of tax-exclusivity *only where*

*domestic tax distortions were evident from the record*." 366 F. Supp. 2d at 1275

(emphasis added).

The Department's reasoning that since Cocommunity data are ostensibly

region specific, they are unrepresentative of broad market averages, in contrast to

the GTA data which provide country-wide data, is similarly unavailing.  Goods

imported under Philippine HTS 4402 are neither specific nor comparable to the factor being valued. On the other hand, record evidence unambiguously demonstrates that coconut charcoal is specific as well as comparable to the types of carbonized materials consumed by the respondents. In view of this, the product-specific Cocommunity data, even though lacking country-wide coverage, represent a far more suitable surrogate value data source. The CIT has also previously supported the Department's selection of a regional but product-specific surrogate value. *See, e.g., Jining Yongjia Trade Co. v. United States*, 2010 Ct. Intl. Trade LEXIS 140 at *43-*44 (Ct. Int'l Trade 2010) (noting that even though "the Azadpur APMC is one of 7,000 APMCs throughout India," yet "the APMC Bulletin data met Commerce's preferred criteria for surrogate values" and "does in fact represent a broad market average, as it is from a large agricultural market in India and is for a substantial portion of the garlic market in that country").

Significantly, in the two most recent reviews of the activated carbon from China antidumping duty order (2011-2012 and 2012-13), the Department relied on Cocommunity data to value carbonized materials, finding that it did not suffer from any deficiencies. In *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 70,533 (Nov. 26, 2013)(emphasis added), I&D Memo at Cmt. 6, the Department held:

43

Cocommunity is a monthly trade publication from the
Asian and Pacific Coconut Community ("APCC") which
was established under the auspices of the United Nations.
The APCC is an intergovernmental organization
consisting of 15 member countries and accounts for 85-
90% of the world production of coconut.  As stated
above, we did not use Cocommunity in the Preliminary
Results, because it previously did not appear to represent
a broad-market average.  However, in its post-
preliminary SV submission, Jacobi provided a
certification from an official from the Philippine Coconut
Authority, Philippine Department of Agriculture, stating
that the price of coconut shell charcoal in the Visayas
(the region identified in Cocommunity) is similar to that
of Mindanao which is the largest coconut producing
region in the Philippines. Therefore, the prices for
Visayas found in Cocommunity are representative of
over 75% of the Philippines. *Consequently, the coconut
shell charcoal prices are representative of a broad-
market average, publicly available, contemporaneous
with the POR, and tax and duty exclusive.*

The Department echoed the above findings in *Certain Activated Carbon

from the People's Republic of China: Issues and Decision Memorandum for the

Final Results of the Sixth Antidumping Duty Administrative Review and I&D

Memo* (Nov. 18, 2014) at Cmt. 11 ("The prices found in Cocommunity are

representative of a broad- market average, publicly available and contemporaneous

with the POR, tax and duty exclusive and more specific to the input used by

Cherishmet."), available at https://access.trade.gov (barcode 3242405-01).

Commerce's determination that Cocommunity data are representative of a broad-

market average and are tax- and duty-exclusive is significant and should be taken

44

into consideration. Thus, there is no doubt that the Cocommunity data satisfy all of the established criteria used for selection of a surrogate value data source.

### III. THE TRIAL COURT ERRED IN FINDING THAT THE DEPARTMENT'S CHOICE OF SURROGATE VALUE DATA FOR TRUCK FREIGHT IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND CONTRARY TO LAW

In the Preliminary Results, in which the Department selected Thailand as the primary surrogate country, the Department valued truck freight by computing a unit average rate based on the cost of transportation of goods by truck from Bangkok to five other cities classified in two categories – Class 3 and Class 4. *See* Preliminary Results Surrogate Values Mem. at 9 and Attachment 8. JA302-320. When the Department issued its Final Results, it changed its choice of primary surrogate country from Thailand to the Philippines. Consequently, the Department determined the truck freight rate by averaging the highest and lowest cost of transportation of goods by truck from Manila to a particular destination, Legazpi City, as reported in Cost of Doing Business in Legazpi City, Philippines. *See* Final Surrogate Values Mem. at page 6 and Attachment 5a. JA406, JA425.

Thai truck freight data applied in the Preliminary Results meet all of the criteria established for the selection of the best surrogate value. They are based on a broad market average, an important factor in the context of freight, and are more specific than the Philippine Cost of Doing Business data. In contrast, the

45

Department's selection in the Final Results of the Philippine data source fails to comport with the statute, is unsupported by substantial evidence, is inconsistent with established precedent and yields an aberrationally high and commercially unrealistic value. Therefore, the Court should reject the Department's choice of the Philippine data and remand the issue for the Department to apply the Thai data to value truck freight.

### A.      PHILIPPINE DATA ARE ABERRATIONAL

Commerce is obligated to "establish antidumping margins as accurately as possible." *Shakeproof Assembly, supra*, 268 F.3d at 1382. Thus, "[w]hen confronted with a colorable claim that the data that Commerce is considering is aberrational, Commerce must examine the data and provide a reasoned explanation as to why the data it chooses is reliable and non-distortive." *Mittal Steel Galati S.A. v. United States*, 502 F. Supp. 2d 1295, 1308 (Ct. Int'l Trade 2007)(citation omitted). In such a case, it is not enough for Commerce to "summarily discard the alternatives as flawed;" Commerce must also "evaluate the reliability of its own choice." *Shanghai Foreign Trade Enters. Co., Ltd. v. United States*, 318 F. Supp. 2d 1339, 1352 (Ct. Int'l Trade 2004); *see also Guangdong Chems. Imp. & Exp. Corp. v. United States*, 460 F. Supp. 2d 1365, 1369 (Ct. Int'l Trade 2006). The CIT has explained that:

> Even though it enjoys some discretion in selecting the
> best available information, Commerce must defend its
> surrogate choices when confronted with data
> undermining the surrogate's reliability. . . .  If the
> agency's surrogate prices diverge violently from credible
> benchmark prices, Commerce must explain why it chose
> to reject plaintiff's data while crediting its own.

*Blue Field (Sichuan) Food Indus. Co. v. United States*, 949 F. Supp. 2d 1311, 1326

(Ct. Int'l Trade 2013) (remanding Commerce's surrogate value for rice straw

because it was aberrational).

When compared to all other truck freight data that the Department has

applied in prior proceedings, including the Preliminary Results of POR 4, the

Philippine truck freight data used in the Final Results are demonstrably

aberrational.  In the Final Results of the LTFV Investigation, the Department

valued truck freight at 0.0007 Rs/Kg/Km,[8] which is equivalent to 0.015121

USD/MT/Km.  In the POR 1 final results, the Department valued truck freight at

1.6280 Rs/MT/Km,[9] *i.e.*, 0.0393 USD/MT/Km.  In the POR 2 final results, truck

---

[8] *See* Memo For: The File, Through: James C. Doyle, Office Director, Office 9, IA, From: Anya Naschak, Senior Case Analyst, Office 9, IA, Re: Administrative Duty Investigation of Certain Activated Carbon from the People's Republic of China: Surrogate Value for the Preliminary Determination (Oct. 4, 2006), at 13-14 (Truck freight SV data unchanged in the Final Results).

[9] *See* Memo To: The File, Through: Catherine Bertrand, Program Manager, Office 9, IA, From: Blaine Wiltse, International Trade Compliance Analyst, Office 9, IA, Re: First Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Value for the Final Results (Nov. 3, 2009), at Attachment 1 (using the conversion rate 1 Rs = 0.024164 USD).

47

freight was valued at 1.85 Rs/MT/Km,[10] *i.e.*, 0.0413 USD/MT/Km.  In the POR 3

final results, truck freight was valued at 1.80 Rs/MT/Km,[11] *i.e.*, 0.0396

USD/MT/Km.  And in the Preliminary Results of POR 4, truck freight was valued

at 1.1849 Baht/MT/Km,[12] *i.e.*, 0.0379 USD/MT/Km by applying a Thai data

source.  Finally, in the Final Results of POR 4, the Department used a value that

inflated that Thai truck freight value by nearly 8.5 times, to 14.07 Peso/MT/

Km,[13] *i.e.*, $0.3152/MT/Km using a Philippine data source.

A comparative analysis of all of the above truck freight data shows that the

surrogate value of truck freight selected for the Final Results of POR 4 is several

times higher than the value applied in each of the prior proceedings:  21 times

higher than that used in the LTFV Investigation and nearly eight times higher than

the value applied in the final results of PORs 1, 2 and 3.  And, as noted above, the

---

[10] *See* Memo To: The File, Through: Catherine Bertrand, Program Manager, Office 9, IA, From: Bob Palmer, Case Analyst, Office 9, IA, Re: Second Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Value for the Final Results (Nov. 9, 2010), at Attachment 1.

[11] *See* Memo To: The File, Through: Catherine Bertrand, Program Manager, Office 9, IA, From: Bob Palmer, Case Analyst, Office 9, IA, Re: Third Administrative Review of Certain Activated Carbon from the People's Republic of China: Surrogate Value for the Final Results (Oct. 25, 2011), at Attachment 1.

[12] *See* Preliminary Surrogate Value Mem. at Attachment 1. JA313-314.
[13] *See* Final Surrogate Values Mem. at Attachment 1. JA410.

value used in the Final Results is nearly 8.5 times higher than the Thai value used in the Preliminary Results of POR 4. Thus, the Philippine truck freight data, which are not representative of a broad market average, as explained above, are demonstrably aberrational.  The Department has failed to support its choice of so aberrational a dataset with substantial record evidence.  Therefore, the Philippine truck freight data merit rejection.

In contrast, the above analysis demonstrates that the Thai truck freight data applied in the Preliminary Results are within a close range of the truck freight surrogate values applied in all prior proceedings.  Since Thai truck freight data provide an accurate and reliable data source, their choice is supported by court precedent.  *See Clearon Corp. v. United States*, 2013 Ct. Intl. Trade LEXIS 27 (Ct. Int'l Trade Feb. 20, 2013), *citing Fuwei Films Shandong Co. v. United States*, 837 F. Supp. 2d 1347, 1356 (Ct. Int'l Trade 2012)("Commerce's preference for using data from a single country [is] unreasonable when the data was demonstrably aberrational as compared to certain benchmark prices, and alternative data sources could be better corroborated").

