NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

_____

**JACOBI CARBONS AB, JACOBI CARBONS, INC.,
NINGXIA GUANGHUA CHERISHMET ACTIVATED
CARBON CO., LTD., CHERISHMET INC., BEIJING
PACIFIC ACTIVATED CARBON PRODUCTS CO.,
LTD., , DATONG MUNICIPAL YUNGUANG
ACTIVATED CARBON CO., LTD., SHANXI
INDUSTRY TECHNOLOGY TRADING CO., LTD.,
CARBON ACTIVATED CORPORATION, CAR GO
WORLDWIDE, INC., TANGSHAN SOLID CARBON
CO., LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, CALGON CARBON
CORPORATION, NORIT AMERICAS, INC.,**
*Defendants-Appellees*

_____

2014-1752, 2014-1753, 2014-1754, 2014-1756

_____

Appeals from the United States Court of International Trade in Nos. 1:12-cv-00365-RKE, 1:12-cv-00372-RKE, 1:12-cv-00377-RKE, 1:12-cv-00396-RKE, 1:12-cv-00401-RKE, Senior Judge Richard K. Eaton.

_____

Decided: August 3, 2015

_____

DANIEL L. PORTER, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, argued for plaintiffs-appellants Jacobi Carbons AB, Jacobi Carbons, Inc. Also represented by CHRISTOPHER DUNN, JAMES P. DURLING, CLAUDIA DENISE HARTLEBEN.

KAVITA MOHAN, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Washington, DC, argued for plaintiffs-appellants Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., et al. Also represented by FRANCIS J. SAILER, MARK PARDO, ANDREW THOMAS SCHUTZ.

NANCY NOONAN, Arent Fox, LLP, Washington, DC, for plaintiffs-appellants Carbon Activated Corporation, Car Go Worldwide, Inc.

GREGORY S. MENEGAZ, DeKieffer & Horgan, PLLC, Washington, DC, for plaintiff-appellant Tangshan Solid Carbon Co., Ltd. Also represented by JAMES KEVIN HORGAN, JOHN J. KENKEL.

ANTONIA RAMOS SOARES, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, REGINALD T. BLADES, JR.; DEVIN S. SIKES, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC.

ROBERT ALAN LUBERDA, Kelley Drye & Warren, LLP, Washington, DC, argued for defendants-appellees Calgon Carbon Corporation, Norit Americas, Inc. Also represented by DAVID A. HARTQUIST, JOHN M. HERRMANN.

———————————

Before MOORE, BRYSON, and CHEN, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* MOORE.

Dissenting opinion filed by *Circuit Judge* BRYSON.

MOORE, *Circuit Judge*.

Appellants Jacobi Carbons AB and Jacobi Carbons, Inc. (collectively, "Jacobi"); Ningxia Guanghua Cherishmet Activated Carbon Co. ("GHC"), Cherishmet Inc., Beijing Pacific Activated Carbon Products Co., Datong Municipal Yunguang Activated Carbon Co. ("Datong Municipal"), and Shanxi Industry Technology Trading Co. ("Shanxi") (collectively, "Cherishmet"); and Carbon Activated Corp., Car Go Worldwide, Inc., and Tangshan Solid Carbon Co. ("Tangshan") (collectively, "CAC") appeal the decision of the United States Court of International Trade ("CIT") sustaining the U.S. Department of Commerce's ("Commerce") Final Results in the fourth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China ("PRC") covering the period April 1, 2010 through March 31, 2011. For the reasons set forth below, we *affirm*.

BACKGROUND

Congress has provided for the imposition of antidumping duties on foreign merchandise sold, or likely to be sold, at less than fair value in the United States. 19 U.S.C. § 1673. Commerce determines antidumping duties based on the amount by which the "normal value" of merchandise (its price in its home market) exceeds its "export price" (its price in the United States). *Id.* §§ 1677(35)(A), 1677b(a) (2012). For nonmarket economies like the PRC, Commerce calculates normal value based on "the value of the factors of production utilized in producing the merchandise and . . . an [added] amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* § 1677b(c)(1)(B).

On April 27, 2007, Commerce issued an antidumping duty order covering certain activated carbon from the

PRC. *Certain Activated Carbon from the People's Republic of China*, 72 Fed. Reg. 20,988 (Dep't of Commerce Apr. 27, 2007). After receiving requests seeking administrative review of the order, Commerce initiated the subject review on May 27, 2011. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 76 Fed. Reg. 30,912, 30,913–16 (Dep't of Commerce May 27, 2011). Commerce selected appellants Jacobi Carbons AB and GHC as two of the mandatory respondents for individual examination during the administrative review. Appellants Shanxi, Datong Municipal, and Tangshan subsequently filed separate rate certifications.

