# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## Appeal No. 2014-1752, -1753, -1754, -1756

JACOBI CARBONS AB, JACOBI CARBONS, INC., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., CHERISHMET INC., BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., CARBON ACTIVATED CORPORATION, CAR GO WORLDWIDE, INC., TANGSHAN SOLID CARBON CO., LTD.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee,

and

CALGON CARBON CORPORATION and NORIT AMERICAS, INC.,

Defendants-Appellees.

---

Appeal from the United States Court of International Trade in
Case Nos. 12-cv-00365, 12-cv-00372, 12-cv-00377, 12-cv-00396, 12-cv-00401,
Judge Richard K. Eaton

---

**JOINT PETITION FOR PANEL REHEARING OF PLAINTIFFS-APPELLANTS NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., CHERISHMET INC., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., JACOBI CARBONS AB, JACOBI CARBONS, INC., CARBON ACTIVATED CORPORATION, CAR GO WORLDWIDE, INC., and TANGSHAN SOLID CARBON CO., LTD.**

Francis J. Sailer
Kavita Mohan
**Grunfeld, Desiderio, Lebowitz,
Silverman & Klestadt LLP**
1201 New York Ave., NW, Ste. 650
Washington, DC 20005

Phone: (202) 783-6881
Fax : (202) 783-0405
*Attorneys for Plaintiffs-Appellants
Ningxia Guanghua Cherishmet
Activated Carbon Co., Ltd.,
Cherishmet Inc., Beijing Pacific
Activated Carbon Products Co., Ltd.,
Datong Municipal Yunguang
Activated Carbon Co., Ltd., Shanxi
Industry Technology Trading Co.,
Ltd.*

Daniel L. Porter
Christopher Dunn
Claudia D. Hartleben
**Curtis, Mallet-Prevost, Colt &
Mosle LLP**
1717 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 452-7373
*Counsel for Plaintiffs-Appellants
Jacobi Carbons AB and Jacobi
Carbons, Inc.*

Gregory S. Menegaz
**deKieffer & Horgan PLLC**
1455 Pennsylvania Ave., NW
Suite 900B
Washington, D.C. 20004
(202) 783-6900
*Counsel to Plaintiffs-Appellants
Tangshan Solid Carbon Co., Ltd.,
Carbon Activated Corporation and
Car Go Worldwide,Inc.*

Dated: September 17, 2015

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**
**JACOBI CARBONS AB V. U.S.**
**Appeal No. 2014-1752, -1753, -1754, -1756**

**CERTIFICATE OF INTEREST**

Pursuant to Rule 47.4 of the Rules of the U.S. Court of Appeals for the Federal Circuit, counsel for Plaintiffs-Appellants, Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Cherishmet Inc., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd., certify the following:

1.     The full name of every party or *amicus* represented by me is: Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Cherishmet Inc., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Shanxi Industry Technology Trading Co., Ltd.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest)
        Not applicable.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:
        Not applicable.

4.     The names of all law firms and the partners or associates that have appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Francis J. Sailer, Mark E. Pardo, Andrew T. Schutz, Dharmendra N. Choudhary, and Kavita Mohan of the law firm Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP (GDLSK) appeared in the trial court below and Francis J. Sailer, Mark E. Pardo, Andrew T. Schutz, and Kavita Mohan of GDLSK are expected to appear in this court.

Date: September 17, 2015                   /s/Francis J. Sailer
                                           Francis J. Sailer
                                           *Counsel for Plaintiffs-Appellants*

FORM 9.  Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Jacobi Carbons AB, et al.    **v.**    United States

Case No.    2014-1752

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Plaintiff-Appellant    certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Jacobi Carbons AB and Jacobi Carbons, Inc.

2.    The name of the real party in interest (Please only include any real party in interest NOT identified in Question 3. below) represented by me is:

Jacobi Carbons AB and Jacobi Carbons, Inc.

3.    All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below. (Please list each party or amicus curiae represented with the parent or publicly held company that owns 10 percent or more so they are distinguished separately.)

Osaka Gas Chemicals Co., Ltd; AddSorb Holding AB

4.  ☒  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this case) are:

Curtis, Mallet-Prevost, Colt & Mole LLP: Daniel L. Porter, Christopher Dunn and Claudia D. Hartleben

September 17, 2015
Date

/s/ Daniel L. Porter
Signature of counsel

Please Note: All questions must be answered

cc:    All counsel of record.

Daniel L. Porter
Printed name of counsel

Reset Fields

**Form 9**

FORM 9.  Certificate of Interest

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Jacobi Carbons AB _____ v. United States _____

No. 14-1752

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)

Car Go Worldwide Inc. _____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.    The full name of every party or amicus represented by me is:

Car Go Worldwide Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

n/a

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Car Go Worldwide Inc. is a U.S. company. Lionel Perera and his wife, Mrs. Nirmala P. Perera, are the sole owners of Car Go Worldwide. They are both U.S. citizens. Car Go Worldwide does not have any publicly-owned subsidiaries or affiliates.

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Gregory S. Menegaz, J. Kevin Horgan, John J. Kenkel, deKieffer & Horgan, PLLC, 1455 Pennslyvania Avenue NW, Suite 900B, Washington, D.C. 20004

9/27/2015
_____
Date

/s/ Gregory S. Menegaz
_____
Signature of counsel

Gregory S. Menegaz
_____
Printed name of counsel

Please Note: All questions must be answered

cc: _____

Form 9

FORM 9.   Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Jacobi Carbons AB _____ v. United States _____

No. 14-1752

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Carbon Activated Corporation certifies the following (use "None" if applicable; use extra sheets
if necessary):

1.      The full name of every party or amicus represented by me is:

Carbon Activated Corporation

_____

2.      The name of the real party in interest (if the party named in the caption is not the real
party in interest) represented by me is:

n/a

_____

3.      All parent corporations and any publicly held companies that own 10 percent or more
of the stock of the party or amicus curiae represented by me are:

Carbon Activated Corporation is a U.S. company. Lionel Perera and his wife, Mrs. Nirmala
P. Perera, are the sole owners of Carbon Activated Corp. They are both U.S. citizens.
Carbon Activated Corporation does not have any publicly-owned subsidiaries or affiliates.

_____

4.  ☑  The names of all law firms and the partners or associates that appeared for the party
or amicus now represented by me in the trial court or agency or are expected to appear in this
court are:

Gregory S. Menegaz, J. Kevin Horgan, John J. Kenkel, deKieffer & Horgan, PLLC, 1455 Pennslyvania
Avenue NW, Suite 900B, Washington, D.C. 20004

_____

9/27/2015
_____
Date

/s/ Gregory S. Menegaz
_____
Signature of counsel

Gregory S. Menegaz
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

Form 9

FORM 9. Certificate of Interest

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Jacobi Carbons AB _____ v. United States _____

No. 14-1752

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
Tangshan Solid Carbon Co., Ltd. certifies the following (use "None" if applicable; use extra sheets if necessary):

1.     The full name of every party or amicus represented by me is:

Tangshan Solid Carbon Co., Ltd.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

The party listed under No. 1 above is the real party in interest.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

None.

4.  ☑  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Gregory S. Menegaz, J. Kevin Horgan, John J. Kenkel, deKieffer & Horgan, PLLC, 1455 Pennslyvania Avenue NW, Suite 900B, Washington, D.C. 20004

9/27/2015
_____
Date

/s/ Gregory S. Menegaz
_____
Signature of counsel

Gregory S. Menegaz
_____
Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

# <u>TABLE OF CONTENTS</u>

**POINTS OF LAW OR FACTS OVERLOOKED OR MISAPPREHENDED BY THE COURT** ................................................................. 1

**ARGUMENT** ........................................................................................ 2

**I.    PLAINTIFFS-APPELLANTS DID NOT WAIVE ANY ARGUMENTS DURING THE ADMINISTRATIVE PROCEEDINGS** .................................................................... 3

**II.   THE COURT'S DETERMINATION TO AFFIRM COMMERCE'S SURROGATE VALUE FOR CARBONIZED MATERIAL IS BASED ON ITS MISAPPREHENSION OF FACTS ON THE RECORD** ...................................................................... 8

   **A.    THE COURT'S CONCLUSION THAT RESPONDENTS FAILED TO BUILD THE ADMINISTRATIVE RECORD IS BASED ON A MISAPPREHENSION OF FACT** ........................ 8

   **B.    THERE WERE NO USEABLE IMPORT DATA AVAILABLE FOR COCONUT SHELL CHARCOAL TO THE PHILIPPINES DURING THE PERIOD OF REVIEW** ............. 12

   **C.    COCONUT SHELL CHARCOAL IS MORE COMPARABLE TO COAL-BASED CHARCOAL THAN WOOD CHARCOAL** 13

**II.   CONCLUSION** ................................................................. 15

# TABLE OF AUTHORITIES

## Cases

*Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933 (Fed. Cir. 1990) ......................................................................................................... 15