The trial court acknowledged that Philippine data were eight times higher than the Thai-sourced surrogate value in the Preliminary Results.  *Jacobi AB*, 992 F. Supp. 2d at 1375.  However, the trial court incorrectly held that "Plaintiffs' objection, unsupported by further record evidence, is that the Philippine prices

49

must not be the best available information because they are too high." As noted above, not only were the Philippine data more than eight times higher than the Thai data used in the Preliminary Results, but they were eight times higher than the surrogate value used for truck freight in PORs 1, 2, and 3. The Philippine data used in this POR were 21 times higher than the surrogate value for truck freight used in the original investigation. Thus, it is not that the surrogate value used in this POR was too high; the fact that it is aberrationally high as compared to the corresponding values applied in every other POR demonstrates that it is not probative of actual truck freight in the Philippines and, therefore, leads to an inaccurate computation of normal value.

### B.  PHILIPPINE DATA DO NOT REPRESENT A BROAD MARKET AVERAGE

As discussed above, in an administrative review of a NME country, Commerce is required to calculate surrogate values for the subject merchandise using the "best available information." 19 U.S.C. § 1677b(c)(1). The choice of the most appropriate surrogate value data for any factor depends on the nature of the factor. In the context of truck freight, one of the most significant criterion is "broad market average covering a range of prices" because a surrogate value based on an average of multiple price data points covering transportation of cargo over several different routes yields a more reliable and accurate cost that would be

50

comparable to those incurred by a hypothetical NME producer operating in the surrogate country. *Cf. US Magnesium LLC v. United States*, 895 F. Supp. 2d 1319, 1329 (Ct. Int'l Trade 2013) (noting that in the context of truck freight, Commerce must "establish a link between the rates and the actual transaction prices").

Record evidence demonstrates that the truck freight data from the Philippines are based on one route only, *i.e.*, from Legazpi to Manila. *See* Final Results Surrogate Values Mem. at 6 and Attachment 5a. JA406, JA425. As such, these data fail to accurately estimate an average cost incurred in transporting goods over several different routes, and they are, therefore, unrepresentative of a broad market average. In contrast, the Thai truck freight data applied in the Preliminary Results are based on an average of ten different price points, including the cost of transporting goods over five different routes classified in two different categories – Class 3 and Class 4. *See* Preliminary Surrogate Values Mem. at 9 and Attachment 8. JA310, JA315. Since the Thai data include multiple price data points, they account for regional variations as well as for the transportation of cargo under different truck loads conditions. Consequently, the average truck freight data from Thailand are representative of a broader geographical market average as compared to the much narrower Philippine data. *See High Pressure Steel Cylinders from the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 77 Fed. Reg. 26,739, 26,742 (May 7, 2012) ("the Department prefers having as

51

many data points and as much explanation of the details related to the prices of services as possible, *i.e.*, size of truck and price per weight of measure, which Della-ua.com does provide, and which Budmo.org do not").

The trial court minimized the fact that Philippine data were substantially narrower in scope than Thai data by arguing that there was evidence on the record for a second route. *Jacobi AB*, 992 F Supp. 2d at 1376. However, evidence of a second route does not demonstrate that Philippine data are "more representative." As noted above, Thai data consist of ten different price points, including the cost of transporting goods over five different routes classified in two different categories – Class 3 and Class 4. Thus, Philippine data are substantially less representative of a broad market average than Thai data.

### C.    PHILIPPINE DATA FAIL TO SATISFY THE SPECIFICITY CRITERIA

The Philippine data also fail to satisfy the "specificity" criterion inasmuch as the truck freight data are reported in Pesos per kg, based on the transportation of "loose cargo." *See* Final Surrogate Values Mem. at 6 and Attachment 5a. JA406, JA425. As such, the Philippine data fail to represent the cost incurred in transporting bulk cargo under conditions of a full truckload. Therefore, the Philippine data are not probative of the actual freight cost incurred in transporting a commercial shipment of bulk cargo. On the other hand, the Thai data provide a

truck freight cost for transporting cargo under full truck load conditions, specifying 13 MT as the maximum cargo load per truck. *See* Preliminary Surrogate Value Mem. at page 9 and Attachment 8. JA310, JA315. Thus, the trial court and the Department ignored the obvious inference, from the nomenclature "loose cargo," that shipments of lower quantities of goods are being addressed in the Philippine data, reasoning that "[n]owhere in the Philippine data source does it define or explain the relevance or meaning of "loose cargo," nor has GHC offered anything to support its contention that the Philippine data based on the transportation of "loose cargo" is not representative of the transportation costs incurred for a fully loaded truck." *Jacobi AB*, 992 F Supp. 2d at 1376. The court further reasoned that "the Thai data appears to represent shipping costs for less than a truckload of shipments, while there is no record evidence that the Philippine data is not representative of the shipping costs for a full truckload, albeit of loose cargo." *Id*.

In affirming the choice of the Philippine data, the court ignored the obvious infirmities emanating from a self-explanatory "loose cargo" designation of transported goods, which is clearly unrepresentative of the conditions of containerized shipments of subject merchandise by GHC.[14] Conversely, the court's rejection of Thai data even though it expressly refers to a full truck load of

---

[14] In its Section A response to the Department's questionnaire, GHC provided documentary evidence supporting the fact that its shipments were all containerized. JA97-101.

53

10 to 12 MT, which signifies commercial shipments of bulk cargo, is unavailing

because based on the record evidence, the Thai data is far more specific to the

shipments of subject merchandise, as compared to the Philippine data.

Accordingly, the Thai truck freight data are far more accurate and specific to

the conditions involved in the transportation of commercial cargo. Therefore, the

Thai truck freight data better satisfy the specificity criteria and are, consequently,

preferable to the Philippine data.

### D.      THE DEPARTMENT MAY RELY UPON A SECONDARY SURROGATE COUNTRY TO CALCULATE AN ACCURATE RATE

In selecting the best available surrogate value information, the Department is

not constrained by the choices emanating from the primary surrogate country

alone.   The statute permits Commerce to draw surrogate value information from

more than one market economy country.  *See* 19 U.S.C. § 1677b(c)(1)(stating that

Commerce may derive FOPs from "countries considered to be appropriate,"

emphasis supplied); *see also Timken Co. v. United States*, 166 F. Supp. 2d 608,

621 (Ct. Int'l Trade 2001); *Shantou Red Garden Foodstuff Co. v. United States*,

880 F. Supp. 2d 1332, 1334-1335 (Ct. Int'l Trade 2012). Rather, the Department is

obligated to apply the best available information available from any other market

economy country.

The Department is not circumscribed by either law or practice to select surrogate value data from among the information available from the primary surrogate country alone. *See, e.g., Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of the 2007-2008 Administrative Review of the Antidumping Duty Order*, 75 Fed. Reg. 844 (Jan. 6, 2010), I&D Memo at Cmt. 3 ("Although Petitioner is correct that it is the Department's practice to stay within the primary surrogate country to value all costs of production where the surrogate value data warrants, the Department carefully considers the evidence in light of the particular facts of each industry and evaluates surrogate value data on a case-by-case basis."); *Certain Cut-to-Length Carbon Steel Plate from Romania: Notice of Final Results and Final Partial Rescission of Antidumping Duty Administrative Review*, 70 Fed Reg. 12,651 (Mar. 15, 2005), I&D Memo at Cmt. 3 ("Thus, for purposes of this final result, we will value surrogate values for the NME portion of the POR using Egypt as our primary surrogate and the Philippines and Algeria as secondary surrogate countries, where values from Egypt are not available." The CIT explained in *Timken Co*, 166 F. Supp. 2d at 616 that:

> the statute grants to Commerce broad discretion to
> determine the "best available information" in a
> reasonable manner on a case-by-case basis. See Lasko
> Metal Prods., Inc. v. United States, 43 F.3d 1442, 1446
> (Fed. Cir. 1994) (noting that the statute "simply does not
> say--anywhere--that the factors of production must be

> ascertained in a single fashion.") Consequently,
> Commerce values as many FOPs as possible using
> information obtained from the "primary" surrogate
> country, that is, the country that Commerce considers to
> be most comparable in economic terms to the NME
> country being investigated, and that also produces
> merchandise comparable to the subject merchandise.
> Additionally, if Commerce determines that suitable
> values cannot be obtained from the data of the primary
> surrogate country, Commerce resorts to the data from the
> second, and sometimes the third, surrogate.

Even in the Final Results of this case, the Department noted that it would

"value all primary FOPs using Philippine data, except for bituminous coal, for

which we will continue to use GTA import data from Thailand." JA397.

With regard to truck freight, since Thailand is a potential surrogate country

and was, in fact, selected as the primary surrogate country in the Preliminary

Results, the Thai truck freight data meet all of the substantive criteria applied to

evaluate the merits of surrogate value information. Accordingly, the Court should

remand this issue to the Department, with instructions to apply the qualitatively

superior Thai truck freight data in place of the Philippine data.

## IV.  THE DEPARTMENT SHOULD RECALCULATE THE RATE ASSIGNED TO APPELLANT SEPARATE RATE COMPANIES

In its *Final Results*, the Department assigned to Shanxi a separate rate of

$1.04 per kilogram of subject merchandise, which was based on the ranged,

publicly available U.S. sales quantities from the two mandatory respondents:

56

Jacobi and GHC.  As discussed below, in accordance with the law, Shanxi's

margin was calculated in a manner consistent with the Department's customary

practice of assigning dumping margins to non-individually investigated companies

based on the margins calculated for the exporters and producers that are

individually investigated as mandatory respondents.  Accordingly, in revising the

final dumping margin for Jacobi and/or GHC based on any remands ordered by

this Court, the Department should also recalculate the final weighted average

dumping margin for Shanxi using the revised margins calculated for Jacobi and/or

GHC.