Commerce published the preliminary results of the review on May 4, 2012. *Certain Activated Carbon from the People's Republic of China*, 77 Fed. Reg. 26,496 (Dep't of Commerce May 4, 2012) ("*Preliminary Results*"). For the Preliminary Results, Commerce selected Thailand as the primary surrogate country and therefore used Thai data to calculate surrogate values for the respondents' factors of production. Commerce calculated weighted-average dumping margins of $1.49 per kilogram for Jacobi Carbons AB, $1.07 per kilogram for GHC, and $1.34 per kilogram for the separate rate companies.

Following publication of the Preliminary Results, the respondents placed additional data from the Philippines on the record and urged Commerce to use this data to value the major material inputs. *Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1364 (Ct. Int'l Trade 2014). Commerce published the final results of the review and the accompanying Issues and Decision Memorandum on November 9, 2012. *Certain Activated Carbon from the People's Republic of China*, 77 Fed. Reg. 67,337 (Dep't of Commerce Nov. 9, 2012) ("*Final Results*"); *Certain Activated Carbon from the People's Republic of China* A-570-904 (Issues and Decision Memorandum for the Final Results of the Fourth Antidumping Duty Adminis-

trative Review) (Dep't of Commerce Nov. 9, 2012) ("*Issues and Decisions Memorandum*") (J.A. 371–400). In the Final Results, Commerce selected the Philippines over Thailand as the primary surrogate country and used Philippine data, rather than Thai data, to calculate the surrogate values for many of the respondents' factors of production, including carbonized material and truck freight. In light of these changes, Commerce calculated weighted-average dumping margins of $0.44 per kilogram for Jacobi Carbons AB, $2.11 per kilogram for GHC, and $1.04 per kilogram for the separate rate companies.

Appellants challenged the Final Results at the CIT, arguing that Commerce did not use the best available information when it calculated the surrogate values for carbonized material and truck freight. The CIT disagreed, finding that substantial evidence supported each of Commerce's surrogate value determinations. *Jacobi Carbons*, 992 F. Supp. 2d at 1374, 1377. Because the CIT found that substantial evidence supported Commerce's surrogate value determinations, it sustained the agency's separate rate calculation. *Id.* at 1377. This appeal followed. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

DISCUSSION

We review decisions of the CIT de novo, applying the same standard used by the CIT. *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1373 (Fed. Cir. 2015). In antidumping duty proceedings, we uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938). "Our review is limited to the record before Commerce in the particular review proceeding at issue," *Qingdao Sea-*

*Line Trading Co. v. United States*, 766 F.3d 1378, 1385 (Fed. Cir. 2014), and the burden of creating this record lies with the interested parties, not with Commerce, *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011).

To determine the surrogate value for a factor of production from a nonmarket economy like the PRC, Congress directed Commerce to use the "best available information" from a comparable market economy country or countries. 19 U.S.C. § 1677b(c)(1)(B). "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute." *Qingdao*, 766 F.3d at 1386. In doing so, it is Commerce's practice to choose, where possible, data that reflects a broad market average and is publicly available, contemporaneous with the period of review, specific to the input in question, and exclusive of taxes on exports. *See QVD Food Co. v. United States*, 721 F. Supp. 2d 1311, 1315 (Ct. Int'l Trade 2010), *aff'd*, 658 F.3d 1318 (Fed. Cir. 2011).

I.    Surrogate Value for Carbonized Material

Carbonized material is a material input used to produce activated carbon. To determine the surrogate value for carbonized material, Commerce considered two data sources: (1) Global Trade Atlas ("GTA") statistics for Philippine imports categorized under Harmonized Tariff Schedule ("HTS") 4402, "Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated," and (2) pricing data for coconut charcoal contained in *Cocommunity*, a monthly publication of the Asian and Pacific Coconut Community organization.[1] Commerce found that

---

[1]    Commerce also considered a third data source not at issue on appeal consisting of Thai import statistics. *Issues & Decision Memo.* at 17 (J.A. 387).

the *Cocommunity* data was flawed for two reasons. First, Commerce found the prices were not representative of the Philippines as a whole because the data was from the Visayas region of the Philippines. *Issues & Decision Memo.* at 18 (J.A. 388). Second, Commerce found that it was not clear whether the *Cocommunity* prices were tax and duty exclusive. *Id.* Commerce therefore used the Philippine import data from the GTA to calculate the surrogate value for carbonized material.

Appellants argue that substantial evidence does not support Commerce's selection of the Philippine import data over the *Cocommunity* data. They argue the Philippine import data is flawed because it is less specific to the input in question than the *Cocommunity* data and because it results in an aberrationally high surrogate value compared to the surrogate value of carbonized material in prior reviews of the subject merchandise. Appellants also argue that the record did not support Commerce's criticisms of the *Cocommunity* data. Finally, appellants argue that by selecting the Philippine import data over the domestic Philippine *Cocommunity* data, Commerce violated its preference for using domestic data. Although a close case, substantial evidence supported Commerce's selection of the Philippine import data as the best available information.

## A. Specificity

Appellants argue that the Philippine import data is less specific to the carbonized material used to produce the subject merchandise than the *Cocommunity* data. To determine whether a data source is product specific, Commerce compares the products covered by the data source with the material input in question.