*Corus Staal BV v. United States*, 502 F.3d 1370 (Fed. Cir. 2007) ......................... 4

*Essar Steel, Ltd. v. United States*, 753 F.3d 1368 (Fed. Cir. 2014) ......................... 4

*Itochu Building Prods. v. United States*, 733 F.3d 1140 (Fed. Cir. 2013) .............. 4

*Jacobi Carbons AB, v. United States*, 2015 U.S. App. LEXIS 13626 (Fed. Cir. Aug. 3, 2015) ...................................................................................... passim

*Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014) . 5

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639 (1976) ............... 4

*Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231 (Ct. Int'l Trade 2009) ........................................................................................................ 6

*Taian Ziyang Food Co. v. United States,* 783 F. Supp. 2d 1292 (Ct. Int'l Trade 2011) ...................................................................................................... 11

*Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328 (Ct. Int'l Trade 2015) ...................................................................................................... 7

## Statutes and Regulations

28 U.S.C. § 2637 ................................................................................................. 4

*Omnibus Trade and Competitiveness Act of 1988*, H.R. Conf. Rep. No. 100-576 (1988) ...................................................................................................... 13

## Administrative Decisions

Final Results of Redetermination Pursuant to Ct. Remand, *Calgon Carbon Corp. v. United States*, No. 09-00524 (Ct. Int'l Trade July 26, 2011), ECF No. 36 ... 14, 15

## Other Authorities

*Xanthan Gum from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2013-2014*, 80 Fed. Reg. 47464 (Aug. 7, 2015) ............................. 13

## <u>POINTS OF LAW OR FACTS OVERLOOKED OR MISAPPREHENDED BY THE COURT</u>

Appellants jointly file this petition pursuant to Fed. Cir. R. 40, seeking a rehearing of the majority decision in *Jacobi Carbons AB, et al. v. United States*, Case 14-1752, on the basis that the Court overlooked and misapprehended key points of law and fact in sustaining the Department of Commerce's determination to use Philippine import data to value carbonized material in two respects.

1.      The Court incorrectly found that two of Plaintiffs-Appellants' arguments were waived because the Plaintiffs-Appellants failed to present evidence in support of these arguments to Commerce during the administrative review proceeding. The Court incorrectly applied a *de novo* standard of review in determining whether these arguments were waived, instead of an "abuse of discretion" standard. The lower court correctly concluded that because Commerce did not select the Philippines as the primary surrogate country until its Final Determination, Plaintiffs-Appellants did not have an opportunity to raise all arguments during the administrative proceedings. Thus, this case falls into a clearly defined exception to the "exhaustion" doctrine.

2.      The Court overlooked and misapprehended compelling record evidence when it sustained Commerce's decision to reject Cocommunity data in favor of clearly aberrant GTA import data that were not used in the preliminary

1

determination.   First, the Court incorrectly faulted Plaintiffs-Appellants for failing to support with record evidence their arguments that Philippine import data were not specific to the subject merchandise because there were no imports of coconut shell charcoal to the Philippines during the review period.  This conclusion resulted from a misapprehension by the Court at oral argument of what Commerce considers usable import data.  Second, the majority overlooked express findings in the record demonstrating that coconut shell charcoal is more comparable to coal-based charcoal than wood charcoal.

## ARGUMENT

On August 3, 2015, the Court of Appeals for the Federal Circuit ("CAFC") issued a non-precedential opinion in *Jacobi Carbons AB v. United States*, Court No. 14-1752, affirming the Court of International Trade's ("CIT") decision and sustaining the U.S. Department of Commerce's ("DOC") Final Results in the fourth administrative review ("POR 4") of the antidumping duty order on certain activated carbon from the People's Republic of China.  Appellants raised two issues before the CAFC: whether Commerce used the best available information when it calculated the surrogate values for (1) carbonized material; and, (2) truck freight.  The majority of the CAFC affirmed the DOC's Final Results on both issues. However, Judge Bryson filed a dissenting opinion regarding the surrogate value for carbonized material.   In this Petition for Panel Rehearing, Plaintiffs-

2

Appellants demonstrate that the majority opinion sustaining Commerce's surrogate value selection for carbonized material was based on misapprehensions of fact and law, and should be reversed.

## I.    PLAINTIFFS-APPELLANTS DID NOT WAIVE ANY ARGUMENTS DURING THE ADMINISTRATIVE PROCEEDINGS

The majority held that Plaintiffs-Appellants waived two arguments by failing to raise them before the Department: (1) that Philippine import data for the review period were limited to wood charcoal and did not include coconut shell charcoal; and (2) that the Philippine import data were aberrational as compared to the surrogate values for carbonized material in prior reviews. The majority's conclusion that Plaintiffs-Appellants did not raise these arguments before the agency is based on misapprehensions of law and fact, as discussed below.

First, the panel applied the incorrect standard of review with regard to the claim that Plaintiffs-Appellants waived these arguments. In its August 3, 2015, decision, the CAFC explained that it "reviews decisions of the CIT de novo, applying the same standard used by the CIT." *Jacobi Carbons AB et al. v. United States*, 2015 U.S. App. LEXIS 13626, at *6 (Fed. Cir. Aug. 3, 2015). While this standard is correct as to the Court's review of the appropriate surrogate value that should be applied, it is not correct with regard to the CIT's decision that Plaintiffs-

3

Appellants did not waive their arguments. In *Corus Staal BV v. United States*, 502 F.3d 1370, 1381 (Fed. Cir. 2007), the Court stated:

> The decision whether to require ***exhaustion in a particular case is a matter committed to the discretion of the trial court; in particular, we have held that applying exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade***.

*Id.*; 28 U.S.C. § 2637(d) (providing that "the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies"). *See also Essar Steel, Ltd. v. United States*, 753 F.3d 1368, 1374 (Fed. Cir. 2014) (application of doctrine of exhaustion is subject to discretion of Court of International Trade); *Itochu Building Prods. v. United States*, 733 F.3d 1140, 1145 (Fed. Cir. 2013) ("[w]e review for abuse of discretion the Trade Court's determination that dismissal for failure to exhaust was 'appropriate' here").

Accordingly, this Court must review the CIT's discretionary decision that Plaintiffs-Appellants did not fail to exhaust administrative remedies only for "abuse of discretion." Under this standard, the question is not whether the appellate court "would as an original matter have [acted as the trial court did]; it is whether the [trial court] abused its discretion in so doing." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976). The CAFC's application of the wrong standard to conclude that plaintiffs failed to exhaust their administrative

remedies is clear legal error, and the panel in a rehearing should expressly address whether the lower court abused its discretion in finding that the plaintiffs <u>did not fail to exhaust</u> their administrative remedies.

Furthermore, the CIT did not abuse its discretion in dismissing the exhaustion claims. The CIT explained:

> This Court has held, however, that requiring exhaustion may be inappropriate under certain circumstances. For instance, "[a] party . . . may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level."

*Jacobi Carbons AB v. United States*, 992 F. Supp. 2d 1360, 1367 (Ct. Int'l Trade 2014). The trial court understood that Commerce's change in the Final Determination from Thailand to the Philippines as the primary surrogate country to value most of the major factors of production necessarily affected a full airing of all potential issues: "while plaintiffs argued for the use of the Philippine data, they could hardly foresee what use the Department would make of that data." The trial court noted:

> ***It is simply too much to ask of the parties to anticipate (1) that Commerce would change the surrogate country between the preliminary and Final Results, (2) the reasons that the Department would state for deciding to change surrogate countries, and (3) precisely how Commerce would value the various inputs***. Under

> similar circumstances, it has been held that a party "is not
> required to predict that Commerce would accept other
> parties' arguments and change its decision." . . .
> Accordingly, because plaintiffs had no realistic
> opportunity to present their arguments before the
> Department, the court finds that plaintiffs did not fail to
> exhaust their administrative remedies.

*Id.* at 1366-67 (emphasis added) (citations omitted).

The CIT's determination that Plaintiffs-Appellants did not waive their arguments is in line with similar cases. In *Qingdao Taifa Group Co. v. United States*, 637 F. Supp. 2d 1231, 1237 (Ct. Int'l Trade 2009), the CIT found that Taifa was not required to exhaust administrative remedies through the filing of case briefs when it received a favorable rate at the Preliminary Determination and received a rate based on adverse facts available only at the Final Determination. The court explained that "Taifa is not required to predict that Commerce would accept other parties' arguments and change its decision. The exhaustion doctrine therefore does not preclude the court's review of Taifa's claims." *Id.* at 1236-37.

It was not an abuse of discretion for the CIT to apply the same reasoning here. Although Plaintiffs-Appellants supported the selection of the Philippines as the primary surrogate country, they objected to the surrogate values assigned to carbonized material and truck freight. Plaintiffs-Appellants had no way of knowing the data that the DOC would use or the specific surrogate values that it would select until the Final Determination. Since the determination to select the

Philippines as the primary surrogate country occurred only at the Final Determination, Plaintiffs-Appellants did not have an opportunity to raise their objections to these two surrogate values in their case briefs. As noted by the dissent in the instant appeal,

> [F]ailure to raise objections to the use of Philippine import data during the administrative process is ***entirely understandable***, because the Commerce Department did not indicate its intention to rely on that data at any point before issuing the final results in this case, ***at which point it was too late for the plaintiffs to object.***

*Jacobi Carbons*, 2015 U.S. App. LEXIS 13626 at *30 (Bryson, dissenting) (emphasis added).