This Court should remand the Final Results of the administrative review to

the Department with instructions to recalculate Shanxi's  final weighted average

dumping margin using any revised final dumping margins calculated using the

ranged, publicly available U.S. sales quantities from the mandatory respondents in

this case (i.e., Jacobi and GHC).  Generally, where the Department limits its

examination of potential respondents in an administrative review pursuant to 19

U.S.C. § 1677f-1(c)(2)(B), the statute and the Department's regulations do not

directly address how the Department should calculate a specific margin to be

applied to companies eligible for a separate rate but not individually selected for

examination in a review.  *See Amanda Foods (Vietnam) Ltd. v. United States*, 774

F. Supp. 2d 1286, 1290 (Ct. Int'l Trade 2011) ("the statute does not address the

methodology that Commerce must use when…assigning dumping margins to companies that were not individually investigated in an administrative review"); *see also Amanda Foods (Vietnam) Ltd. v. United States*, 714 F. Supp. 2d 1282, 1289 (Ct. Int'l Trade 2010) ("Amanda Foods I") ("No statutory or regulatory provision directly addresses the methodology to be employed when calculating a dumping margin for companies not selected for individual investigation where Commerce limits its examination in an administrative review").

Therefore, relying on 19 U.S.C. § 1673d(c)(5), the Department has developed a well-established practice of assigning dumping margins to non-individually reviewed companies in non-market economy cases "based on the weighted-average of the estimated dumping margins established for exporters and producers individually investigated." *Multilayered Wood Flooring From the People's Republic of China: Final Determination of Sales at Less Than Fair Value*, 76 Fed. Reg. 64,318, 64,322 (Oct. 18, 2011) and I&D Memo at Cmt. 11; *see also Administrative Review of Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Results and Partial Rescission of Antidumping Duty Administrative Review*, 76 Fed. Reg. 51,940, 51,942 (Aug. 19, 2011) ("the Department's usual practice has been to average the rates for the {individually} selected companies."). The Court of International Trade has previously recognized the Department's practice as reasonable. *See Yangzhou Bestpak Gifts & Crafts Co.*

58

*v. United States*, 783 F. Supp. 2d 1343, 1349 (Ct. Int'l Trade 2011) ("To calculate

the separate rate for non-individually investigated respondents in non-market

economy investigations, Commerce normally relies on the statutory provision in 19

U.S.C. § 1673d(c)(5)(A), which describes the all-others rate used in market

economy investigations…{and which} instructs the Department to weight-average

the rates calculated for the investigated parties…."); *see also Amanda Foods I*

(stating that § 1673d(c)(5) provides a general rule, which states that "the estimated

all-others rate shall be an amount equal to the weighted average of the estimated

weighted average dumping margins established for exporters and producers

individually investigated…").

In the instant case, in accordance with its practice of relying on §

1673d(c)(5) in non-market economy cases, the Department assigned to Shanxi the

weighted average dumping margin calculated using the ranged, publicly available

U.S. sales quantities from the mandatory respondents Jacobi and GHC, the two

exporters whom the Department selected to individually investigate, and whom

were assigned positive dumping margins in this review.  Specifically, because

Shanxi established its separate rate eligibility but was not individually reviewed,

Jacobi's and GHC's margins provided the only individually calculated weighted

average margins from which Shanxi's margin could be calculated.  Thus, the

Department relied on Jacobi's and GHC's weighted average margins to calculate Shanxi's margin.

Consequently, should the Department recalculate Jacobi's and/or GHC's final dumping margins pursuant to Court remand, the Department should also recalculate Shanxi's dumping margin based on and revised final dumping margins assigned to Jacobi and/or GHC.  As a respondent that has established its separate rate eligibility but was not individually reviewed by the Department, such recalculation of Shanxi's margin would be necessary based on the Department's established practice, which is also in accordance with the law.

*** 

## CONCLUSION AND REQUEST FOR RELIEF

For all of the reasons discussed above, Plaintiffs respectfully request that this Court reverse the trial court's decision and remand this proceeding to Commerce with instructions to grant the relief requested.

/s/ Francis J. Sailer
Francis J. Sailer
Kavita Mohan

GRUNFELD, DESIDERIO,
LEBOWITZ,  SILVERMAN &
KLESTADT LLP
1201 New York Ave., NW, Ste. 650
Washington, DC 20005
Phone: (202) 783-6881
Fax : (202) 783-0405

Dated: November 24, 2014                    *Attorneys for Plaintiffs - Appellants*

# ADDENDUM



JACOBI CARBONS AB, JACOBI CARBONS, INC., NINGXIA GUANGHUA
CHERISHMET ACTIVATED CARBON CO., LTD., CHERISHMET INC.,
BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., DATONG
MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., SHANXI
INDUSTRY TECHNOLOGY TRADING CO., LTD., CARBON ACTIVATED
CORP., CAR GO WORLDWIDE, INC., and TANGSHAN SOLID CARBON CO.,
LTD., Plaintiffs, v. UNITED STATES, Defendant, and CALGON CARBON CORP.
and NORIT AMERICAS, INC., Defendant-Intervenors.

Consol. Court No. 12-00365

UNITED STATES COURT OF INTERNATIONAL TRADE

*992 F. Supp. 2d 1360*; *36 Int'l Trade Rep. (BNA) 602*; *2014 Ct. Intl. Trade LEXIS 67*;
*SLIP OP. 2014-70*

June 24, 2014, Decided

**PRIOR HISTORY:** *Calgon Carbon Corp. v. United States, 2011 Ct. Intl. Trade LEXIS 21 (Feb. 17, 2011)*

**DISPOSITION:** [**1]    Plaintiffs' motions for judgment on the agency record are denied.

**COUNSEL:** Daniel L. Porter, Curtis, Mallet-Prevost, Colt & Mosle LLP, of Washington, D.C., argued for plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. With him on the brief was Ross Bidlingmaier.

Francis J. Sailer, Grunfeld Desiderio Lebowitz Silverman & Klestadt LLP, of Washington, D.C., argued for consolidated plaintiffs Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Cherishmet Inc., Beijing Pacific Activated Carbon Products Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd. With him on the briefs were Mark E. Pardo, Dharmendra N. Choudhary, Andrew T. Schutz, and Kavita Mohan.

Nancy A. Noonan and Matthew L. Kanna, Arent Fox LLP, of Washington, D.C., for consolidated plaintiffs Carbon Activated Corp. and Car Go Worldwide, Inc.

Gregory S. Menegaz, deKieffer & Horgan, PLLC, of Washington, D.C., for consolidated plaintiff Tangshan Solid Carbon Co., Ltd.

Antonia R. Soares, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for defendant. On the brief were Melissa M. Devine, Trial Attorney, Commercial [**2] Litigation Branch, Civil Division, U.S. Department of Justice, Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief was Devin S. Sikes, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

John M. Herrmann, Kelley Drye & Warren, LLP, of Washington, D.C., argued for defendant-intervenors Calgon Carbon Corp. and Norit Americas, Inc. With him on the brief were David A. Hartquist and R. Alan Luberda.

**JUDGES:** Before: Richard K. Eaton, Judge.

992 F. Supp. 2d 1360, *; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **2; SLIP OP. 2014-70

**OPINION BY:** Richard K. Eaton

**OPINION**

[*1362] EATON, Judge: This matter is before the court on the *USCIT Rule 56.2* motions for judgment on the agency record of plaintiffs Jacobi Carbons AB and Jacobi Carbons, Inc. (collectively, "Jacobi"),[1] and consolidated plaintiffs [2] Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC"), Cherishmet Inc. ("Cherishmet"), Beijing Pacific Activated Carbon Products Co., Ltd. ("BPACP"), Datong Municipal Yunguang Activated Carbon Co., Ltd. ("Datong Municipal"), Shanxi Industry Technology Trading Co., Ltd. ("Shanxi Industry"), Carbon Activated Corp. and Car Go Worldwide, Inc. (collectively, "CAC"), [**3] and Tangshan Solid Carbon Co., Ltd. ("Tangshan") (collectively, "plaintiffs"). By their motions, plaintiffs, all of which are producers, exporters, or importers of subject merchandise,[3] challenge the U.S. Department of Commerce's ("Commerce" or [*1363] the "Department") Final Results in the fourth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC"). *Certain Activated Carbon From the PRC, 77 Fed. Reg. 67,337* (Dep't of Commerce Nov. 9, 2012) (final results of antidumping duty admin. review), and accompanying Issues and Decision Memorandum ("Issues & Dec. Mem.") (collectively, "Final Results").

    1  Jacobi Carbons AB is a foreign producer and exporter of subject merchandise, while Jacobi Carbons, Inc. is the importer of record for Jacobi Carbons AB's merchandise. Compl. ¶ 3 (ECF Dkt. No. 7).
    2  This action includes court numbers 12-00372, 12-00377, 12-00396, and 12-00401. *See* Scheduling Order (ECF Dkt. No. 42).
    3  The subject merchandise is activated carbon, a substance "capable of collecting gases, liquids, or dissolved substances on the surface of its pores." McGraw-Hill Concise Encyclopedia of Science & Technology 21 (Sybil P. Parker [**4] ed., 2d ed. 1987). Activated carbon is described in the antidumping duty order as follows:

        [A] powdered, granular, or pelletized carbon product obtained

by "activating" with heat and steam various materials containing carbon, including but not limited to coal (including bituminous, lignite, and anthracite), wood, coconut shells, olive stones, and peat.
    . . .

    The scope of this order covers all forms of activated carbon that are activated by steam or $CO_2$ [(carbon dioxide)] . . . . Unless specifically excluded, the scope of this investigation covers all physical forms of certain activated carbon . . . .
    . . .

    Excluded from the scope of the order are chemically-activated carbons. . . . Chemically activated carbons are typically used to activate raw materials with a lignocellulosic component such as cellulose, including wood, sawdust, paper mill waste and peat.