### 1. Material Input

The material input in question is carbonized material. The record shows that Jacobi's and Cherishmet's suppli-

ers used carbonized material made from coal to produce the subject merchandise.   J.A. 110, 133 (questionnaire responses from two of Jacobi's suppliers); J.A. 150, 155–56, 290–301 (Cherishmet's U.S. sales database during the period review); *see also* Jacobi's Br. 6.   The record also shows that one of Jacobi's suppliers used carbonized material made from coconut shell charcoal to produce the subject merchandise, in addition to carbonized material made from coal.   J.A. 111–15, 765–68.  There is no evidence that any of Jacobi's or Cherishmet's suppliers used carbonized material made of wood to produce the subject merchandise.[2]  Thus, it appears based on the record that the material input in question is carbonized material made of coal and coconut shell charcoal.

2. Data Sources

The *Cocommunity* data is limited to coconut shell charcoal, while the Philippine import data includes all imports to the Philippines categorized under HTS 4402, "Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated"—a broader basket category consisting of carbonized material made from wood and coconut shell.

---

[2]   The CIT erred when it found that Jacobi and Cherishmet produced the subject merchandise during the period of review using carbonized material made of wood. *See Jacobi Carbons*, 992 F. Supp. 2d at 1372–73.  Although it is possible to produce activated carbon using carbonized material made of wood, *id.* (citing J.A. 102, 260), the record indicates that Jacobi and Cherishmet used only carbonized material made from coal and coconut shell charcoal, not wood, to produce the activated carbon shipped to the United States during the review period, *see* J.A. 110–15, 133, 150, 155–56, 290–301, 765–68.  The inputs used to produce the subject merchandise are the inputs most relevant to this review.

Appellants argue that the Philippine import data is not specific because there were no imports of coconut shell charcoal to the Philippines during the review period. Appellants contend that HTS 4402 consists of four sub-categories, one of which—HTS 4402.00.00.01 ("Of Coconut Shell, Not Agglomerated")—covers coconut shell charcoal.[3]   Jacobi's Br. 32; Cherishmet's Br. 30–31.   Appellants further contend that the Philippine import data in the HTS 4402.00.00.01 subcategory indicates that there were zero imports of coconut shell charcoal to the Philippines during the review period.   Thus, appellants argue that although in theory the Philippine import data includes coconut shell charcoal, the pricing data for the review period is limited to wood charcoal, not coconut shell charcoal.   This is a new argument not made, in any meaningful or detailed sense, to Commerce below.

The unsupported, conclusory statement by Jacobi made below that there was "no data available for coconut shell charcoal from the Philippines imported under HTS 4402.00.10," J.A. 177, is insufficient.   Jacobi presented Commerce with no evidence supporting the proposition that there were no imports of coconut shell charcoal to the Philippines during the period of review.   Indeed, Jacobi incorrectly transcribed the HTS number, stating there was no data available for coconut shell charcoal from the Philippines under "HTS *4402.00.10*" instead of HTS *4402.00.00.01*, so Commerce could not verify Jacobi's claim.   This is compounded by the fact that the record does not support appellants' claim that HTS 4402 consists of four ten-digit subcategories and that one of those

---

[3]    The other three categories that appellants contend make up HTS 4402 are 4402.00.00.02 ("Of Wood, Not Agglomerated"); 4402.00.00.03 ("Of Wood (Including of Shell or Not Agglomerated)"); and 4402.00.00.04 ("Other").   Jacobi's Br. 32; Cherishmet's Br. 30–31.

subcategories is HTS 4402.00.00.01. Rather, the record indicates that HTS 4402 has only two subcategories, neither of which is limited to coconut shell charcoal: 4402.10.00 ("Of bamboo") and 4402.90.00 ("Other"). J.A. 255. Thus, Jacobi presented to Commerce a single conclusory sentence which inaccurately references an HTS category, with no record evidence or data to support its claim. Without any record evidence that there were zero imports of coconut shell charcoal to the Philippines during the period of review under HTS 4402.00.00.01, or even that HTS 4402.00.00.01 existed, Commerce could not evaluate Jacobi's statement that there was "no data available for coconut shell charcoal from the Philippines." It was Jacobi's and Cherishmet's responsibility to build an adequate record before Commerce, so any failure of proof lies with them. *QVD Food*, 658 F.3d at 1324. We will not reverse Commerce's decision about the best available information on the basis of an argument not made and evidence not presented on the administrative record. *Qingdao*, 766 F.3d at 1385 ("Our review is limited to the record before Commerce in the particular review proceeding at issue.").