The alarming effect of the majority's decision is that parties may be required to prognosticate every issue or change in any of the many small decisions that go into a determination of dumping that may (or may not) become issues between a preliminary DOC determination and a different final determination, contrary to substantial CIT jurisprudence. *See, e.g., Zhaoqing Tifo New Fibre Co. v. United States*, 60 F. Supp. 3d 1328, 1348-50, n.27 (Ct. Int'l Trade 2015) (containing extensive discussion of the case law and finding that parties are not responsible to predict changes and reasons between preliminary and final results). Such a requirement would create a challenge of Herculean proportions for *all* parties.

Moreover, the majority noted in its opinion that this was a "close case," *Jacobi Carbons AB*, 2015 U.S. App. LEXIS 13626 at *8, and that it "may not agree with Commerce's selection, particularly in light of the evidence and arguments not made to Commerce below." *Id.* at *24. In view of the Court's application of the wrong standard of review in rejecting Plaintiffs-Appellants' arguments, it must reconsider the impact of the close case presented here in light of the arguments that the trial court properly found were *not* waived and the necessity of which could not have been foreseen by the parties.

For these reasons, this Petition for Panel Rehearing should be granted and the majority's opinion that Plaintiffs-Appellants waived arguments relating to the Department's selection of the surrogate value for carbonized material should be reversed and its decision on the merits reconsidered.

## II.  THE COURT'S DETERMINATION TO AFFIRM COMMERCE'S SURROGATE VALUE FOR CARBONIZED MATERIAL IS BASED ON ITS MISAPPREHENSION OF FACTS ON THE RECORD

### A.    THE COURT'S CONCLUSION THAT RESPONDENTS FAILED TO BUILD THE ADMINISTRATIVE RECORD IS BASED ON A MISAPPREHENSION OF FACT

The majority's rejection of Plaintiffs-Appellants' claims that Philippine import data are less specific to the carbonized material used to produce the subject merchandise than the Cocommunity data was based on a misapprehension of facts on the record. The majority explained in its decision that:

8

> Without any record evidence that there were zero imports
> of coconut shell charcoal to the Philippines during the
> period of review under HTS 4402.00.00.01, or even that
> HTS 4402.00.00.01 existed, Commerce could not evaluate
> Jacobi's statement that there was "no data available for
> coconut shell charcoal from the Philippines." It was
> Jacobi's and Cherishmet's responsibility to build an
> adequate record before Commerce, so any failure of proof
> lies with them.

*Jacobi Carbons AB*, 2015 U.S. App. LEXIS 13626 at *11-*12.   The Court's

rationale is premised on the general rule that it is respondent's burden to build the

administrative record.

   While respondents must build the record with new information that the

agency would not otherwise have available, that is not the case where the agency

itself *already has* the information.  Petitioner-Appellants respectfully submit that

the Court's blunt application of this rule to effectively defeat their claim stretches

beyond reason.  Despite Defendant's less than forthright treatment of this issue at

oral argument, Oral Argument at 30:31, *Jacobi Carbons AB, et al. v. United States*,

Nos. 2014-1752, -1753, -1754, -1756, *available at*

http://www.cafc.uscourts.gov/oral-argument-recordings, the Commerce

Department has – as it must – intimate knowledge of and access to global HTS

codes and the related GTA data, and Commerce fully understood that there were

no coconut shell imports under the relevant HTS provision. The majority's

conclusion that Petitioners-Appellants somehow lapsed in their responsibility to

provide HTS import data to prove a negative is a fundamental misapprehension of the record.

Moreover, the Court improperly characterized Plaintiff-Appellant Jacobi's statements as "unsupported and conclusory." Jacobi provided uncontroverted evidence on the record that Cocommunity data should be used over Philippine import data because "there are no data available for coconut shell charcoal from the Philippines imported" under the HTS provision used in past administrative reviews of the subject merchandise. Jacobi also explained that "HTS category 4402.00 contains many types of charcoal (*i.e.*, wood charcoal, including shell and nut charcoal) that are not specific to the activated carbon industry and particularly [Jacobi's activated carbon supplier] DTFW." *See* Jacobi's Comments on Surrogate Values at 4, dated November 16, 2011 (P.R. Doc. 101 (Part 2)). JA177-178. This critical statement was *never* challenged by any interested party or the Department itself.

If the Department was unwilling to accept Jacobi's statements, it should have sought clarification from the parties. Neither Commerce nor petitioners placed any evidence on the record disputing Jacobi's statement. The trade court has explained that:

> The general principle that the respondent bears the burden of proof *in **no way relieves Commerce of the requirements that it value factors of production based on***

10

> *the "best available information" and that it establish*
> *antidumping margins "as accurately as possible."* . . . .
> Further, while Commerce may not be obligated to help a
> respondent obtain information to support the surrogate
> value that the respondent advocates, "Commerce [is]
> required to obtain adequate evidence for the value it
> select[s]."

*Taian Ziyang Food Co. v. United States,* 783 F. Supp. 2d 1292, 1331 (Ct. Int'l

Trade 2011) (emphasis added) (citations omitted).

Thus, Defendant is not in a position at the appellate stage to dispute that

record evidence. This is particularly so in view of the fact that the Department – in

observance of its duty to vet data submitted by all parties to the case – always

downloads GTA data itself to ensure its satisfaction with the accuracy of the data

used, even when a party provides such data. Attachment 2A to the Department's

Final Surrogate Value Memorandum demonstrates such a download at the 4-digit

level. JA421. *See* Oral Argument at 65:00. That the Department never rebutted

Jacobi's statement that there were no useable data at the ten-digit level proves that

it did download these data and confirmed the accuracy of Jacobi's statement.

Since neither the Department nor any interested party ever challenged Jacobi's

unambiguous assertion that there were no imports of coconut shell charcoal under

the HTS sub-heading, the only plausible conclusion is that imports under HTS

4402 during the POR did not include coconut shell charcoal.

**B.    THERE WERE NO USEABLE IMPORT DATA AVAILABLE FOR COCONUT SHELL CHARCOAL TO THE PHILIPPINES DURING THE PERIOD OF REVIEW**

In addition to inaptly imposing the burden on respondents to provide information that Commerce already had available, the majority misapprehended the factual distinction between imports in general and *usable* imports. During the Oral Argument, Judge Moore indicated that she had reviewed the source data and that it appeared to her that there were imports into the Philippines amounting to USD 70,000 under the specific provision for coconut shell charcoal. Oral Argument at 8:50. Those imports were in fact from China (a non-market economy country) and Indonesia (a market economy country that maintains export subsidies). In response, Jacobi's counsel explained that there were imports under the coconut shell charcoal heading, but they were from non-market economy countries (*e.g.*, China, Vietnam, etc.). Oral Argument at 64:17. In addition to imports from non-market economy countries, countries believed or suspected by Commerce to provide "non-industry specific export subsidies" are disregarded by the Department for surrogate value purposes.[1] Thus, although the coconut shell

---

[1] *See, e.g., Xanthan Gum from the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review and Preliminary Determination of No Shipments; 2013-2014*, 80 Fed. Reg. 47464 (Aug. 7, 2015) ("[W]e continued to apply the Department's long-standing practice of disregarding import prices that we have reason to believe or suspect are subsidized or dumped. In this regard, the

provision of the Philippine HTS published in the GTA included imports there were *no useable data* on the record for coconut shell charcoal imports, consistent with Jacobi's assertions before the Department in the review proceeding.

### C.    COCONUT SHELL CHARCOAL IS MORE COMPARABLE TO COAL-BASED CHARCOAL THAN WOOD CHARCOAL

The majority found that "[t]here are no findings nor have we been presented with record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal." *Jacobi Carbons*, 2015 U.S. App. LEXIS at *16. In reaching this conclusion, the majority dismissed Plaintiffs-Appellants arguments that, in prior reviews, Commerce had found that coconut shell charcoal was comparable to coal-based carbonized material in all material respects. The Court, narrowly construing this prior Commerce finding, concluded that Commerce's prior distinction was a distinction only as between coconut shell and cokes of coal and, therefore, had no application when making a comparison to wood charcoal. However, this analysis misses Commerce's critical finding that

---

Department previously found that it is appropriate to disregard prices of imports from India, *Indonesia*, South Korea, and Thailand because it determined that these countries maintain broadly available, non-industry specific export subsidies.")(emphasis added). *See also Omnibus Trade and Competitiveness Act of 1988*, H.R. Conf. Rep. No. 100-576, at 590-91 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1623-23 ("In valuing such factors [of production], Commerce shall avoid using any prices which it has reason to believe or suspect may be dumped or subsidized prices.").