*Certain Activated Carbon From the PRC, 72 Fed. Reg. 20,988, 20,988* (Dep't of Commerce Apr. 27, 2007) (notice of antidumping duty order).

Jacobi, GHC, Cherishmet, BPACP, Datong Municipal, CAC, and Tangshan contest two aspects of the Department's Final Results: (1) the selection of the surrogate value for carbonized material, which is one [**5] of the primary inputs used in the production of subject merchandise;[4] and (2) the selection of the surrogate value for truck freight. *See* Resp't Pls.' *Rule 56.2* Mot. for J. on the Agency R. 1-2 (ECF Dkt. No. 47) ("Jacobi's Br."); Mem. in Supp. of Pls.' *Rule 56.2* Mot. for J. upon the Agency R. 1 (ECF Dkt. No. 46) ("GHC's Br.[5]); *Rule 56.2* Mot. for J. upon the Agency R. of Pls. Carbon Activated Corporation and Car Go Worldwide, Inc. 2 ("CAC's Mot."); Consol. Pl. Tangshan Solid Carbon Co., Ltd.'s *Rule 56.2* Mot. for J. on the Agency R. 1-2 ("Tangshan's Mot.").

    4  In order to produce steam-activated carbon, the carbonized materials are placed in a furnace and activated through steam at temperatures between 800 and 1,000 degrees Centigrade. Letter from

Ross Bidlingmaier, Counsel for Jacobi, to The Honorable Rebecca M. Blank, Acting Secretary of Commerce, U.S. Department of Commerce at 99, PD 29, at bar code 3027303-01 (Sept. 1, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's Questionnaire Response"). "This process produces a carbonaceous substance (i.e., activated carbons with many small pores." Jacobi's Questionnaire Response at 99.

5  The Department treated GHC and BPACP as a single entity, [**6] based on a determination in the first administrative review of the Order. *Final Results, 77 Fed. Reg. at 67,338 n.23.* Accordingly, Commerce assigned the entity a single rate. *Final Results, 77 Fed. Reg. at 67,338 n.23.* Thus, although this brief was jointly submitted by GHC, Cherishmet, BPACP, and Datong Municipal, the arguments made in this brief will be represented by reference only to GHC.

Shanxi Industry and Tangshan (collectively, "separate rate companies" or "separate rate respondents") are plaintiffs that established their independence from Chinese government control, and as a result, were assigned a separate antidumping duty rate in the Final Results. *See Final Results, 77 Fed. Reg. at 67,338.* The separate rate respondents and CAC 6 claim that, should Commerce recalculate the final dumping margin for the mandatory respondents pursuant to any remand ordered by the court, the Department must also recalculate the rate assigned to the separate rate companies. *See Mem. of Law in Supp. of Pl. Shanxi Industry Technology Trading Co., Ltd.'s Rule 56.2 Mot. for J. upon the Agency R. 2 (ECF Dkt. No. 44) ("Shanxi Industry's Br.");* Tangshan's Mot. 2; CAC's Mot. 2.

6  The companies from which [**7] CAC imported subject merchandise are separate rate companies. CAC's Mot. 2.

Defendant United States opposes plaintiffs' motions and asks that Commerce's Final Results be sustained. Def.'s Resp. to Pls.' and Consol. Pls.' Mots. for J. upon the Agency R. 2 (ECF Dkt. No. 56) ("Def.'s Br."). Defendant-intervenors, Calgon Carbon Corp. and Norit Americas, Inc. (collectively, "defendant intervenors"), each domestic manufacturers of activated carbon, join in opposition to plaintiffs' motions. Def.-Ints.' Resp. in Opp'n to Consol. Pls.' Mots. for J. on the Agency R. 1

(ECF Dkt. No. 58) ("Def.-Ints.' Br."). Jurisdiction lies pursuant to *28 U.S.C. § 1581(c) (2006)* and *19 U.S.C. §§ 1516a(a)(2)(A)(i)(I),* [*1364] *(B)(iii) (2006).* For the reasons set out below, Commerce's Final Results are sustained.

## BACKGROUND

On April 27, 2007, the Department issued the antidumping duty order on certain activated carbon from the *PRC. Certain Activated Carbon From the PRC, 72 Fed. Reg. 20,988, 20,988* (Dep't of Commerce Apr. 27, 2007) (notice of antidumping duty order) (the "Order"). Following timely requests from defendant-intervenors and other companies, the Department conducted its fourth administrative review of the Order [**8] for the period of review ("POR"), April 1, 2010, through March 31, 2011. *Initiation of Antidumping and Countervailing Duty Administrative Reviews, 76 Fed. Reg. 30,912, 30,913* (Dep't of Commerce May 27, 2011).

On May 4, 2012, the Department published its Preliminary Results for the review, selecting Datong Juqiang Activated Carbon Co., Ltd.,7 Jacobi, and GHC as mandatory respondents. *Certain Activated Carbon from the PRC, 77 Fed. Reg. 26,496, 26,497* (Dep't of Commerce May 4, 2012) (preliminary results of the fourth antidumping duty admin. review, and intent to rescind in part) ("Preliminary Results"). BPACP, Datong Municipal, Shanxi Industry, and Tangshan each filed separate rate certifications, and Cherishmet and CAC joined as interested U.S. importers. *See Preliminary Results, 77 Fed. Reg. at 26,501.* In the Preliminary Results, Commerce "selected Thailand as the primary surrogate country for the valuation of the [factors of production] and surrogate financial ratios." Mem. from Katie Marksberry, International Trade Specialist, to the File at 1, PD 193, at bar code 3072722-01 (Apr. 30, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Preliminary Results Surrogate Values Mem.").

7  Datong Juqiang [**9] Activated Carbon Co., Ltd. is not a party to this action.

Following publication of the Preliminary Results, Jacobi, GHC, Cherishmet, and BPACP submitted comments that placed on the record additional data from the Philippines, and urged the Department to use it to value all of the major material inputs. Issues & Dec. Mem. at cmt. 1. In the Final Results, Commerce found that "both the Philippines and Thailand [were] significant

992 F. Supp. 2d 1360, *1364; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **9; SLIP OP. 2014-70

producers [of activated carbon] because, in quantity terms, they [were] exporters of goods identical to the subject merchandise, [and] ha[d] production of comparable merchandise as evidenced by the financial statements on the record." Issues & Dec. Mem. at cmt. 1. The Department determined, however, that although otherwise "relatively equal in terms of quality and satisf[action] of all of the surrogate value criteria," the Philippine data (particularly the financial statements) was "clearly superior" to the Thai data because it was "industry-specific, whereas the Thai data [was] for the manufacturing sector in general." Issues & Dec. Mem. at cmt. 1. The Philippine data was also found to be more contemporaneous to the POR than the Thai data. Issues & Dec. Mem. at [**10] cmt. 1.

As a result, Commerce departed from its determination in the Preliminary Results, and selected the Philippines as the primary surrogate country to value most of the major material inputs used in the production of subject merchandise, including the carbonized material and truck freight.[8] *Final Results, 77 Fed. Reg. at 67,338.* [*1365] Specifically, the Department used Harmonized Tariff Schedule ("HTS")[9] import data, derived from the Global Trade Atlas ("GTA"), from the Philippines under heading HTS 4402 ("Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated") to value carbonized material, and used publicly available data reported in the Cost of Doing Business in Legazpi City, Philippines ("Cost of Doing Business") to value truck freight. Mem. from Emeka Chukwudebe, Case Analyst, to the File at 3, 6, PD 283, at bar code 3104537-01 (Nov. 2, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Final Results Surrogate Values Mem.").

8    Global Trade Atlas import data from Thailand, however, was found by the Department to be superior for two inputs: bituminous coal and pitch. Issues & Dec. Mem. at cmt. 1; Mem. from Emeka Chukwudebe, Case Analyst, to the File at 2, 3, PD 283, at bar [**11] code 3104537-01 (Nov. 2, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Final Results Surrogate Values Mem."). Accordingly, the Department used the Thai data to value bituminous coal and pitch, despite using Philippine data to value all other major factors of production. Issues & Dec. Mem. at cmt. 1; Final Results Surrogate Values Mem. at 2, 3. These findings are uncontested.

9    The purpose of the HTS is to provide a certain level of organization to the classification of imported goods. "The tariff schedules of signatories to the Harmonized System Convention are required to have tariff categories 'harmonized with the internationally-developed HS nomenclature up to the six-digit level, *i.e.,* to the two-digit chapter, the four-digit heading, and the six-digit subheading levels.'" *Xinjiamei Furniture (Zhangzhou) Co. v. United States,* 38 CIT    , n.2, 968 F. Supp. 2d 1255, 1261 n.2 (2014) (internal quotation marks omitted) (quoting *Victoria's Secret Direct, LLC v. United States,* 37 CIT    , , 908 F. Supp. 2d 1332, 1345 (2013)).

## STANDARD OF REVIEW

"The court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise [**12] not in accordance with law." *19 U.S.C. § 1516a(b)(1)(B)(i) (2006).*

## DISCUSSION

### I. LEGAL FRAMEWORK

"The United States imposes duties on foreign-produced goods that are sold in the United States at less-than-fair value." *Clearon Corp. v. United States,* 37 CIT    , , 2013 Ct. Intl. Trade LEXIS 27, *5 (2013). The Department is responsible for making the fair value determination, and is directed by statute to make a "comparison . . . between the export price or constructed export price [10] and normal value." *19 U.S.C. § 1677b(a) (2006).* Where, as here, the merchandise in question is exported from a nonmarket economy country,[11] "the normal value of the [*1366] subject merchandise [is based on] the value of the factors of production utilized in producing the merchandise and [an] added . . . amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id. § 1677b(c)(1)(B).*

10    Under the statute, the terms "export price" and "constructed export price" are defined as follows:

The term "export price" means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of

992 F. Supp. 2d 1360, *1366; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **12; SLIP OP. 2014-70

importation by the producer or exporter of the subject merchandise outside of [**13] the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States . . . .