### 3. Commerce's Past Practice

Appellants argue that Commerce's past practice demonstrates that coconut shell charcoal is a better match for coal-based carbonized material than the broader HTS 4402 category of wood charcoal. In past reviews of the instant antidumping duty order, Commerce found coconut shell charcoal comparable to coal-based carbonized material. For example, in the investigation to determine whether to impose antidumping duties on the subject merchandise, Commerce used coconut shell charcoal import data to value carbonized material because the "coconut shell charcoal value, although not identical to the coal-based carbonized material used by respondents, is comparable in that both products are a type of charcoal." *Certain Activated Carbon from the People's Repub-*

*lic of China* A-570-904 (Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Activated Carbon from the PRC) (Dep't of Commerce Feb. 23, 2007) (J.A. 48). Similarly, during the first period of review, Commerce wrote:

> [C]oconut shell charcoal shares similar properties with carbonized material and . . . those similar properties are essential in the production of activated carbon. The expert's report found that coal-based carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in the production of activated carbon. Thus, in this instance, between the two alternative . . . HTS categories, "Other Cokes of Coal" and "Coconut Shell Charcoal," the Department determines that . . . "Coconut Shell Charcoal" results in a better, input-specific price for coal-based carbonized materials.

Final Results of Redetermination Pursuant to Ct. Remand at 10–11, *Calgon Carbon Corp. v. United States*, No. 09-00524 (Ct. Int'l Trade July 26, 2011), ECF No. 36 (footnotes omitted) (J.A. 55–56). And during the third period of review, Commerce explained that because "coconut shell charcoal shares similar properties with carbonized material and . . . those similar properties are essential in the production of activated carbon," it would value carbonized material using imports categorized under HTS category "Coconut Shell Charcoal," instead of HTS category "Other Cokes of Coal." *Certain Activated Carbon from the People's Republic of China* A-570-904 (Issues and Decision Memorandum for the Final Results of the Third Antidumping Duty Administrative Review) (Dep't of Commerce Oct. 24, 2011) (J.A. 158–61).

In these prior analyses, Commerce was choosing between coconut shell charcoal and the HTS category "Other

Cokes of Coal" to find a comparable surrogate for coal-based carbonized material. Commerce's determination that coconut shell charcoal is better than "Other Cokes of Coal" does not mean that coconut shell data is better than wood charcoal. Wood charcoal is also a type of charcoal and can also be used to create the subject merchandise. Thus for the same reasons articulated by Commerce in the earlier periods of review, wood charcoal would be a better surrogate than "Other Cokes of Coal." There are no express findings or comparisons between wood charcoal and coconut shell charcoal, and this record does not establish any such conclusions.

While coconut shell charcoal is more specific than "Other Cokes of Coal," the record does not compare coconut shell charcoal and wood charcoal. Commerce's past practice does not demonstrate that coconut shell charcoal is a better match for coal-based carbonized material than the broader Philippine import data category, which includes wood charcoal and coconut shell charcoal.

### 4. Conclusion

Here, the material input in question is carbonized material made of coal and coconut shell charcoal. With respect to the coconut shell subset of this material input, the *Cocommunity* data, which includes only coconut shell charcoal, is more specific than the Philippine import data, which includes other forms of wood charcoal in addition to coconut shell charcoal. With regard to the carbonized material made of coal, which constitutes the bulk of the subject merchandise, there is no evidence on this record comparing wood charcoal and coconut shell charcoal. There are no findings nor have we been presented with record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal. Thus for the bulk of the imports at issue, there is no proof that coconut shell charcoal is a better surrogate. Neither of these data sources is specific to carbon-

ized material made of coal and Commerce's past selection of coconut shell charcoal as the best available surrogate was based on a comparison with "Other Cokes of Coal," not wood charcoal. The imports at issue include coconut shell charcoal and coal-based carbonized material. Once again, we do not review Commerce's determinations de novo. We cannot conclude on this record that Commerce's decision that both data sources were specific to the inputs in question was not supported by substantial evidence.

B. Aberrational Nature of Philippine Import Data

Cherishmet also faults the Philippine import data as aberrational compared to the surrogate values for carbonized material in prior reviews of the subject merchandise. During this period of review, Commerce calculated a price of $1,203.90 per metric ton of carbonized material based on the Philippine import data. Cherishmet asserts that Commerce priced the surrogate value of carbonized material much lower in prior reviews:

| Period of Review | Surrogate Value |
|:---:|:---:|
| 1st | $32.99/MT |
| 2nd | $66.256/MT (coconut shell charcoal); $435.62/MT (coal-based carbonized material) |
| 3rd | $83.45/MT |

Cherishmet's Br. 32–33 (citations omitted). It argues that the *Cocommunity* data, with a price of $255 per metric ton, maps more closely to Commerce's prior valuations of carbonized material than the Philippine import data, with a price almost five times as high.

The surrogate values presented by Cherishmet suggest that the Philippine import data is aberrational. And Commerce may opt to disregard data where there is record evidence that it is aberrational. Here, however, we cannot conclude that Commerce should have disregarded the Philippine import data as aberrational.

The government argues that there is an explanation for the apparently aberrational nature of the Philippine import data. Commerce selected India as the surrogate country in the first three periods of review. *See* J.A. 733–35. In the fourth period of review, Commerce found that India was not at a comparable level of economic development to the PRC, and therefore selected a different surrogate country. *See id.*; *see also* J.A. 94–96. Thus, the first three surrogate values were calculated with reference to a different level of economic development than the current surrogate value.