"[C]oconut shell charcoal *shares similar properties with carbonized material and*

*. . . those similar properties are essential in the production of activated carbon*."

The expert's report found that coal-based carbonized materials used by Cherishmet

and coconut shell charcoal are similar in porosity and adsorption, which are both

properties essential in the production of activated carbon." Final Results of

Redetermination Pursuant to Ct. Remand at 10-11, *Calgon Carbon Corp. v. United*

*States*, No. 09-00524 (Ct. Int'l Trade July 26, 2011), ECF No. 36 (footnotes

omitted, emphasis supplied). Judge Bryson cited this in his dissent, explaining:

> While that statement was used to justify the selection of
> coconut shell charcoal over "other cokes of coal," the
> statement is pertinent in this case (where "other cokes of
> coal" are not involved) because it clearly states that
> *coconut charcoal is comparable to coal-based charcoal.*
> *Because the evidence before Commerce established that*
> *coconut shell charcoal is comparable to coal-based*
> *charcoal, whereas the evidence does not show the same*
> *for wood-based charcoal, the Cocommunity data, which*
> *was directed to coconut shell charcoal, was more*
> *specific than the Philippine import data*, which was
> directed to both wood-based charcoal and charcoal
> obtained from coconut shell.

*Jacobi Carbons*, 2015 U.S. App. LEXIS 13626 at *34-*35 (Bryson,

dissent)(emphasis added).

The fact that Philippine data results in a surrogate value that is almost three

times higher than the highest other surrogate value determined in any other period

of review and fourteen times as high as the immediately prior period of review

14

establishes the aberrant quality of the Philippine data as a surrogate value for carbonized material in this period of review. *See id*. at *32.

Finally, a remand on this issue is appropriate based on Commerce's subsequent determination that coconut shell charcoal is comparable to coal-based charcoal based on its qualities of adsorption and porosity. Final Results of Redetermination Pursuant to Ct. Remand at 10-11, *Calgon Carbon Corp. v. United States*, No. 09-00524 (Ct. Int'l Trade July 26, 2011), ECF No. 36. In *Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 939 (Fed. Cir. 1990), this Court noted that "Where such intervening events [which have occurred between the date of an agency (or trial court) decision and the date of decision on appeal] are properly brought to the attention of the reviewing court, that court may rely on that occurrence and typically will remand for consideration by the decision-maker."

## II.     **CONCLUSION**

Given the significant errors of fact and law made by the majority as discussed above, Plaintiffs-Appellants respectfully request that the Court grant this Petition for Panel Rehearing on the issues addressed herein.

Respectfully submitted,
/s/ Francis J. Sailer
Francis J. Sailer
Kavita Mohan

15

**Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP**
*Attorneys for Plaintiffs-Appellants Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Cherishmet Inc., Beijing Pacific Activated Carbon Products Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., Shanxi Industry Technology Trading Co., Ltd.*


/s/ Daniel L. Porter
Daniel L. Porter
Christopher Dunn
Claudia D. Hartleben
**Curtis, Mallet-Prevost, Colt & Mosle LLP**
*Counsel for Plaintiffs-Appellants Jacobi Carbons AB and Jacobi Carbons, Inc.*


/s/ Gregory S. Menegaz
Gregory S. Menegaz
**deKieffer & Horgan PLLC**
*Counsel to Plaintiffs-Appellants Tangshan Solid Carbon Co., Ltd., Carbon Activated Corporation and Car Go Worldwide, Inc.*

September 17, 2015
Washington, D.C.

16

# ADDENDUM



**JACOBI CARBONS AB, JACOBI CARBONS, INC., NINGXIA GUANGHUA CHERISHMET ACTIVATED CARBON CO., LTD., CHERISHMET INC., BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., CARBON ACTIVATED CORPORATION, CAR GO WORLDWIDE, INC., TANGSHAN SOLID CARBON CO., LTD., Plaintiffs-Appellants v. UNITED STATES, CALGON CARBON CORPORATION, NORIT AMERICAS, INC., Defendants-Appellees**

**2014-1752, 2014-1753, 2014-1754, 2014-1756**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*2015 U.S. App. LEXIS 13626*; *37 Int'l Trade Rep. (BNA) 1482*

**August 3, 2015, Decided**

**NOTICE:** THIS DECISION WAS ISSUED AS UNPUBLISHED OR NONPRECEDENTIAL AND MAY NOT BE CITED AS PRECEDENT. PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [*1] Appeals from the United States Court of International Trade in Nos. 1:12-cv-00365-RKE, 1:12-cv-00372-RKE,1:12-cv-00377-RKE, 1:12-cv-00396-RKE, 1:12-cv-00401-RKE, Senior Judge Richard K. Eaton.
*Jacobi Carbons Ab v. United States, 992 F. Supp. 2d 1360, 2014 Ct. Intl. Trade LEXIS 67 (2014)*

**DISPOSITION:** AFFIRMED.

**COUNSEL:** DANIEL L. PORTER, Curtis, Mallet-Prevost, Colt & Mosle LLP, Washington, DC, argued for plaintiffs-appellants Jacobi Carbons AB, Jacobi Carbons, Inc. Also represented by CHRISTOPHER DUNN, JAMES P. DURLING, CLAUDIA DENISE HARTLEBEN.

KAVITA MOHAN, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, Washington, DC, argued for plaintiffs-appellants Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., et al. Also represented by FRANCIS J. SAILER, MARK PARDO, ANDREW THOMAS SCHUTZ.

NANCY NOONAN, Arent Fox, LLP, Washington, DC, for plaintiffs-appellants Carbon Activated Corporation, Car Go Worldwide, Inc.

GREGORY S. MENEGAZ, DeKieffer & Horgan, PLLC, Washington, DC, for plaintiff-appellant Tangshan Solid Carbon Co., Ltd. Also represented by JAMES KEVIN HORGAN, JOHN J. KENKEL.

ANTONIA RAMOS SOARES, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, [*2] REGINALD T. BLADES, JR.; DEVIN S. SIKES, Office of the Chief Counsel for Import Administration, United States Department of Commerce, Washington, DC.

ROBERT ALAN LUBERDA, Kelley Drye & Warren, LLP, Washington, DC, argued for defendants-appellees Calgon Carbon Corporation, Norit Americas, Inc. Also represented by DAVID A. HARTQUIST, JOHN M. HERRMANN.

**JUDGES:** Before MOORE, BRYSON, and CHEN, Circuit Judges. Opinion for the court filed by Circuit Judge MOORE. Dissenting opinion filed by Circuit Judge BRYSON.

**OPINION BY:** MOORE

**OPINION**

Moore, *Circuit Judge*.

Appellants Jacobi Carbons AB and Jacobi Carbons, Inc. (collectively, "Jacobi"); Ningxia Guanghua Cherishmet Activated Carbon Co. ("GHC"), Cherishmet Inc., Beijing Pacific Activated Carbon Products Co., Datong Municipal Yunguang Activated Carbon Co. ("Datong Municipal"), and Shanxi Industry Technology Trading Co. ("Shanxi") (collectively, "Cherishmet"); and Carbon Activated Corp., Car Go Worldwide, Inc., and Tangshan Solid Carbon Co. ("Tangshan") (collectively, "CAC") appeal the decision of the United States Court of International Trade ("CIT") sustaining the U.S. Department of Commerce's ("Commerce") Final Results in the fourth administrative review of the antidumping [*3] duty order on certain activated carbon from the People's Republic of China ("PRC") covering the period April 1, 2010 through March 31, 2011. For the reasons set forth below, we *affirm*.

BACKGROUND

Congress has provided for the imposition of antidumping duties on foreign merchandise sold, or likely to be sold, at less than fair value in the United States. *19 U.S.C. § 1673*. Commerce determines antidumping duties based on the amount by which the "normal value" of merchandise (its price in its home market) exceeds its "export price" (its price in the United States). *Id. §§ 1677(35)(A), 1677b(a)* (2012). For nonmarket economies like the PRC, Commerce calculates normal value based on "the value of the factors of production utilized in producing the merchandise and . . . an [added] amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id. § 1677b(c)(1)(B)*.

On April 27, 2007, Commerce issued an antidumping duty order covering certain activated carbon from the PRC. *Certain Activated Carbon from the People's Republic of China, 72 Fed. Reg. 20,988* (Dep't of Commerce Apr. 27, 2007). After receiving requests seeking administrative review of the order, Commerce initiated the subject review on May 27, 2011. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 76 Fed. Reg. 30,912, 30,913-16* (Dep't of Commerce May 27, 2011). Commerce [*4] selected appellants Jacobi Carbons AB and GHC as two of the mandatory respondents for individual examination during the administrative review. Appellants Shanxi, Datong Municipal, and Tangshan subsequently filed separate rate certifications.