. . . .

The term "constructed export price" means the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter . . . .

*19 U.S.C. § 1677a(a)--(b) (2006).*

11    A nonmarket economy country is a "foreign country that the [Department] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." *19 U.S.C. § 1677(18)(A).* Because the Department deems the PRC "to be a nonmarket economy country, Commerce generally considers information on sales in [the PRC] and financial information obtained from Chinese producers to be unreliable for determining, under *19 U.S.C. § 1677b(a),* the normal value of the subject merchandise." *Shanghai Foreign Trade Enters. Co. v. United States, 28 CIT 480, 481, 318 F. Supp. 2d 1339, 1341 (2004).*

To [**14] determine the normal value of the subject merchandise, Commerce is directed to use "the best available information regarding the values of such factors in a [comparable] market economy country or countries considered to be appropriate by the [Department]." *Id.* Commerce's practice, in selecting the best available information for valuing factors of production, is to "choose surrogate values that represent broad market-average prices, prices specific to the input, prices that are net of taxes and import duties, prices that are

contemporaneous with the POR, and publicly available non-aberrational data from a single surrogate market-economy." *Clearon, 37 CIT at    , 2013 Ct. Intl. Trade LEXIS 27, *11* (citation omitted) (internal quotation marks omitted); *see also 19 C.F.R. § 351.408(c)(2) (2012)* ("[T]he Secretary [of Commerce] normally will value all factors [of production] in a single surrogate country."). The Department's task is to "attempt to construct a hypothetical market value" of the subject merchandise in the nonmarket economy. *Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1375 (Fed. Cir. 1999).*

## II. EXHAUSTION OF ADMINISTRATIVE REMEDIES

As an initial matter, defendant and defendant-intervenors [**15] claim that plaintiffs failed to exhaust their administrative remedies with respect to certain arguments. They contend that plaintiffs failed to present these arguments during the underlying administrative proceeding, and are thus, prohibited from making them now before the court. Specifically, defendant and defendant-intervenors allege that plaintiffs failed to present their arguments before Commerce with respect to (1) the Philippine surrogate value for truck freight selected by the Department, and (2) claims that the import data under Philippine HTS 4402 is not the best available information when compared to the domestic Cocommunity data [12] and the price data used by Commerce to value carbonized material in prior reviews. Def.'s Br. 27-37; Def.-Ints.' Br. 10-13.

12    As shall be seen, the term "Cocommunity data" means data derived from a monthly publication of the Asian and Pacific Coconut Community. Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S. Department of Commerce at 47, PD 101, at bar code 3041311-01 (Nov. 16, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's Surrogate Value Comments").

The court finds defendant and defendant-intervenors' [**16] exhaustion claims to be unpersuasive. A court "shall, where appropriate, require the exhaustion of administrative remedies." *28 U.S.C. § 2637(d) (2006); Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed. Cir. 2013).* "To exhaust its administrative remedies, a party usually must submit a case brief 'present[ing] all arguments that continue in [its]

Case: 14-1752    Document: 54    Page: 75    Filed: 12/01/2014

Page 6

992 F. Supp. 2d 1360, *1366; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **16; SLIP OP. 2014-70

view to be relevant to [Commerce's] final determination or final results.'" *Qingdao Taifa Grp. Co. v. United States, 33 CIT 1090, 1092-93, 637 F. Supp. 2d 1231, 1236 (2009)* (alterations in original) (quoting *19 C.F.R. § 351.309(c)(2) (2012)*). This Court has held, however, that requiring exhaustion may be inappropriate under certain circumstances. [*1367] For instance, "[a] party . . . may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level." *Id. at 1093, 637 F. Supp. 2d at 1236* (citing *LTV Steel Co. v. United States, 21 CIT 838, 868-69, 985 F. Supp. 95, 120 (1997))*.

Here, in the Final Results, Commerce changed [**17] the primary surrogate country from Thailand to the Philippines to value most of the major factors of production used in the production of subject merchandise. Issues & Dec. Mem. at cmt. 1. In its Preliminary Results, where it used Thailand as the primary surrogate country, Commerce valued carbonized material using GTA import data derived from Thai HTS 440290, and used publicly available Thai data from a Thai consulting company to value truck freight transportation costs. Preliminary Results Surrogate Values Mem. at 9, 13. Following publication of the Preliminary Results, the parties submitted case and rebuttal briefs to the Department regarding its determinations, and while plaintiffs argued for the use of the Philippine data, they could hardly foresee what use the Department would make of that data.

In the Final Results, Commerce departed from its prior determinations by selecting the Philippines as the primary surrogate country to value most of the factors of production. Issues & Dec. Mem. at cmt. 1. Thus, Commerce valued the carbonized material input using Philippine HTS 4402, and valued truck freight using publicly available data reported in the Cost of Doing Business in Legazpi [**18] City, Philippines. Final Results Surrogate Values Mem. at 3, 6. As a result, it was not until after the submission of the parties' case briefs that Commerce made its determination to select the Philippines as the primary surrogate country, and articulated its basis for its selection of sources to value carbonized material and truck freight (i.e., Philippine HTS 4402 and Cost of Doing Business). It is simply too much to ask of the parties to anticipate (1) that Commerce would change the surrogate country between

the preliminary and Final Results, (2) the reasons that the Department would state for deciding to change surrogate countries, and (3) precisely how Commerce would value the various inputs. Under similar circumstances, it has been held that a party "is not required to predict that Commerce would accept other parties' arguments and change its decision." *Qingdao, 33 CIT at 1093, 637 F. Supp. 2d at 1237*. Accordingly, because plaintiffs had no realistic opportunity to present their arguments before the Department, the court finds that plaintiffs did not fail to exhaust their administrative remedies.

### III. COMMERCE'S CHOICE OF A SURROGATE VALUE FOR CARBONIZED MATERIAL IS IN ACCORDANCE [**19] WITH LAW AND SUPPORTED BY SUBSTANTIAL EVIDENCE

#### A. The Cocommunity Data Is Deficient

In the Final Results, the Department found that the Cocommunity [13] price data placed on the record by Jacobi was not the [*1368] best available information to value the carbonized material input. *See 19 U.S.C. § 1677b(c)(1)(B)*. Plaintiffs object to this finding.

> 13  Cocommunity is a monthly publication of the Asian and Pacific Coconut Community that contains news, statistical data, and domestic prices for coconut shell charcoal in the Philippines. Jacobi's Surrogate Value Comments at 47. "[T]he [Asian and Pacific Coconut Community] is an independent regional intergovernmental organization which consists of sixteen member countries and accounts for 85-90% of the world production of coconut." Jacobi's Surrogate Value Comments at 47.

When making a "best available information" finding, this Court, among other things, has repeatedly confirmed the importance that the information used to value the factors of production (1) represents a broad market average of prices for the input in question, and (2) be exclusive of taxes and duties. *See, e.g., Jining Yongjia Trade Co. v. United States, 34 CIT    ,    , 2010 Ct. Intl. Trade LEXIS 140, *28 (2010)* [**20] ("Commerce's practice, in selecting the best available information for valuing [factors of production], is to select surrogate values which are . . . representative of a broad market average . . . and exclusive of taxes and duties." (citation omitted) (internal quotation marks omitted)).

Case: 14-1752    Document: 54    Page: 76    Filed: 12/01/2014

Page 7

992 F. Supp. 2d 1360, *1368; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **20; SLIP OP. 2014-70

As noted, in the Final Results, Commerce selected the Philippines as the primary surrogate country to value most of the major factors of production used in the manufacture of activated carbon. *Final Results, 77 Fed. Reg. at 67,338.* Specifically, the Department used HTS import data derived from the GTA from the Philippines under heading HTS 4402 [14] ("Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated") to value carbonized material, one of the important material inputs used in the production of activated carbon. Final Results Surrogate Values Mem. at 3.

14    In its Issues and Decision Memorandum, Commerce misidentified the tariff heading that it was using as Philippine HTS 4402.90.00. *See* Issues & Dec. Mem. at cmt. 1 ("First, the publicly available import data from the Philippines under HTS 4402.90.00 comes from an approved surrogate country."). Having reviewed the record, however, [**21] it is clear that Commerce analyzed the Philippine import data under the four-digit heading, HTS 4402, and not under 4402.90.00. *See, e.g.,* Issues & Dec. Mem. at cmt. 1 (properly naming the section heading two lines above its inadvertent error, as "Philippine GTA Import Data 4402.00.00"); Final Results Surrogate Values Mem. at 3 ("For the final results, we valued carbonized material using GTA data from the Philippines, specifically HTS 4402.00, for a value of 53.73 Ps/Kg.").

Although plaintiffs argue for the use of the Cocommunity data that they placed on the record to value the carbonized material input, it is clear that the data is deficient in at least two important respects. The Cocommunity data's deficiencies begin with its limited geographical scope for the prices, in the Philippines, of carbonized material derived from coconut shell charcoal. The Cocommunity publication unmistakably indicates that its Philippine prices for coconut shell charcoal are based only on one geographical area. That is, the data came only from the Visayas region.[15] *See* Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S. Department of Commerce at 51, [**22] PD 101, at bar code 3041311-01 (Nov. 16, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's Surrogate Value Comments") (**Coconut Shell Charcoal:** Philippines (Domestic), *Visayas,* Buyer" (emphasis added)). A review of the "Prices of Coconut Products and Selected Oils (US\$/MT)" ledger makes that

much clear. *See* Jacobi's Surrogate Value Comments at 51.