Looking at the table above, it is not entirely clear which measure is appropriate for comparison to determine whether the Philippine import data is aberrationally high. Commerce's price of $1203.90 is more than thirty times more than the surrogate value calculated for the first period of review ($32.99/MT) and nearly fifteen times higher than the surrogate value calculated for the third period of review ($83.45/MT). Both of these comparisons lead toward a conclusion that the Philippine import data is aberrational, and it seems unlikely that the switch from India to the Philippines could account for this dramatic change in pricing. However, in the second period of review, Commerce separated the pricing for coconut shell charcoal ($66.256/MT) and coal-based carbonized material ($435.62/MT). The price for coal-based carbonized material is an order of magnitude higher than the price for coconut shell charcoal. Given that the bulk of the imports in question are produced using coal-based carbonized material, the price from this review is only 2.8 times higher than the surrogate value for coal-based carbonized

material from the second period of review. Perhaps this disparity would have been enough to cause Commerce to reach a different conclusion regarding the best available information. Or perhaps Commerce would have concluded that the *Cocommunity* data for coconut shell charcoal, which was priced at $255/MT, was too low. Its prior determination during the second period of review that coal-based carbonized material was much more expensive than coconut shell charcoal may have only reinforced its conclusion here that the Philippine data was the best available information. We do not know how Commerce would have evaluated this complicated issue because it was not raised below.

Neither Jacobi nor Cherishmet presented any evidence or made any arguments that the Philippine import data was aberrational during the administrative review. This is another new argument made for the first time at the CIT on judicial review of Commerce's decision, not to Commerce itself. If all of the arguments made on appeal had been made to Commerce and the record made to support them, Commerce may well have reached a different conclusion regarding the best available information. We will not create a new record, entertain new arguments, and reverse Commerce on the basis of them.

## C. Regional Data

Jacobi argues that substantial record evidence does not support Commerce's determination that the *Cocommunity* data describes "regional" prices from a single state in the Philippines, not national prices. We disagree. The record shows that the *Cocommunity* data covers only a single region of the Philippines. The chart from which the *Cocommunity* data is taken indicates that the price of coconut shell charcoal is for "Philippines (Domestic), Visayas, Buyer." J.A. 191. The Visayas is one of three principal geographical regions of the Philippines. By contrast, other entries on the *Cocommunity* chart indicate

that they are national, not regional. *Id.* (listing coconut shell charcoal from "Sri Lanka (Domestic)" and desiccated coconut from "Philippines (Domestic)"). This constitutes substantial record evidence that the *Cocommunity* data is regional, not national.

Appellants did not show in the record for this administrative review that the *Cocommunity* coconut shell charcoal prices are representative, despite being regional. *Jacobi Carbons*, 992 F. Supp. 2d at 1369. For example, the record does not show that the Visayas region is a substantial portion of the market for coconut shell charcoal or that prices in the Visayas are reflective of the national Philippine market. Without record evidence to the contrary, we conclude that substantial evidence supported Commerce's finding that the *Cocommunity* prices were less representative of a broad market average than the Philippine import data.

## D. Tax and Duty Exclusivity

Appellants challenge Commerce's finding that the *Cocommunity* data was flawed because there was no indication whether that data was free of taxes and duties. They argue that the burden lay on Commerce to show that the *Cocommunity* data was distorted by taxes and duties. The government disagrees. We need not resolve the parties' dispute here. Even if Commerce erred when it critiqued the *Cocommunity* data for lacking information about whether the prices were tax and duty exclusive, substantial evidence still supports the selection of the Philippines import data.

## E. Conclusion

Substantial evidence supports Commerce's selection of the Philippine import data to calculate the surrogate value for carbonized material. Commerce was forced to select between two flawed data sets, and selected the Philippine import data because it was product-specific,

publicly available, reflected a broad market average, and was contemporaneous with the period of review.

Appellants fault Commerce for violating its preference for using domestic data when it selected the Philippine import data instead of the domestic *Cocommunity* data. Commerce determines what constitutes the "best available information" without reference to any such preference. *See Qingdao*, 766 F.3d at 1386. ("Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review."). At best, statements to the contrary indicate that Commerce prefers domestic prices over import prices "all else being equal." *Rhodia Inc. v. United States*, 185 F. Supp. 2d 1343, 1352 (Ct. Int'l Trade 2001).

All else is not equal here. Both the *Cocommunity* data and the Philippine import data are flawed. Such is the nature of surrogate data, which is likely never a perfect substitute. The selection of a data source is highly situational and requires weighing numerous factors; no factor is necessarily more important than any other factor and no factor is necessarily dispositive. Commerce considered both data sets and determined that the Philippine import data constituted the best available information for determining the surrogate value for carbonized material on the administrative record for this review period. That Commerce may have found the *Cocommunity* the best available information in more recent periods of review does not mean that substantial evidence did not support Commerce's decision that the Philippine import data was the best available information. Commerce selects the best available information based on the record before it at the time of the decision, not a hypothetical record or the record created for other periods of review.