Commerce published the preliminary results of the review on May 4, 2012. *Certain Activated Carbon from the People's Republic of China, 77 Fed. Reg. 26,496* (Dep't of Commerce May 4, 2012) ("*Preliminary Results*"). For the Preliminary Results, Commerce selected Thailand as the primary surrogate country and therefore used Thai data to calculate surrogate values for the respondents' factors of production. Commerce calculated weighted-average dumping margins of $1.49 per kilogram for Jacobi Carbons AB, $1.07 per kilogram for GHC, and $1.34 per kilogram for the separate rate companies.

Following publication of the Preliminary Results, the respondents placed additional data from the Philippines on the record and urged Commerce to use this data to value the major material inputs. *Jacobi Carbons AB v. United States, 992 F. Supp. 2d 1360, 1364 (Ct. Int'l Trade 2014)*. Commerce published the final results of the review and the accompanying Issues and Decision Memorandum on November 9, 2012. *Certain Activated Carbon from the People's Republic of China, 77 Fed. Reg. 67,337* (Dep't of Commerce Nov. 9, 2012) ("*Final Results*"); *Certain Activated* [*5] *Carbon from the People's Republic of China* A-570-904 (Issues and Decision Memorandum for the Final Results of the Fourth Antidumping Duty Administrative Review) (Dep't of Commerce Nov. 9, 2012) ("*Issues and Decisions Memorandum*") (J.A. 371-400). In the Final Results, Commerce selected the Philippines over Thailand as the primary surrogate country and used Philippine data, rather than Thai data, to calculate the surrogate values for many of the respondents' factors of production, including carbonized material and truck freight. In light of these

changes, Commerce calculated weighted-average dumping margins of $0.44 per kilogram for Jacobi Carbons AB, $2.11 per kilogram for GHC, and $1.04 per kilogram for the separate rate companies.

Appellants challenged the Final Results at the CIT, arguing that Commerce did not use the best available information when it calculated the surrogate values for carbonized material and truck freight. The CIT disagreed, finding that substantial evidence supported each of Commerce's surrogate value determinations. *Jacobi Carbons, 992 F. Supp. 2d at 1374, 1377*. Because the CIT found that substantial evidence supported Commerce's surrogate value determinations, it sustained the agency's separate rate calculation. [*6] *Id. at 1377*. This appeal followed. We have jurisdiction under *28 U.S.C. § 1295(a)(5)*.

## DISCUSSION

We review decisions of the CIT de novo, applying the same standard used by the CIT. *Downhole Pipe & Equip., L.P. v. United States, 776 F.3d 1369, 1373 (Fed. Cir. 2015)*. In antidumping duty proceedings, we uphold Commerce's determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." *19 U.S.C. § 1516a(b)(1)(B)(i)*. "Substantial evidence is more than a mere scintilla," and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. of N.Y. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)*. "Our review is limited to the record before Commerce in the particular review proceeding at issue," *Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1385 (Fed. Cir. 2014)*, and the burden of creating this record lies with the interested parties, not with Commerce, *QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011)*.

To determine the surrogate value for a factor of production from a nonmarket economy like the PRC, Congress directed Commerce to use the "best available information" from a comparable market economy country or countries. *19 U.S.C. § 1677b(c)(1)(B)*. "Commerce has broad discretion to determine what constitutes the best available information, as this term is not defined by statute." *Qingdao, 766 F.3d at 1386*. In doing so, it is Commerce's practice to choose, where possible, data that reflects a broad market average and is publicly available, contemporaneous with the [*7] period of review, specific to the input in question, and exclusive of taxes on

exports. *See QVD Food Co. v. United States, 721 F. Supp. 2d 1311, 1315, 34 Ct. Int'l Trade 1166 (Ct. Int'l Trade 2010), aff'd, 658 F.3d 1318 (Fed. Cir. 2011)*.

## I. Surrogate Value for Carbonized Material

Carbonized material is a material input used to produce activated carbon. To determine the surrogate value for carbonized material, Commerce considered two data sources: (1) Global Trade Atlas ("GTA") statistics for Philippine imports categorized under Harmonized Tariff Schedule ("HTS") 4402, "Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated," and (2) pricing data for coconut charcoal contained in *Cocommunity*, a monthly publication of the Asian and Pacific Coconut Community organization.[1] Commerce found that the *Cocommunity* data was flawed for two reasons. First, Commerce found the prices were not representative of the Philippines as a whole because the data was from the Visayas region of the Philippines. *Issues & Decision Memo*. at 18 (J.A. 388). Second, Commerce found that it was not clear whether the *Cocommunity* prices were tax and duty exclusive. *Id.* Commerce therefore used the Philippine import data from the GTA to calculate the surrogate value for carbonized material.

> 1   Commerce also considered a third data source not at issue on appeal consisting of [*8] Thai import statistics. *Issues & Decision Memo*. at 17 (J.A. 387).

Appellants argue that substantial evidence does not support Commerce's selection of the Philippine import data over the *Cocommunity* data. They argue the Philippine import data is flawed because it is less specific to the input in question than the *Cocommunity* data and because it results in an aberrationally high surrogate value compared to the surrogate value of carbonized material in prior reviews of the subject merchandise. Appellants also argue that the record did not support Commerce's criticisms of the *Cocommunity* data. Finally, appellants argue that by selecting the Philippine import data over the domestic Philippine *Cocommunity* data, Commerce violated its preference for using domestic data. Although a close case, substantial evidence supported Commerce's selection of the Philippine import data as the best available information.

### A. Specificity

Appellants argue that the Philippine import data is less specific to the carbonized material used to produce the subject merchandise than the *Cocommunity* data. To determine whether a data source is product specific, Commerce compares the products covered by the data source with the material input in question.

1. Material [*9] Input

The material input in question is carbonized material. The record shows that Jacobi's and Cherishmet's suppliers used carbonized material made from coal to produce the subject merchandise. J.A. 110, 133 (questionnaire responses from two of Jacobi's suppliers); J.A. 150, 155-56, 290-301 (Cherishmet's U.S. sales database during the period review); *see also* Jacobi's Br. 6. The record also shows that one of Jacobi's suppliers used carbonized material made from coconut shell charcoal to produce the subject merchandise, in addition to carbonized material made from coal. J.A. 111-15, 765-68. There is no evidence that any of Jacobi's or Cherishmet's suppliers used carbonized material made of wood to produce the subject merchandise.[2] Thus, it appears based on the record that the material input in question is carbonized material made of coal and coconut shell charcoal.

> 2 The CIT erred when it found that Jacobi and Cherishmet produced the subject merchandise during the period of review using carbonized material made of wood. *See Jacobi Carbons, 992 F. Supp. 2d at 1372-73*. Although it is possible to produce activated carbon using carbonized material made of wood, *id.* (citing J.A. 102, 260), the record indicates that Jacobi and Cherishmet [*10] used only carbonized material made from coal and coconut shell charcoal, not wood, to produce the activated carbon shipped to the United States during the review period, *see* J.A. 110-15, 133, 150, 155-56, 290-301, 765-68. The inputs used to produce the subject merchandise are the inputs most relevant to this review.

2. Data Sources

The *Cocommunity* data is limited to coconut shell charcoal, while the Philippine import data includes all imports to the Philippines categorized under HTS 4402, "Wood Charcoal (Including Shell or Nut Charcoal), Whether or Not Agglomerated"--a broader basket category consisting of carbonized material made from wood and coconut shell.

Appellants argue that the Philippine import data is not specific because there were no imports of coconut shell charcoal to the Philippines during the review period. Appellants contend that HTS 4402 consists of four subcategories, one of which--HTS 4402.00.00.01 ("Of Coconut Shell, Not Agglomerated")--covers coconut shell charcoal.[3] Jacobi's Br. 32; Cherishmet's Br. 30-31. Appellants further contend that the Philippine import data in the HTS 4402.00.00.01 subcategory indicates that there were zero imports of coconut shell charcoal to [*11] the Philippines during the review period. Thus, appellants argue that although in theory the Philippine import data includes coconut shell charcoal, the pricing data for the review period is limited to wood charcoal, not coconut shell charcoal. This is a new argument not made, in any meaningful or detailed sense, to Commerce below.

> 3 The other three categories that appellants contend make up HTS 4402 are 4402.00.00.02 ("Of Wood, Not Agglomerated"); 4402.00.00.03 ("Of Wood (Including of Shell or Not Agglomerated)"); and 4402.00.00.04 ("Other"). Jacobi's Br. 32; Cherishmet's Br. 30-31.