15    The Visayas is one of three geographical regions, consisting of several islands that make up the Philippines.

GHC, in its case brief, acknowledges that the Cocommunity publication lacked countrywide data. GHC's Br. 27 ("[T]he product specific Cocommunity data, even though lacking country wide coverage, represent a far more suitable surrogate value [*1369] data source."). Thus, the Cocommunity prices are less representative of broad market averages than the GTA data for HTS 4402, which provides nationwide data for imports of carbonized materials that enter the Philippines from its global trading partners. Moreover, despite GHC's assertions, plaintiffs identify no record evidence demonstrating that the Cocommunity data is, in fact, representative of a broad market average. That is, plaintiffs point to no record evidence suggesting that the Visayas region [**23] represents a substantial portion of the market for activated carbon in the Philippines, or that these prices are reflective of the national Philippine market for the subject merchandise. It is therefore apparent that the import data represents a broader market average than the Cocommunity data, and that the Cocommunity data fails to provide the "broad market average" of prices reasonably preferred by Commerce when making a best available information finding.

Next, aside from Jacobi's own statements in its surrogate value comments submitted to Commerce, plaintiffs cite no record evidence demonstrating that the Cocommunity prices are tax and duty exclusive. *See* Jacobi's Surrogate Value Comments at 5 ("[T]he data in *Cocommunity* meet the Department's criteria of being specific to the input in question and the data tax exclusive."). As has been noted, that a price be "exclusive of tax and duties" is another important preference for Commerce when considering the "best available information," so that an "apples to apples" calculation can be made when constructing normal value. The Department has found that import data is "reported on a duty-exclusive, tax-exclusive basis." *Shandong Huarong Gen. Corp. v. United States, 25 CIT 834, 845, 159 F. Supp. 2d 714, 725 (2001); [**24] see also* Issues & Dec. Mem. at cmt. 1 ("Finally, the Department previously has found that data from the [GTA], such as that on the record, is publicly-available, represents a broad market

Case: 14-1752    Document: 54    Page: 77    Filed: 12/01/2014

Page 8
992 F. Supp. 2d 1360, *1369; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **24; SLIP OP. 2014-70

average, and is *tax and duty exclusive.*" (emphasis added) (citation omitted)).

The burden of building the administrative record lies with the interested parties. *QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011)* (citations omitted). Thus, the burden, here, rested with plaintiffs to supply Commerce with a probative source showing that the Cocommunity prices were free of tax and duty. Because plaintiffs put no evidence on the record showing that the Cocommunity data was tax and duty free, the data lacks an important criterion looked at in a best available information determination.

Based on the foregoing, the Department's finding that the Cocommunity data lacked two important preferences looked to by Commerce when making a best available information determination was reasonable.

**B. Commerce's Past Practice**

GHC also contends that Commerce's failure to use the Cocommunity data as the surrogate value for carbonized material marked a departure from an established agency preference and policy [**25] to rely on domestic data for the valuation of material inputs, rather than import statistics. GHC's Br. 14 (citing *Tianjin Magnesium Int'l Co. v. United States, 34 CIT    ,    , 722 F. Supp. 2d 1322, 1333 (2010)* ("[W]hen the Department has a choice between domestic data and import statistics, Commerce's preference is to use domestic data." (citations omitted)); *Dorbest Ltd. v. United States, 30 CIT 1671, 1688-89, 462 F. Supp. 2d 1262, 1278-79 (2006), rev'd on other grounds, 604 F.3d 1363 (Fed. Cir. 2010)*; *Hebei Metals & Minerals Imp. & Exp. Corp. v. United States, 29 CIT 288, 294-303,* [*1370] *366 F. Supp. 2d 1264, 1269-77 (2005))*.

While it may be the case that Commerce has a preference for domestic data, the Department, as has been noted, also prefers, whenever possible, to use data that (1) represents a broad market average of prices for the input, and (2) is exclusive of taxes and duties. *Jining, 34 CIT at    , 2010 Ct. Intl. Trade LEXIS 140, *28*. Had the record contained domestic countrywide data, that was tax and duty free, GHC's claim might have had merit. Here, although the Cocommunity data represented domestic price information, the data (1) was regional and not countrywide, and (2) was not shown [**26] to be tax and duty exclusive. None of the cases relied upon by GHC involved domestic price data that suffered from similar

deficiencies as those in the data published in Cocommunity. Thus, these cases do not aid plaintiffs.

**C. Specificity of HTS 4402**

Plaintiffs also argue that, when valuing the carbonized material input, the Department was required to employ a surrogate price for the type of carbonized material that they actually used in their production processes.[16] Jacobi's Br. 1-2; GHC's Br. 8-9. Thus, they insist that, even though the Philippine HTS 4402 heading covers the carbonized material derived from shell that Jacobi and GHC used in their processes, the heading cannot be used because it also covers carbonized material made from wood, which, they claim, neither company used in their production of activated carbon.

> 16   Plaintiffs initially contended that carbonized material derived from wood could not be used to make products covered by the Order, but have since seemingly abandoned this argument when it was pointed out by the other parties that plaintiffs had inaccurately represented to the court the Order's contents. *See* Jacobi's Br. 16-18; Resp't Pls.' Reply Br. in Supp. of their [**27] Mot. for J. on the Agency R. 14-15 (ECF Dkt. No. 68); GHC's Br. 13, 18-19; Def.'s Br. 16-17; Def.-ints.' Br. 20-22.

For plaintiffs, because Commerce used a surrogate value for the carbonized material input that was derived, in part, from a feedstock (i.e., wood) other than those used by Jacobi's and GHC's suppliers (anthracite coal and coconut shell charcoal for Jacobi, and bituminous coal, coconut shell charcoal, "and other carbonized materials" for GHC), HTS 4402 was not the best available information on the record. Jacobi's Br. 2 ("Very simply, the import data for HTS category 4402 cannot possibly be considered the 'best information available' for carbonized material because such import data for HTS category 4402 concerned primarily raw material inputs [(i.e., wood)] that were not used by Jacobi to make the steam activated carbon produced by Jacobi and exported to the United States."); *see* Letter from Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, to Secretary of Commerce, U.S. Department of Commerce at 17, 22, CD 106, at bar code 3046449-01 (Dec. 14, 2011), ECF Dkt. No. 43 (Apr. 5, 2013) ("GHC's Supplemental Section D Response"); Letter from Daniel L. Porter, Counsel for Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S.

Case: 14-1752    Document: 54    Page: 78    Filed: 12/01/2014

Page 9

992 F. Supp. 2d 1360, *1370; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **27; SLIP OP. 2014-70

Department of Commerce at 10-11, [**28] PD 109, at bar code 3041511-01 (Nov. 17, 2011), ECF Dkt. No. 43 (Apr. 5, 2013); Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable Rebecca M. Blank, Acting Secretary of Commerce, U.S. Department of Commerce at 99, 146, PD 29, at bar code 3027307-01 (Sept. 1, 2011), ECF Dkt. No. 43 (Apr. 5, 2013).

With respect to plaintiffs' legal argument, the court finds that plaintiffs are correct, that the factors of production actually [*1371] used by a respondent are important, if not controlling, when determining normal value. This is because the purpose of a review is to determine a margin for a respondent's product based on the valuation of the product's factors of production. Were the factors of production of another company used, even to make an identical product, the margin would not be as accurate a reflection of that respondent's cost of production. *See Zhejiang DunAn Hetian Metal Co. v. United States, 652 F.3d 1333, 1341 (Fed. Cir. 2011)* ("In determining the valuation of the factors of production, 'the critical question is whether the methodology used by Commerce is based on the best available information and establishes the antidumping margins as accurately as possible.'" [**29] (quoting *Shakeproof Assembly Components v. United States, 268 F.3d 1376, 1382 (Fed. Cir. 2001)).* Thus, although the Order covers activated carbon products manufactured using other inputs, here, the inputs actually used by plaintiffs must be taken into account.

Although plaintiffs are correct in their assessment of the importance of the inputs actually used in the production of their activated carbon, their claims with respect to the HTS 4402 data fail on substantial evidence grounds. As has been noted, both GHC and Jacobi use carbonized material produced from shell and coal in their manufacturing processes. As part of their argument favoring the use of the Cocommunity data over the data obtained from imports under HTS 4402, plaintiffs insist that carbonized material derived from shell, and carbonized material derived from coal, are comparably priced.

Specifically, the Cocommunity data reflects the price for carbonized material derived from shell, while the data for Philippine HTS 4402 includes import data for carbonized material derived from shell, as well as other sources, such as wood. GHC argues that price data for coconut shell charcoal (i.e., the Cocommunity price data)

is the best [**30] available information, because the Department found, in the initial less-than-fair value investigation and in its final results of remand redetermination in the first administrative review of the Order, that coconut shell charcoal and coal-based carbonized materials are comparably priced. GHC's Br. 15-16 (citing Certain Activated Carbon from the *PRC, 72 Fed. Reg. 9,508* (Dep't of Commerce Mar. 2, 2007) (final determination of sales at less than fair value), and accompanying Issues and Decision Memorandum at comment 16 ("In the instant case, as discussed in the *Preliminary Determination,* the Department found that the coconut shell charcoal value, although not identical to the coal-based carbonized material used by respondents, is comparable in that both products are a type of charcoal." (citation omitted) (internal quotation marks omitted)); Final Results of Redetermination Pursuant to Ct. Remand at 10-11, *Calgon Carbon Corp. v. United States,* No. 09-00524 (2011), ECF Dkt. No. 36 ("*Calgon Carbon* Remand Results") ("[O]ur re-examination of the record indicates that coconut shell charcoal shares similar properties with carbonized material and that those similar properties are essential [**31] in the production of activated carbon. The expert's report found that coal-based carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in the production of activated carbon. Thus, in this instance, between the two alternative Indian HTS categories, 'Other Cokes of Coal' and 'Coconut Shell Charcoal,' the Department determines that Indian HTS number 4402.00.10 'Coconut Shell Charcoal' results in a better, input-specific price for coal-based carbonized materials." (footnotes omitted)). Thus, for [*1372] plaintiffs, because both inputs (shell-derived carbonized material and coal-based carbonized material) that they employed in their production processes are comparably priced, they are both covered by the Cocommunity data relating to the price of shell.