We may not agree with Commerce's selection, particularly in light of the evidence and arguments not made to

Commerce below.  However, Jacobi and Cherishmet did not make these arguments or place this evidence before Commerce.  We cannot say that Commerce's selection of the Philippine import data was unreasonable based on arguments made and the administrative record created by Jacobi and Cherishmet.

## II.    Surrogate Value for Truck Freight

Because Commerce selected Thailand as the primary surrogate country for the Preliminary Results, it initially based the surrogate value for truck freight on publicly available data from a Thai consulting company of the price to transport goods by truck from Bangkok to five other provinces in Thailand in 2005 ("Thai freight data"). *Preliminary Results*, 77 Fed. Reg. at 26,505.  At the urging of appellants, Commerce selected the Philippines instead of Thailand as the primary surrogate country in the Final Results.  It therefore based the surrogate value for truck freight on the average reported rate of transporting goods by truck in the Philippines from Manila to Legazpi City ("Philippine freight data").

On appeal, Cherishmet and CAC argue that substantial evidence did not support Commerce's use of the Philippine freight data instead of the Thai freight data to calculate the surrogate value for truck freight.  Specifically, Cherishmet and CAC criticize the Philippine freight data as (1) unrepresentative of a broad market average; (2) nonspecific to the actual transportation costs; and (3) aberrational compared to the surrogate value for truck freight calculated during other periods of review of the subject merchandise.

We disagree.  It is true that the Philippine freight data, which Commerce calculated based on the cost of transporting goods over a single route, is less representative of a broad market average than the Thai freight data, which is based on ten different values representing the cost of transporting goods from Bangkok to five other Thai

provinces. Although the Philippine freight data covers only a single route, it consists of data reported by multiple trucking companies. It is therefore broader than Cherishmet and CAC suggest. Furthermore, the Philippines is made up of many islands. A more representative sample would include overseas routes in addition to overland routes, and likely be less comparable to freight costs in the PRC.

Cherishmet and CAC argue that the Philippine freight data is not specific to actual transportation costs because it represents "loose cargo," while the respondents' shipments were containerized. Cherishmet's Br. 53 n.14; CAC's Br. 15. However, the record does not clearly show that the respondents' shipments were containerized. Cherishmet's invoice, which indicates that Cherishmet's products were shipped in a container, is for a shipment to the United States, not within the PRC. *See* J.A. 101 (packing slip with final address in New Jersey). It therefore does not speak to how Cherishmet's products were shipped within the PRC. And the fact that Commerce calculated a surrogate value for packaging materials does not mean that all of Cherishmet's and Jacobi's shipments were transported in containers. *See* J.A. 404–05.

Cherishmet and CAC also argue that the Philippine freight data is aberrational compared to the surrogate value for truck freight calculated during other periods of review of the subject merchandise. The surrogate value for freight calculated from the Philippine freight data is $0.3152 per metric ton per kilometer. Cherishmet's Br. 48. Cherishmet calculates the surrogate values for prior periods of review as follows:

| Period of Review | Surrogate Value |
|:---:|:---:|
| 1st | $0.0393/MT/km |
| 2nd | $0.0413/MT/km |
| 3rd | $0.0396/MT/km |

*Id.* at 47–48 (citations omitted).  Cherishmet argues that the past surrogate values are more in line with the Thai freight data, which has a surrogate value of $0.0379 per metric ton per kilometer for truck freight.  *Id.* at 48.

However, this argument was not made to Commerce during the review period, and Cherishmet and CAC point to no evidence in the administrative record supporting it. Furthermore, as discussed earlier, Commerce selected India as the surrogate country for past review periods of the subject merchandize, so the surrogate values cited by Cherishmet and CAC are based on the cost of transporting freight in India.  *See* J.A. 733–35.  It is not surprising that the cost of transporting goods by truck was higher in the Philippines than it was in India.  The record does not support all of Cherishmet and CAC's critiques of the Philippine freight data.

Moreover, the Thai freight data is also flawed.  First, the Thai freight data is dated August 8, 2005, more than four years before the period of review.  J.A. 316–20.  The Thai freight data is thus not contemporaneous with the period of review, unlike the Philippine freight data. Second, 19 C.F.R. § 351.408(c)(2) provides that Commerce "normally will value all factors [of production] in a single surrogate country."  Cherishmet and CAC do not challenge Commerce's selection of the Philippines as the surrogate country.

In summary, in selecting the surrogate value for truck freight, Commerce was faced with two imperfect data sources. Substantial evidence supported Commerce's selection of the contemporaneous, albeit less representative, Philippine freight data over the Thai freight data. Moreover, Commerce's selection of the Philippine freight data was in accord with its preference for valuing all factors of production from a single surrogate country.[4]

CONCLUSION

We *affirm* the CIT's decision sustaining Commerce's Final Results.