The unsupported, conclusory statement by Jacobi made below that there was "no data available for coconut shell charcoal from the Philippines imported under HTS 4402.00.10," J.A. 177, is insufficient. Jacobi presented Commerce with no evidence supporting the proposition that there were no imports of coconut shell charcoal to the Philippines during the period of review. Indeed, Jacobi incorrectly transcribed the HTS number, stating there was no data available for coconut shell charcoal from the Philippines under "HTS *4402.00.10*" instead of HTS *4402.00.00.01*, so Commerce could not verify Jacobi's claim. This [*12] is compounded by the fact that the record does not support appellants' claim that HTS 4402 consists of four ten-digit subcategories and that one of those subcategories is HTS 4402.00.00.01. Rather, the record indicates that HTS 4402 has only two subcategories, neither of which is limited to coconut shell charcoal: 4402.10.00 ("Of bamboo") and 4402.90.00 ("Other"). J.A. 255. Thus, Jacobi presented to Commerce a single conclusory sentence which inaccurately references an HTS category, with no record evidence or data to support its claim. Without any record evidence that there were zero imports of coconut shell charcoal to the Philippines during the period of review under HTS 4402.00.00.01, or even that HTS 4402.00.00.01 existed, Commerce could not evaluate Jacobi's statement that

there was "no data available for coconut shell charcoal from the Philippines." It was Jacobi's and Cherishmet's responsibility to build an adequate record before Commerce, so any failure of proof lies with them. *QVD Food, 658 F.3d at 1324.* We will not reverse Commerce's decision about the best available information on the basis of an argument not made and evidence not presented on the administrative record. *Qingdao, 766 F.3d at 1385* ("Our review is limited to [*13] the record before Commerce in the particular review proceeding at issue.").

### 3. Commerce's Past Practice

Appellants argue that Commerce's past practice demonstrates that coconut shell charcoal is a better match for coal-based carbonized material than the broader HTS 4402 category of wood charcoal. In past reviews of the instant antidumping duty order, Commerce found coconut shell charcoal comparable to coal-based carbonized material. For example, in the investigation to determine whether to impose antidumping duties on the subject merchandise, Commerce used coconut shell charcoal import data to value carbonized material because the "coconut shell charcoal value, although not identical to the coal-based carbonized material used by respondents, is comparable in that both products are a type of charcoal." *Certain Activated Carbon from the People's Republic of China* A-570-904 (Issues and Decision Memorandum for the Final Determination in the Antidumping Duty Investigation of Certain Activated Carbon from the PRC) (Dep't of Commerce Feb. 23, 2007) (J.A. 48). Similarly, during the first period of review, Commerce wrote:

> [C]oconut shell charcoal shares similar properties with carbonized material and . [*14] . . those similar properties are essential in the production of activated carbon. The expert's report found that coalbased carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in the production of activated carbon. Thus, in this instance, between the two alternative . . . HTS categories, "Other Cokes of Coal" and "Coconut Shell Charcoal," the Department determines that . . . "Coconut Shell Charcoal" results in a better, input-specific price for coal-based

carbonized materials.

Final Results of Redetermination Pursuant to Ct. Remand at 10-11, *Calgon Carbon Corp. v. United States*, No. 09-00524 (Ct. Int'l Trade July 26, 2011), ECF No. 36 (footnotes omitted) (J.A. 55-56). And during the third period of review, Commerce explained that because "coconut shell charcoal shares similar properties with carbonized material and . . . those similar properties are essential in the production of activated carbon," it would value carbonized material using imports categorized under HTS category "Coconut Shell Charcoal," instead of HTS category "Other Cokes of Coal." *Certain Activated Carbon from the People's Republic of China* A-570-904 (Issues and Decision Memorandum for the [*15] Final Results of the Third Antidumping Duty Administrative Review) (Dep't of Commerce Oct. 24, 2011) (J.A. 158-61).

In these prior analyses, Commerce was choosing between coconut shell charcoal and the HTS category "Other Cokes of Coal" to find a comparable surrogate for coal-based carbonized material. Commerce's determination that coconut shell charcoal is better than "Other Cokes of Coal" does not mean that coconut shell data is better than wood charcoal. Wood charcoal is also a type of charcoal and can also be used to create the subject merchandise. Thus for the same reasons articulated by Commerce in the earlier periods of review, wood charcoal would be a better surrogate than "Other Cokes of Coal." There are no express findings or comparisons between wood charcoal and coconut shell charcoal, and this record does not establish any such conclusions.

While coconut shell charcoal is more specific than "Other Cokes of Coal," the record does not compare coconut shell charcoal and wood charcoal. Commerce's past practice does not demonstrate that coconut shell charcoal is a better match for coal-based carbonized material than the broader Philippine import data category, which includes wood [*16] charcoal and coconut shell charcoal.

### 4. Conclusion

Here, the material input in question is carbonized material made of coal and coconut shell charcoal. With respect to the coconut shell subset of this material input, the *Cocommunity* data, which includes only coconut shell charcoal, is more specific than the Philippine import data,

which includes other forms of wood charcoal in addition to coconut shell charcoal. With regard to the carbonized material made of coal, which constitutes the bulk of the subject merchandise, there is no evidence on this record comparing wood charcoal and coconut shell charcoal. There are no findings nor have we been presented with record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal. Thus for the bulk of the imports at issue, there is no proof that coconut shell charcoal is a better surrogate. Neither of these data sources is specific to carbonized material made of coal and Commerce's past selection of coconut shell charcoal as the best available surrogate was based on a comparison with "Other Cokes of Coal," not wood charcoal. The imports at issue include coconut shell charcoal and coal-based [*17] carbonized material. Once again, we do not review Commerce's

determinations de novo. We cannot conclude on this record that Commerce's decision that both data sources were specific to the inputs in question was not supported by substantial evidence.

B. Aberrational Nature of Philippine Import Data

Cherishmet also faults the Philippine import data as aberrational compared to the surrogate values for carbonized material in prior reviews of the subject merchandise. During this period of review, Commerce calculated a price of $1,203.90 per metric ton of carbonized material based on the Philippine import data. Cherishmet asserts that Commerce priced the surrogate value of carbonized material much lower in prior reviews:

| Period of Review | Surrogate Value |
|---|---|
| 1st | $32.99/MT |
| | $66.256/MT (coconut shell charcoal); |
| 2nd | $435.62/MT (coal-based carbonized material) |
| 3rd | $83.45/MT |

Cherishmet's Br. 32-33 (citations omitted). It argues that the *Cocommunity* data, with a price of $255 per metric ton, maps more closely to Commerce's prior valuations of carbonized material than the Philippine import data, with a price almost five times as high.

The surrogate values presented by Cherishmet suggest that the Philippine import [*18] data is aberrational. And Commerce may opt to disregard data where there is record evidence that it is aberrational. Here, however, we cannot conclude that Commerce should have disregarded the Philippine import data as aberrational. The government argues that there is an explanation for the apparently aberrational nature of the Philippine import data. Commerce selected India as the surrogate country in the first three periods of review. *See* J.A. 733-35. In the fourth period of review, Commerce found that India was not at a comparable level of economic development to the PRC, and therefore selected a different surrogate country. *See id.; see also* J.A. 94-96.

Thus, the first three surrogate values were calculated with reference to a different level of economic development than the current surrogate value.

Looking at the table above, it is not entirely clear which measure is appropriate for comparison to determine whether the Philippine import data is aberrationally high. Commerce's price of $1203.90 is more than thirty times more than the surrogate value calculated for the first period of review ($32.99/MT) and nearly fifteen times higher than the surrogate value calculated for the third [*19] period of review ($83.45/MT). Both of these comparisons lead toward a conclusion that the Philippine import data is aberrational, and it seems unlikely that the switch from India to the Philippines could account for this dramatic change in pricing. However, in the second period of review, Commerce separated the pricing for coconut shell charcoal ($66.256/MT) and coal-based carbonized material ($435.62/MT). The price for coal-based carbonized material is an order of magnitude higher than

the price for coconut shell charcoal. Given that the bulk of the imports in question are produced using coal-based carbonized material, the price from this review is only 2.8 times higher than the surrogate value for coal-based carbonized material from the second period of review. Perhaps this disparity would have been enough to cause Commerce to reach a different conclusion regarding the best available information. Or perhaps Commerce would have concluded that the *Cocommunity* data for coconut shell charcoal, which was priced at $255/MT, was too low. Its prior determination during the second period of review that coal-based carbonized material was much more expensive than coconut shell charcoal may [*20] have only reinforced its conclusion here that the Philippine data was the best available information. We do not know how Commerce would have evaluated this complicated issue because it was not raised below.

Neither Jacobi nor Cherishmet presented any evidence or made any arguments that the Philippine import data was aberrational during the administrative review. This is another new argument made for the first time at the CIT on judicial review of Commerce's decision, not to Commerce itself. If all of the arguments made on appeal had been made to Commerce and the record made to support them, Commerce may well have reached a different conclusion regarding the best available information. We will not create a new record, entertain new arguments, and reverse Commerce on the basis of them.

## C. Regional Data

Jacobi argues that substantial record evidence does not support Commerce's determination that the *Cocommunity* data describes "regional" prices from a single state in the Philippines, not national prices. We disagree. The record shows that the *Cocommunity* data covers only a single region of the Philippines. The chart from which the *Cocommunity* data is taken indicates that the price of coconut [*21] shell charcoal is for "Philippines (Domestic), Visayas, Buyer." J.A. 191. The Visayas is one of three principal geographical regions of the Philippines. By contrast, other entries on the *Cocommunity* chart indicate that they are national, not regional. *Id.* (listing coconut shell charcoal from "Sri Lanka (Domestic)" and desiccated coconut from "Philippines (Domestic)"). This constitutes substantial record evidence that the *Cocommunity* data is regional, not national.