Despite the Department's finding as to price comparability between shell charcoal and coal, this finding is not determinative here. First, it is worth noting that the discussion leading up to the comparability finding is less than clear as to whether the price of shell-derived charcoal is comparable to that of coal-based carbonized material, or if the materials [**32] themselves are comparable for the use in the manufacture of activated carbon. Although, in the Final Results of Redetermination Pursuant to Court Remand in the first

administrative review of the antidumping duty order, the Department concluded "that Indian HTS number 4402.00.10 'Coconut Shell Charcoal' results in a better, input-specific *price* for coal-based carbonized material," the discussion leading up to this finding does not support the conclusion as to price. *Calgon Carbon* Remand Results at 11 (emphasis added).

Moreover, even if shell-based charcoal and coal-based carbonized materials have comparable prices, the Cocommunity data is only marginally more useful on the basis of specificity than the import data. This is because HTS heading 4402 also encompasses shell-derived carbonized material. Thus, if coconut shell charcoal is "comparable" to coal-derived carbonized material, the import heading covers entries comparably priced with coal-derived carbonized material too. The Cocommunity publication that covers price data for coconut shell charcoal is only more specific to value coal-based carbonized material than HTS 4402 because the import data also covers imports of wood-based [**33] carbonized material. Thus, it is only the possibility that the HTS 4402 data could contain some entries of carbonized material derived from wood that arguably makes this data less comparable to the carbonized materials used by GHC and Jacobi than the Cocommunity data.

This observation leads to plaintiffs' next argument. Plaintiffs contend that the Philippine HTS 4402 import data is less specific than the Cocommunity data because the heading covers carbonized material derived from wood, which they insist, is a material that they did not use in the production of their activated carbon. As noted, plaintiffs argue, and the court has found, that the factors of production actually used by a respondent in an administrative review are important, if not controlling, in determining normal value. Nonetheless, the record here does not support plaintiffs' claim.

Despite arguments to the contrary, the record demonstrates that GHC has used wood as a material in the production of its activated carbon. *See* Letter from Francis J. Sailer, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, to Secretary of Commerce, U.S. Department of Commerce at 44, PD 17, at bar code 3025194-05 (Aug. 19, 2011), ECF [**34] Dkt. No. 43 (Apr. 5, 2013) ("We also produce variety high-grade pellet products with the materials of coconut shell, nutshell and *wood.*" (emphasis added)). Moreover, Jacobi

itself asserted in this review that the carbonized material used to produce the subject merchandise can be derived from coconut shell and coal, as was used by Jacobi and GHC, but also from wood, lignite, and other materials. *See* Letter from Ross Bidlingmaier, Counsel for Jacobi, to The Honorable John Bryson, Secretary of Commerce, U.S. Department of Commerce at 13, PD 159, at bar code 3056304-01 (Feb. 10, 2012), ECF Dkt. No. 43 (Apr. 5, 2013) ("Jacobi's [*1373] Additional Surrogate Value Information") (listing the "[f]ixed carbon content of raw materials used for the production of activated carbon" to include soft wood, hard wood, coconut shells, lignite, bituminous coal, and anthracite). Thus, contrary to plaintiffs' assertions, the record does not indicate unambiguously that neither Jacobi nor GHC used carbonized material derived from wood in the production of their activated carbon products during the POR.

Based on the foregoing, it appears that the Cocommunity data is only modestly more specific to the carbonized material [**35] inputs used in the production of plaintiffs' activated carbon than the import data found under HTS 4402. The court's best available information inquiry, however, does not end here. Despite the specificity conclusion (which remains somewhat uncertain based on the lack of clarity as to price comparability in the discussion in the *Calgon Carbon* Remand Results), the Cocommunity data is unable to overcome the earlier discussed deficiencies from which it suffers, i.e., that the publication's price data for coconut shell charcoal did not represent a broad market average, and was not shown to be tax and duty exclusive. Put another way, Commerce was not unreasonable in finding that a slight superiority in specificity failed to compensate for the Cocommunity data's deficiencies with respect to the limited breadth of market prices it supplied and the lack of record evidence demonstrating that the publication's prices were tax and duty free.

### D. Imports Under HTS 4402

Finally, plaintiffs argue that imports made under HTS 4402 during the POR did not contain any entries of coconut shell charcoal. Jacobi's Br. 19. For plaintiffs, if there were no imports of the input used to produce the carbonized material [**36] that they employed in the manufacture of their merchandise, then the surrogate value for that input is not the best available information. GHC's Br. 17-18 ("[D]uring [the] POR . . . there were no imports of coconut shell charcoal under HTS

4402000001. As such, the Department succumbed to a clear error of fact in its belief that the broad basket sub-heading HTS 4402.00 captured imports of coconut shell charcoal. The issue should be remanded to the Department to correct this erroneous finding of fact because it renders the Department's choice as arbitrary and wholly unsupported by substantial evidence.").

Plaintiffs' only support on the record for this assertion, however, appears to be Jacobi's own statement in its surrogate value comments submitted before the Department. *See* Jacobi's Surrogate Value Comments at 4 ("First, there are no data available for coconut shell charcoal from the Philippines imported under [HTS 4402.00.00.01]"); Jacobi's Br. 20; GHC's Br. 17. Beyond this assertion, plaintiffs do not point to any evidence that there were no inputs of shell-derived carbonized material entered during the POR. Thus, plaintiffs have failed to establish their conclusion with probative [**37] record evidence.

### E. Commerce Reasonably Determined the Surrogate Value for Carbonized Material

Based on the foregoing, the Department's selection of data from Philippine HTS 4402 as the surrogate value for carbonized material in the present review is in accordance with law and supported by substantial evidence. By their arguments, plaintiffs have demonstrated that the Cocommunity data is marginally more specific than the HTS 4402 data. Because of the infirmities in the Cocommunity data, however, it is apparent that Commerce did not err in its selection of GTA import data from HTS 4402 ("Wood Charcoal (Including [*1374] Shell or Nut Charcoal), Whether or Not Agglomerated") to provide the surrogate value for carbonized material.

Accordingly, the court finds that the Cocommunity data was not the best available information on the record with which to calculate the surrogate value for carbonized material. In addition, Commerce reasonably determined that the Philippine GTA import data under HTS 4402 represents the best available information with which to value the carbonized material input used in the production of subject merchandise.

### IV. Commerce's Choice for a Surrogate Value for Truck Freight Is [**38] Supported by Substantial Evidence

In the Preliminary Results, the primary surrogate country selected by the Department was Thailand. Preliminary Results Surrogate Values Mem. at 1. Specifically, "[t]o value the cost of transportation [(truck freight)] from the suppliers to the factory, the Department calculated a contemporaneous per-unit average rate based on publicly available data from Siam Partners Group Company Limited" ("Siam"), a Thai consulting company, for the year 2005, for the transportation of goods by truck from Bangkok to five other provinces in Thailand. Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem. at 9, Attach. 8 at 55. Commerce computed the per-unit average rate by dividing the cost per metric ton rates by the distance from each province to Bangkok. Preliminary Results Surrogate Values Mem. at 9. The Department then averaged the rates for each province to obtain a cost per metric ton per kilometer rate of 0.903 baht. Preliminary Results Surrogate Values Mem. at 9. Because the Siam data was from 2005, the Department then inflated the rate using the Thai Producer Price Index. Preliminary Results [**39] Surrogate Values Mem. at 9. As noted, the POR was April 1, 2010, through March 31, 2011.

For the reasons previously stated, the primary surrogate country selection was changed from Thailand in the Preliminary Results, to the Philippines in the Final Results. Thus, the Department used Philippine data to revalue most of the major factors of production for the subject merchandise, including the cost of truck freight from the suppliers to the factory. *See* Final Results Surrogate Values Mem. at 6. In the Final Results, Commerce "calculated a contemporaneous per-unit average rate based on publicly available data [as reported in] the Cost of Doing Business in Legazpi City, Philippines" from the year 2010. Final Results Surrogate Values Mem. at 6, 53. Commerce computed the per-unit average rate by "taking the average of the high and low [p]eso per [kilogram] rate, and then dividing that amount by the distance from Legazpi City to Manila" to obtain a rate of 0.01 pesos per kilogram per kilometer. Final Results Surrogate Values Mem. at 6. This rate was substantially higher than that found in the Preliminary Results.

GHC objects to the Department's use of the Philippine data to value truck freight. [**40] It argues that, despite the agency's preference to use a single surrogate country, and despite having put the Philippine

Case: 14-1752   Document: 54   Page: 81   Filed: 12/01/2014

Page 12

992 F. Supp. 2d 1360, *1374; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **40; SLIP OP. 2014-70

data on the record itself and urging its use to value all of the factors of production, Commerce should have continued to use the Thai truck freight data used in the Preliminary Results as the surrogate value. *See* GHC's Br. 35-36 (citing *Shantou Red Garden Foodstuff Co. v. United States*, 36 CIT   ,   , 880 F. Supp. 2d 1332, 1334-35 (2012)); *see generally* Case Br. of Cherishmet Group and Datong Juqiang Activated Carbon Co., Ltd., PD 243 at 3081186-01 [*1375] (June 13, 2009), ECF Dkt. No. 43 (Apr. 5, 2013). GHC claims that the Thai data was superior because, (1) unlike the Philippine data, the Thai data "represent[ed] a broad market average covering a range of prices" compared to the Philippine truck freight data which was based on a single route, (2) "[t]he Philippine data fail[ed] to satisfy the 'specificity' criteria," because the reported data was based on the transportation of "loose cargo," while the Thai data provided a truck freight for fully loaded trucks, and (3) the Philippine data is aberrational as compared to the data used in prior reviews of the Order [**41] (approximately eight times higher than the value used in any of the three prior reviews). GHC's Br. 31-34.

As noted, Commerce's preference for surrogate information is to use data that is "product-specific, representative of a broad market average, . . . contemporaneous with the POR[,] and exclusive of taxes and duties." *Jining*, 34 CIT at   , 2010 Ct. Intl. Trade LEXIS 140, *28 (citation omitted) (internal quotation marks omitted). In addition, Commerce's regulations direct that "the Secretary [of Commerce] normally will value all factors [of production] in a single surrogate country." *19 C.F.R. § 351.408(c)(2)*.