**AFFIRMED**

---

[4] We need not address the arguments related to separate rate calculations as they are predicated on the arguments regarding Commerce's choice of surrogate values for carbonized material and truck freight. Because we find that substantial evidence supports Commerce's calculation of the surrogate values for carbonized material and truck freight, we affirm the CIT's decision sustaining the Final Results.

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

————————————

**JACOBI CARBONS AB, JACOBI CARBONS, INC., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., CHERISHMET INC., BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., CARBON ACTIVATED CORPORATION, CAR GO WORLDWIDE, INC., TANGSHAN SOLID CARBON CO., LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, CALGON CARBON CORPORATION, NORIT AMERICAS, INC.,**
*Defendants-Appellees*

————————————

2014-1752, -1753, -1754, -1756

————————————

BRYSON, *Circuit Judge*, dissenting.

I agree with the majority that it was permissible for the Commerce Department to use Thai data as the basis for selecting a surrogate value for truck freight. As to the use of Philippine import data as the basis for the surrogate value for the carbonized materials used in the production of the subject imports, however, I do not agree.

The majority concludes that the Department's decision can be upheld in light of the deference due to the agency in its valuation determinations and the plaintiffs' failure to preserve their claims of error below. I part company with the majority on both points.

1. Waiver

The majority holds that two of the plaintiffs' arguments have been waived because the plaintiffs failed to present evidence in support of those arguments to Commerce during the administrative review proceeding. The two arguments are (1) that the Philippine import data does not actually contain imports of coconut shell charcoal during the review period, and (2) that the Philippine import data is aberrational compared to data used in previous administrative reviews.

The plaintiffs could no doubt have done a better job of making a record in this case on certain issues, such as whether the price listed in the Philippine publication *Cocommunity*, on which they rely, was a national price, rather than a regional price, and whether that price excluded duties and taxes. However, their failure to raise objections to the use of Philippine import data during the administrative review process is entirely understandable, because the Commerce Department did not indicate its intention to rely on that data at any point before issuing the final results in this case, at which point it was too late for the plaintiffs to object.

The Court of International Trade made exactly that point when it rejected the government's waiver argument below. The court said:

> [I]t was not until after the submission of the parties' case briefs that Commerce made its determination to select the Philippines as the primary surrogate country, and articulated its basis for its selection of sources to value carbonized material

and truck freight (i.e., Philippine HTS 4402 and
Cost of Doing Business). It is simply too much to
ask of the parties to anticipate (1) that Commerce
would change the surrogate country between the
preliminary and Final Results, (2) the reasons that
the Department would state for deciding to change
surrogate countries, and (3) precisely how Com-
merce would value the various inputs. Under simi-
lar circumstances, it has been held that a party "is
not required to predict that Commerce would ac-
cept other parties' arguments and change its deci-
sion." *Qingdao*, 33 CIT at 1093, 637 F. Supp. 2d at
1237. Accordingly, because plaintiffs had no realis-
tic opportunity to present their arguments before
the Department, the court finds that plaintiffs did
not fail to exhaust their administrative remedies.

*Jacobi Carbons AB v. United States*, 992 F. Supp. 2d
1360, 1367 (Ct. Int'l Trade 2014). Accordingly, I conclude
that the two arguments the majority characterizes as
inadequately preserved below have not been waived.

2. Aberrational Data

Notwithstanding its waiver ruling, the majority ad-
dresses the merits of the plaintiffs' contention that the
Philippine import data is aberrational.

The government argues that any apparent aberration
in the data can be explained by the fact that the first
through third reviews used India as a surrogate country
whereas the fourth review used the Philippines. The
majority correctly rejects that argument, recognizing that
it is "unlikely that the switch from India to the Philip-
pines could account for [the] dramatic change in pricing."
Nonetheless, the majority concludes that it was permissi-
ble for Commerce to disregard the discrepancy.

If we compare the surrogate values used in the various administrative reviews (including two more recent administrative reviews), it is clear the Philippine import data used in the administrative review at issue in this case departs wildly from the surrogate value relied on by Commerce in other administrative reviews in this case, so much so that it is highly suspect.  Not only is the surrogate value derived from the Philippine import data much greater than the Indian data used in the first through third periods of review, but it is also significantly greater than the data used in the fifth and sixth periods of review, which used data from the Philippines.

The surrogate value of $1203.80 per metric ton is almost three times as high as the highest other surrogate value determined in any of the other periods of review, and it is more than fourteen times as high as the surrogate value for the immediately preceding period of review.  Meanwhile, the *Cocommunity* data on which the plaintiffs rely (indicated by "CoCo" in the table below), showed a price of $255 per metric ton, which was much more in line with the surrogate values found in the prior and subsequent administrative reviews.  While there might in some circumstances be an explanation for data that is as grossly anomalous as the Philippine import data, no such explanation appears in the record in this case.

| Period of Review | Surrogate Value |
|---|---|
| 1st | $32.99/MT |
| 2nd | $66.256/MT (coconut shell charcoal); $435.62/MT (coal-based carbonized material) |
| 3rd | $83.45/MT |

| 4th | $1,203.80/MT |
|------|--------------|
| CoCo | $255/MT |
| 5th | $391.67/MT |
| 6th | $346.25/MT |