Appellants did not show in the record for this administrative review that the *Cocommunity* coconut shell charcoal prices are representative, despite being regional. *Jacobi Carbons, 992 F. Supp. 2d at 1369.* For example, the record does not show that the Visayas region is a substantial portion of the market for coconut shell charcoal or that prices in the Visayas are reflective of the national Philippine market. Without record evidence to the contrary, we conclude that substantial evidence supported Commerce's finding that the *Cocommunity* prices were less representative of a broad market average than the Philippine import data.

## D. Tax and Duty Exclusivity

Appellants challenge Commerce's finding that the *Cocommunity* data was flawed because there was no indication whether [*22] that data was free of taxes and duties. They argue that the burden lay on Commerce to show that the *Cocommunity* data was distorted by taxes and duties. The government disagrees. We need not resolve the parties' dispute here. Even if Commerce erred when it critiqued the *Cocommunity* data for lacking information about whether the prices were tax and duty exclusive, substantial evidence still supports the selection of the Philippines import data.

## E. Conclusion

Substantial evidence supports Commerce's selection of the Philippine import data to calculate the surrogate value for carbonized material. Commerce was forced to select between two flawed data sets, and selected the Philippine import data because it was product-specific, publicly available, reflected a broad market average, and was contemporaneous with the period of review.

Appellants fault Commerce for violating its preference for using domestic data when it selected the Philippine import data instead of the domestic *Cocommunity* data. Commerce determines what constitutes the "best available information" without reference to any such preference. *See Qingdao, 766 F.3d at 1386.* ("Commerce generally selects, to the extent practicable, surrogate values that are [*23] publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review."). At best, statements to the contrary indicate that Commerce prefers domestic prices over import prices "all else being equal." *Rhodia Inc. v. United States, 185 F. Supp. 2d 1343, 1352, 25 Ct. Int'l Trade 1278 (Ct. Int'l*

*Trade 2001).*

All else is not equal here. Both the *Cocommunity* data and the Philippine import data are flawed. Such is the nature of surrogate data, which is likely never a perfect substitute. The selection of a data source is highly situational and requires weighing numerous factors; no factor is necessarily more important than any other factor and no factor is necessarily dispositive. Commerce considered both data sets and determined that the Philippine import data constituted the best available information for determining the surrogate value for carbonized material on the administrative record for this review period. That Commerce may have found the *Cocommunity* the best available information in more recent periods of review does not mean that substantial evidence did not support Commerce's decision that the Philippine import data was the best available information. Commerce selects the best available information based on the record before it [*24] at the time of the decision, not a hypothetical record or the record created for other periods of review.

We may not agree with Commerce's selection, particularly in light of the evidence and arguments not made to Commerce. However, Jacobi and Cherishmet did not make these arguments or place this evidence before Commerce. We cannot say that Commerce's selection of the Philippine import data was unreasonable based on arguments made and the administrative record created by Jacobi and Cherishmet.

II. Surrogate Value for Truck Freight

Because Commerce selected Thailand as the primary surrogate country for the Preliminary Results, it initially based the surrogate value for truck freight on publicly available data from a Thai consulting company of the price to transport goods by truck from Bangkok to five other provinces in Thailand in 2005 ("Thai freight data"). *Preliminary Results, 77 Fed. Reg. at 26,505.* At the urging of appellants, Commerce selected the Philippines instead of Thailand as the primary surrogate country in the Final Results. It therefore based the surrogate value for truck freight on the average reported rate of transporting goods by truck in the Philippines from Manila to Legazpi City ("Philippine freight data"). [*25]

On appeal, Cherishmet and CAC argue that substantial evidence did not support Commerce's use of the Philippine freight data instead of the Thai freight data to calculate the surrogate value for truck freight. Specifically, Cherishmet and CAC criticize the Philippine freight data as (1) unrepresentative of a broad market average; (2) nonspecific to the actual transportation costs; and (3) aberrational compared to the surrogate value for truck freight calculated during other periods of review of the subject merchandise.

We disagree. It is true that the Philippine freight data, which Commerce calculated based on the cost of transporting goods over a single route, is less representative of a broad market average than the Thai freight data, which is based on ten different values representing the cost of transporting goods from Bangkok to five other Thai provinces. Although the Philippine freight data covers only a single route, it consists of data reported by multiple trucking companies. It is therefore broader than Cherishmet and CAC suggest. Furthermore, the Philippines is made up of many islands. A more representative sample would include overseas routes in addition to overland routes, [*26] and likely be less comparable to freight costs in the PRC.

Cherishmet and CAC argue that the Philippine freight data is not specific to actual transportation costs because it represents "loose cargo," while the respondents' shipments were containerized. Cherishmet's Br. 53 n.14; CAC's Br. 15. However, the record does not clearly show that the respondents' shipments were containerized. Cherishmet's invoice, which indicates that Cherishmet's products were shipped in a container, is for a shipment to the United States, not within the PRC. *See* J.A. 101 (packing slip with final address in New Jersey). It therefore does not speak to how Cherishmet's products were shipped within the PRC. And the fact that Commerce calculated a surrogate value for packaging materials does not mean that all of Cherishmet's and Jacobi's shipments were transported in containers. *See* J.A. 404-05.

Cherishmet and CAC also argue that the Philippine freight data is aberrational compared to the surrogate value for truck freight calculated during other periods of review of the subject merchandise. The surrogate value for freight calculated from the Philippine freight data is $0.3152 per metric ton per kilometer. Cherishmet's [*27] Br. 48. Cherishmet calculates the surrogate values for prior periods of review as follows:

| Period of Review | Surrogate Value |
|---|---|
| 1st | $0.0393/MT/km |
| 2nd | $0.0413/MT/km |
| 3rd | $0.0396/MT/km |

*Id.* at 47-48 (citations omitted). Cherishmet argues that the past surrogate values are more in line with the Thai freight data, which has a surrogate value of $0.0379 per metric ton per kilometer for truck freight. *Id.* at 48.

However, this argument was not made to Commerce during the review period, and Cherishmet and CAC point to no evidence in the administrative record supporting it. Furthermore, as discussed earlier, Commerce selected India as the surrogate country for past review periods of the subject merchandize, so the surrogate values cited by Cherishmet and CAC are based on the cost of transporting freight in India. *See* J.A. 733-35. It is not surprising that the cost of transporting goods by truck was higher in the Philippines than it was in India. The record does not support all of Cherishmet and CAC's critiques of the Philippine freight data.

Moreover, the Thai freight data is also flawed. First, the Thai freight data is dated August 8, 2005, more than four years before the period of review. J.A. 316-20. The Thai freight data is [*28] thus not contemporaneous with the period of review, unlike the Philippine freight data. Second, *19 C.F.R. § 351.408(c)(2)* provides that Commerce "normally will value all factors [of production] in a single surrogate country." Cherishmet and CAC do not challenge Commerce's selection of the Philippines as the surrogate country.

In summary, in selecting the surrogate value for truck freight, Commerce was faced with two imperfect data sources. Substantial evidence supported Commerce's selection of the contemporaneous, albeit less representative, Philippine freight data over the Thai freight data. Moreover, Commerce's selection of the Philippine freight data was in accord with its preference for valuing all factors of production from a single surrogate country.[4]

4   We need not address the arguments related to separate rate calculations as they are predicated

on the arguments regarding Commerce's choice of surrogate values for carbonized material and truck freight. Because we find that substantial evidence supports Commerce's calculation of the surrogate values for carbonized material and truck freight, we affirm the CIT's decision sustaining the Final Results.

CONCLUSION

We *affirm* the CIT's decision sustaining Commerce's [*29] Final Results.

**AFFIRMED**

**DISSENT BY:** BRYSON

**DISSENT**

BRYSON, *Circuit Judge*, dissenting.

I agree with the majority that it was permissible for the Commerce Department to use Thai data as the basis for selecting a surrogate value for truck freight. As to the use of Philippine import data as the basis for the surrogate value for the carbonized materials used in the production of the subject imports, however, I do not agree.

The majority concludes that the Department's decision can be upheld in light of the deference due to the agency in its valuation determinations and the plaintiffs' failure to preserve their claims of error below. I part company with the majority on both points.

1. Waiver

The majority holds that two of the plaintiffs' arguments have been waived because the plaintiffs failed to present evidence in support of those arguments to Commerce during the administrative review proceeding. The two arguments are (1) that the Philippine import data does not actually contain imports of coconut shell

charcoal during the review period, and (2) that the Philippine import data is aberrational compared to data used in previous administrative reviews.