Having taken GHC's arguments into consideration, the court holds that the Department reasonably found that Philippine data was the best available information with which to value truck freight. While the Thai data contains ten different price points, valuing the cost of transportation from Bangkok to five other provinces, and may appear to be more probative in this regard, the Thai data suffers from defects that diminish its worth. *See* Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55.

Although GHC contends [**42] that the Philippine data lacked specificity because it was based on the transportation of "loose cargo" rather than that of a "full truckload," the court is unpersuaded. The Thai source is based on the rental cost of a truck carrying ten to twelve tons of cargo. *See* Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55. The source further states that a full cargo load for one of these trucks is thirteen tons. *See* Truck Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55. The Philippine data, on the other hand, reported transportation costs for a truck carrying "loose cargo." *See* Final Results Surrogate Values Mem. at 51. Nowhere in the Philippine data source does it define or explain the relevance or meaning of "loose cargo," nor has GHC offered anything to support its contention that the Philippine data based on the transportation of "loose cargo" is not representative of the transportation costs incurred for a fully loaded truck. Thus, the Thai data appears to represent shipping costs for less than a full truckload of shipments, [**43] while there is no record evidence that the Philippine data is not representative of the shipping costs for a full truckload, albeit of loose cargo. Without more, GHC's speculation that the Philippine data lacks specificity cannot be credited.

Additionally, GHC claims that the Philippine data is aberrational when compared to truck freight rates used by Commerce in prior reviews. Its argument is premised on the observation that the surrogate value for truck freight selected in the Final Results is several times higher than the values applied in prior reviews when Indian data was employed. Specifically, the Philippine data is eight times higher [*1376] than the surrogate value selected in the Preliminary Results, based on the Thai data that GHC contends should be used, and eight times higher than the surrogate values selected in the three prior reviews, from Indian sources. In other words, plaintiffs' objection, unsupported by further record evidence, is that the Philippine prices must not be the best available information because they are too high. Thus, while plaintiffs' observation as to the cost ratios is, no doubt, factually correct, without more it cannot be given much weight.

Despite plaintiffs' [**44] arguments, the Philippine source appears to be the best on the record. First, the data is from 2010, and is thus, far more contemporaneous to the POR (April 1, 2010, through March 31, 2011) than the Thai source which supplied its data from August 8, 2005, over four years prior to the POR. *Compare* Final Results Surrogate Values Mem. at 53, *with* Truck

Case: 14-1752   Document: 54   Page: 82   Filed: 12/01/2014

Page 13
992 F. Supp. 2d 1360, *1376; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **44; SLIP OP. 2014-70

Freight: Transportation Costs, Including Fuel Costs and Freight Rates, Preliminary Results Surrogate Values Mem., Attach. 8 at 55. Indeed, the Philippine data's contemporaneity was expressly identified by Commerce as one of its principal reasons for abandoning the use of Thailand as the primary surrogate country in favor of the Philippines. *See* Issues & Dec. Mem. at cmt. 1; *see, e.g., Jining, 34 CIT at   , 2010 Ct. Intl. Trade LEXIS 140, \*28* ("Commerce's practice, in selecting the best available information for valuing [factors of production], is to select surrogate values which are . . . contemporaneous with the POR . . . . This practice has found approval in this Court." (citations omitted) (internal quotation marks omitted)).

Next, although the Philippine truck freight data relied upon by Commerce was based on the price range of a single route, from [**45] Legazpi to Manila, there is evidence on the record for a second route, from Legazpi to Naga/Tabaco, with the exact same price range. *See* Final Results Surrogate Values Mem. at 51 (listing price ranges from Legazpi to Manila of 5.00/kg to 8.00/kg, and from Legazpi to Naga/Tabaco of 5.00/kg to 8.00/kg). This suggests that the Legazpi to Manila rate is, in fact, more representative than plaintiffs claim.

Finally, although not absolute, the Department is directed by its regulations to endeavor to value all factors of production with a single surrogate country. *See 19 C.F.R. § 351.408(c)(2)* ("[T]he Secretary [of Commerce] normally will value all factors [of production] in a single surrogate country."). Courts have found that Commerce's single surrogate country preference is strong and must be given significant weight. *See, e.g., Clearon, 37 CIT at   , 2013 Ct. Intl. Trade LEXIS 27, \*20.* This Court and the U.S. Court of Appeals for the Federal Circuit have repeatedly confirmed the reasonableness of the preference to restrict selections for surrogate values to a single surrogate country. *See, e.g., Dorbest Ltd. v. United States, 604 F.3d 1363, 1367-68 (Fed. Cir. 2010)* ("For most of the factors of production, [**46] Commerce uses the values that prevail in a single market economy country (called a 'surrogate country') that Commerce finds is both (a) economically comparable to the non-market economy country in question and (b) a significant producer of the merchandise in question." (citing *19 C.F.R. § 351.408(c)(2)*); *Clearon, 37 CIT at   , 2013 Ct. Intl. Trade LEXIS 27, \*20* ("[T]he court must treat seriously the Department's preference for the use of a single surrogate country." (citations omitted)); *Bristol*

*Metals L.P. v. United States, 34 CIT   , , 703 F. Supp. 2d 1370, 1375-76 (2010).*

This preference stems from the sensible conclusion that "deriving the surrogate data from one surrogate country limits the amount of distortion introduced into [the Department's] calculations because a domestic [*1377] producer would be more likely to purchase a product available" domestically. *Clearon, 37 CIT at   , 2013 Ct. Intl. Trade LEXIS 27, \*21* ("[T]he use of a 'single surrogate country' is justified when . . . all other factors are 'fairly equal' because minimizing distortion supports a finding that Commerce relied upon the best available information on the record."). Moreover, the process of determining normal value by using data [**47] from a market economy country to value factors of production used in manufacturing a product in a nonmarket economy country is inexact enough without adding greater ambiguity, such as the inclusion of a third market and yet another currency. Here, the Department valued most of the major inputs by using Philippine prices, and its preference for valuing factors of production from a single country weighs heavily in favor of valuing truck freight using the Philippine data derived from the Cost of Doing Business.

Accordingly, because (1) the Philippine data is more specific than the Thai dataset on the record, (2) the Philippine data is more contemporaneous to the POR than the competing Thai dataset, (3) the Philippine data, while having fewer data points than the Thai data, is supported by information from two routes, and (4) the court is mindful of Commerce's goal to minimize distortion by means of its strong preference to value factors of production within a single surrogate country, Commerce was reasonable in its choice of the Philippine data as the best available information to value truck freight. Thus, the Department's finding is supported by substantial evidence.

## V. COMMERCE'S CALCULATION [**48] OF THE SEPARATE RATE IS SUSTAINED

CAC and the separate rate respondents, Shanxi Industry and Tangshan, urge the court, should it remand the Final Results to Commerce, to instruct the Department to recalculate the dumping margin assigned to the separate rate respondents based on any recalculation of the rate assigned to the mandatory respondents. CAC's Mot. 2; Shanxi Industry's Br. 2; Tangshan's Mot. 2. These companies raise no challenge

992 F. Supp. 2d 1360, *1377; 36 Int'l Trade Rep. (BNA) 602;
2014 Ct. Intl. Trade LEXIS 67, **48; SLIP OP. 2014-70

with respect to the manner in which their rate was calculated. *See* Shanxi Industry's Br. 2 ("[I]n accordance with the law, Shanxi's margin was calculated in a manner consistent with the Department's customary practice of assigning dumping margins to non-individually investigated companies based on the margins calculated for the exporters and producers that are individually investigated as mandatory respondents."). Rather, the success of their motions hinges solely on the merits of Jacobi and GHC's underlying motions, challenging the surrogate values selected for carbonized material and truck freight, which the court has found wanting. Because the court sustains the Department's Final Results, the separate rate respondents' motions for judgment on the [**49] agency record are thereby rendered moot. Accordingly, the separate rate calculated by the Department in the Final Results is sustained, and the motions of CAC, Shanxi Industry, and Tangshan are denied.

**CONCLUSION**

Based on the foregoing, it is hereby

ORDERED that the Department of Commerce's Final Results are sustained. Judgment will be entered accordingly.

Dated: June 24, 2014

New York, New York

/s/ Richard K. Eaton

Richard K. Eaton

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 28th day of November, 2014, a copy of the foregoing Direct Brief filed on behalf of Plaintiffs-Appellants, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd. ("GHC"), Beijing Pacific Activated Carbon Products Co., Ltd. ("BPACP"), Cherishmet Inc., and Datong Municipal Yunguang Activated Carbon Co., Ltd. ("Datong Municipal") (collectively, "Cherishmet"),  and Shanxi Industry Technology Trading Co., Ltd. ("Shanxi") was filed electronically. I understand that notice of this filing will be sent to all counsel of record by operation of the Court's electronic-filing system. Parties may access this filing through the Court's system.

<div style="margin-left:40%">

/s/ Francis J. Sailer
Francis J. Sailer
GRUNFELD,DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP
1201 New York Ave., NW, Ste. 650
Washington, DC 20005
Phone: (202) 783-6881
Fax : (202) 783-0405
*Attorney for Plaintiffs - Appellants*

</div>

Dated: November 28, 2014

## **CERTIFICATE OF COMPLIANCE**

1. This brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 28.1(e)(2) and 32(a)(7)(B).

2. This brief contains 13,721 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

3. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6).

4. This brief has been prepared in a proportionally spaced type face using Word 2013 in Times New Roman 14 point font.

<div style="margin-left:50%">

/s/ Francis J. Sailer
Francis J. Sailer
GRUNFELD, DESIDERIO,
LEBOWITZ, SILVERMAN &
KLESTADT LLP
1201 New York Ave., NW, Ste. 650
Washington, DC 20005
Phone: (202) 783-6881
Fax: (202) 783-0405
*Attorney for Plaintiffs - Appellants*

</div>

Dated: November 28, 2014