3.  Specificity

The plaintiffs argue that the *Cocommunity* data is more specific than the Philippine import data because the *Cocommunity* data relates to coconut shell charcoal, while the Philippine import data relates to "Wood Charcoal (Including Shell or Nut Charcoal)." The plaintiffs contend that coconut shell charcoal is comparable to the coal-based charcoals used by the Chinese manufacturers, and that wood-based charcoal is not comparable to coconut shell or coal-based charcoal. The majority rejects the plaintiffs' argument, finding that there is no express determination in the record that coconut shell charcoal is more comparable to coal-based charcoal than to wood charcoal. I believe the majority reads the available evidence too narrowly.

The majority quotes a statement made by Commerce before the trial court in a previous administrative review: "[C]oconut shell charcoal shares similar properties with carbonized material and . . . those similar properties are essential in the production of activated carbon. The expert's report found that coal-based carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in the production of activated carbon." Final Results of Redetermination Pursuant to Ct. Remand at 10–11, *Calgon Carbon Corp. v. United States*, No. 09-00524 (Ct. Int'l Trade July 26, 2011), ECF No. 36 (footnotes omitted). While that statement was used to justify

the selection of coconut shell charcoal over "other cokes of coal," the statement is pertinent in this case (where "other cokes of coal" are not involved) because it clearly states that coconut charcoal is comparable to coal-based charcoal. Because the evidence before Commerce established that coconut shell charcoal is comparable to coal-based charcoal, whereas the evidence does not show the same for wood-based charcoal, the *Cocommunity* data, which was directed to coconut shell charcoal, was more specific than the Philippine import data, which was directed to both wood-based charcoal and charcoal obtained from coconut shell.

### 4. Defects in the *Cocommunity* Data

Commerce found that the *Cocommunity* data was flawed in fundamental ways that rendered it unusable in determining surrogate value. The majority agrees. I do not regard the perceived flaws in the *Cocommunity* data as nearly so serious.

To begin with, it is true that the *Cocommunity* data is not a perfect match for the value of the carbonized materials used in the production of the plaintiffs' products. But data used to calculate surrogate value seldom is. By its nature, such data is intended to serve as an approximation—as the "best available information." 19 U.S.C. § 1677b(c)(1). In this case, however, the evidence fairly shouts that the Philippine import data used by the Commerce Department was not a good surrogate for the value of the carbonized materials used in manufacturing the subject imports. The flaws in the *Cocommunity* data are trivial in comparison.

The aberrational nature of the surrogate value selected by Commerce should have given Commerce pause and caused it to evaluate the flaws it found in the competing *Cocommunity* data—that the *Cocommunity* price was not shown to be net of duties and taxes, and that the *Cocommunity* price was not shown to be a national price, as

opposed to a regional price. Further consideration would have led Commerce to the following conclusions:

First, the *Cocommunity* price was necessarily exclusive of duties, since the price was for domestic product, not imported goods.

Second, there was no evidence before Commerce that the *Cocommunity* price included taxes, and Jacobi represented to Commerce that it did not. But even if, contrary to Jacobi's representations, the *Cocommunity* price included taxes, a higher price could only work to the detriment of the plaintiffs because it would increase the dumping margin, not reduce it. It does not make sense to refuse the plaintiffs' request to use the *Cocommunity* data on the ground that the data is subject to a flaw that might be prejudicial to them.

Third, the document from which the *Cocommunity* data was derived stated: "In the Philippines, the average price of coconut shall charcoal [for April 2010] was $230 [per metric ton]."[1] In the table that listed the prices, however, the reference to the Philippines was accompanied by a reference to "Visayas," which is a region of the Philippines. While the document suggests that the price was a national price, the reference to "Visayas" provides some support for Commerce's conclusion that the *Cocommunity* price is limited to the Visayas region of the Philippines. Even accepting that view of the evidence, however, it is highly unlikely that the price in that region is significantly different from the "national" price, since the Visayas region, as the trial court observed, is one of the three principal geographical divisions of the Philippines, occupying the entire central portion of the country.

-----

[1] The evidence showed that the average price for the entire period of review was $255 per metric ton.

Finally, it is noteworthy that in the two subsequent administrative reviews (the fifth and sixth), Commerce selected the *Cocommunity* data over the Philippine import data, finding that the *Cocommunity* data was both representative (even though it referenced only a single region) and that it was exclusive of duties and taxes.

A fair view of the *Cocommunity* data thus shows that any flaws with that data are modest. In light of the serious doubts raised by the use of the Philippine import data that includes wood charcoal and that produced a price far in excess of any price used by Commerce in earlier or later reviews of this antidumping duty order, I would hold that it was unreasonable for Commerce to reject the use of the *Cocommunity* data in favor of the Philippine import data in calculating the surrogate value for the carbonized materials used in producing the subject imports. Accordingly, I respectfully dissent.