The plaintiffs could no doubt have done a better job of making a [*30] record in this case on certain issues, such as whether the price listed in the Philippine publication *Cocommunity*, on which they rely, was a national price, rather than a regional price, and whether that price excluded duties and taxes. However, their failure to raise objections to the use of Philippine import data during the administrative review process is entirely understandable, because the Commerce Department did not indicate its intention to rely on that data at any point before issuing the final results in this case, at which point it was too late for the plaintiffs to object.

The Court of International Trade made exactly that point when it rejected the government's waiver argument below. The court said:

> [I]t was not until after the submission of the parties' case briefs that Commerce made its determination to select the Philippines as the primary surrogate country, and articulated its basis for its selection of sources to value carbonized material and truck freight (i.e., Philippine HTS 4402 and Cost of Doing Business). It is simply too much to ask of the parties to anticipate (1) that Commerce would change the surrogate country between the preliminary and Final Results, (2) the [*31] reasons that the Department would state for deciding to change surrogate countries, and (3) precisely how Commerce would value the various inputs. Under similar circumstances, it has been held that a party "is not required to predict that Commerce would accept other parties' arguments and change its decision." *Qingdao, 33 CIT at 1093, 637 F. Supp. 2d at 1237*. Accordingly, because plaintiffs had no realistic opportunity to present their arguments before the Department, the court finds that plaintiffs did not fail to exhaust their administrative remedies.

*Jacobi Carbons AB v. United States, 992 F. Supp. 2d*

*1360, 1367 (Ct. Int'l Trade 2014)*. Accordingly, I conclude that the two arguments the majority characterizes as inadequately preserved below have not been waived.

## 2. Aberrational Data

Notwithstanding its waiver ruling, the majority addresses the merits of the plaintiffs' contention that the Philippine import data is aberrational.

The government argues that any apparent aberration in the data can be explained by the fact that the first through third reviews used India as a surrogate country whereas the fourth review used the Philippines. The majority correctly rejects that argument, recognizing that it is "unlikely that the switch from India to the Philippines could account for [the] dramatic change in pricing." Nonetheless, [*32] the majority concludes that it was permissible for Commerce to disregard the discrepancy.

If we compare the surrogate values used in the various administrative reviews (including two more recent administrative reviews), it is clear the Philippine import data used in the administrative review at issue in this case departs wildly from the surrogate value relied on by Commerce in other administrative reviews in this case, so much so that it is highly suspect. Not only is the surrogate value derived from the Philippine import data much greater than the Indian data used in the first through third periods of review, but it is also significantly greater than the data used in the fifth and sixth periods of review, which used data from the Philippines.

The surrogate value of $1203.80 per metric ton is almost three times as high as the highest other surrogate value determined in any of the other periods of review, and it is more than fourteen times as high as the surrogate value for the immediately preceding period of review. Meanwhile, the *Cocommunity* data on which the plaintiffs rely (indicated by "CoCo" in the table below), showed a price of $255 per metric ton, which was much more in line [*33] with the surrogate values found in the prior and subsequent administrative reviews. While there might in some circumstances be an explanation for data that is as grossly anomalous as the Philippine import data, no such explanation appears in the record in this case.

| Period of Review | Surrogate Value |
|---|---|
| 1st | $32.99/MT |
| 2nd | $66.256/MT (coconut shell charcoal); |
| | $435.62/MT (coal-based carbonized material) |
| 3rd | $83.45/MT |
| 4th | $1,203.80/MT |
| CoCo | $255/MT |
| 5th | $391.67/MT |
| 6th | $346.25/MT |

### 3. Specificity

The plaintiffs argue that the *Cocommunity* data is more specific than the Philippine import data because the *Cocommunity* data relates to coconut shell charcoal, while the Philippine import data relates to "Wood Charcoal (Including Shell or Nut Charcoal)." The plaintiffs contend that coconut shell charcoal is comparable to the coal-based charcoals used by the Chinese manufacturers, and that wood-based charcoal is not comparable to coconut shell or coal-based charcoal. The majority rejects the plaintiffs' argument, finding that there is no express determination in the record that coconut shell charcoal is more comparable to coal-based charcoal than to wood charcoal. I believe the majority reads the available evidence too narrowly. [*34]

The majority quotes a statement made by Commerce before the trial court in a previous administrative review: "[C]oconut shell charcoal shares similar properties with carbonized material and . . . those similar properties are essential in the production of activated carbon. The expert's report found that coal-based carbonized materials used by Cherishmet and coconut shell charcoal are similar in porosity and adsorption, which are both properties essential in the production of activated carbon." Final Results of Redetermination Pursuant to Ct. Remand at 10-11, *Calgon Carbon Corp. v. United States*, No. 09-00524 (Ct. Int'l Trade July 26, 2011), ECF No. 36 (footnotes omitted). While that statement was used to justify the selection of coconut shell charcoal over "other cokes of coal," the statement is pertinent in this case

(where "other cokes of coal" are not involved) because it clearly states that coconut charcoal is comparable to coal-based charcoal. Because the evidence before Commerce established that coconut shell charcoal is comparable to coal-based charcoal, whereas the evidence does not show the same for wood-based charcoal, the *Cocommunity* data, which was directed to coconut shell charcoal, was more specific than the Philippine import data, which was [*35] directed to both wood-based charcoal and charcoal obtained from coconut shell.

### 4. Defects in the *Cocommunity* Data

Commerce found that the *Cocommunity* data was flawed in fundamental ways that rendered it unusable in determining surrogate value. The majority agrees. I do not regard the perceived flaws in the *Cocommunity* data as nearly so serious.

To begin with, it is true that the *Cocommunity* data is not a perfect match for the value of the carbonized materials used in the production of the plaintiffs' products. But data used to calculate surrogate value seldom is. By its nature, such data is intended to serve as an approximation--as the "best available information." *19 U.S.C. § 1677b(c)(1)*. In this case, however, the evidence fairly shouts that the Philippine import data used by the Commerce Department was not a good surrogate for the value of the carbonized materials used in manufacturing the subject imports. The flaws in the *Cocommunity* data are trivial in comparison.

The aberrational nature of the surrogate value selected by Commerce should have given Commerce

pause and caused it to evaluate the flaws it found in the competing *Cocommunity* data--that the *Cocommunity* price was not shown to be net of duties and [*36] taxes, and that the *Cocommunity* price was not shown to be a national price, as opposed to a regional price. Further consideration would have led Commerce to the following conclusions:

First, the *Cocommunity* price was necessarily exclusive of duties, since the price was for domestic product, not imported goods.

Second, there was no evidence before Commerce that the *Cocommunity* price included taxes, and Jacobi represented to Commerce that it did not. But even if, contrary to Jacobi's representations, the *Cocommunity* price included taxes, a higher price could only work to the detriment of the plaintiffs because it would increase the dumping margin, not reduce it. It does not make sense to refuse the plaintiffs' request to use the *Cocommunity* data on the ground that the data is subject to a flaw that might be prejudicial to them.

Third, the document from which the *Cocommunity* data was derived stated: "In the Philippines, the average price of coconut shall charcoal [for April 2010] was $230 [per metric ton]."[1] In the table that listed the prices, however, the reference to the Philippines was accompanied by a reference to "Visayas," which is a region of the Philippines. While the document suggests [*37] that the price was a national price, the reference to "Visayas" provides some support for Commerce's

conclusion that the *Cocommunity* price is limited to the Visayas region of the Philippines. Even accepting that view of the evidence, however, it is highly unlikely that the price in that region is significantly different from the "national" price, since the Visayas region, as the trial court observed, is one of the three principal geographical divisions of the Philippines, occupying the entire central portion of the country.

> 1  The evidence showed that the average price for the entire period of review was $255 per metric ton.

Finally, it is noteworthy that in the two subsequent administrative reviews (the fifth and sixth), Commerce selected the *Cocommunity* data over the Philippine import data, finding that the *Cocommunity* data was both representative (even though it referenced only a single region) and that it was exclusive of duties and taxes.

A fair view of the *Cocommunity* data thus shows that any flaws with that data are modest. In light of the serious doubts raised by the use of the Philippine import data that includes wood charcoal and that produced a price far in excess of any price [*38] used by Commerce in earlier or later reviews of this antidumping duty order, I would hold that it was unreasonable for Commerce to reject the use of the *Cocommunity* data in favor of the Philippine import data in calculating the surrogate value for the carbonized materials used in producing the subject imports. Accordingly, I respectfully dissent.

**FORM 30. Certificate of Service**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on ___September 17, 2015___
by:

        ☐ U.S. Mail

        ☐ Fax

        ☐ Hand

        ☒ Electronic Means (by E-mail or CM/ECF)

| Francis J. Sailer | /s/ Francis J. Sailer |
|---|---|
| Name of Counsel | Signature of Counsel |

| | |
|---|---|
| Law Firm | Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP |
| Address | 1201 New York Ave., NW, Ste. 650 |
| City, State, Zip | Washington, DC 20005 |
| Telephone Number | (202) 783-6881 |
| Fax Number | (202) 783-0405 |
| E-Mail Address | FSailer@GDLSK.COM |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields